**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TERRY BELK; DWAYNE COLLINS, on behalf of themselves and the class they represent,

*Plaintiffs-Appellants,*

WILLIAM CAPACCHIONE, Individually and on behalf of Christina Capacchione, a minor; MICHAEL P. GRANT; RICHARD EASTERLING; LAWRENCE GAUVREAU; KAREN BENTLEY; CHARLES THOMPSON; SCOTT C. WILLARD,

*Plaintiffs-Appellees,*

v.

THE CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; ERIC SMITH, Superintendent, in his official capacity; ARTHUR GRIFFIN, Chairman of the Charlotte-Mecklenburg School Board, in his official capacity,

*Defendants.*

UNITED STATES OF AMERICA; NORTH CAROLINA SCHOOL BOARDS ASSOCIATION; NATIONAL SCHOOL BOARDS ASSOCIATION,

*Amici Curiae.*

No. 99-2389

WILLIAM CAPACCHIONE, Individually and on behalf of Christina Capacchione, a minor; MICHAEL P. GRANT; RICHARD EASTERLING; LAWRENCE GAUVREAU; KAREN BENTLEY; CHARLES THOMPSON; SCOTT C. WILLARD,

*Plaintiffs-Appellees,*

and

TERRY BELK; DWAYNE COLLINS, on behalf of themselves and the class they represent,

*Plaintiffs,*

v.

THE CHARLOTTE-MECKLENBURG BOARD OF EDUCATION; ERIC SMITH, Superintendent, in his official capacity; ARTHUR GRIFFIN, Chairman of the Charlotte-Mecklenburg School Board, in his official capacity,

*Defendants-Appellants.*

UNITED STATES OF AMERICA; NORTH CAROLINA SCHOOL BOARDS ASSOCIATION; NATIONAL SCHOOL BOARDS ASSOCIATION,

*Amici Curiae.*

No. 99-2391

WILLIAM CAPACCHIONE, Individually
and on behalf of Christina
Capacchione, a minor; MICHAEL P.
GRANT; RICHARD EASTERLING;
LAWRENCE GAUVREAU; KAREN
BENTLEY; CHARLES THOMPSON; SCOTT
C. WILLARD,
                    *Plaintiffs-Appellees,*

                and

TERRY BELK; DWAYNE COLLINS, on
behalf of themselves and the class
they represent,
                            *Plaintiffs,*

                    v.                              No. 00-1098

THE CHARLOTTE-MECKLENBURG
BOARD OF EDUCATION; ERIC SMITH,
Superintendent, in his official
capacity; ARTHUR GRIFFIN, Chairman
of the Charlotte-Mecklenburg
School Board, in his official
capacity,
                    *Defendants-Appellants.*

UNITED STATES OF AMERICA; NORTH
CAROLINA SCHOOL BOARDS
ASSOCIATION; NATIONAL SCHOOL
BOARDS ASSOCIATION,
                        *Amici Curiae.*

WILLIAM CAPACCHIONE, Individually
and on behalf of Christina
Capacchione, a minor; MICHAEL P.
GRANT; RICHARD EASTERLING;
LAWRENCE GAUVREAU; KAREN BENTLEY;
CHARLES THOMPSON; SCOTT C.
WILLARD,
                    *Plaintiffs-Appellees,*

            and

TERRY BELK; DWAYNE COLLINS, on
behalf of themselves and the class
they represent,
                    *Plaintiffs,*

            v.                                    No. 00-1432

THE CHARLOTTE-MECKLENBURG
BOARD OF EDUCATION; ERIC SMITH,
Superintendent, in his official
capacity; ARTHUR GRIFFIN, Chairman
of the Charlotte-Mecklenburg School
Board, in his official capacity,
                    *Defendants-Appellants.*

UNITED STATES OF AMERICA; NORTH
CAROLINA SCHOOL BOARDS
ASSOCIATION; NATIONAL SCHOOL
BOARDS ASSOCIATION,
                    *Amici Curiae.*

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-97-482-3-P, CA-65-1974-3-P)

Argued: February 27, 2001

Decided: September 21, 2001

Before WILKINSON, Chief Judge, and WIDENER, WILKINS,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, KING, and GREGORY, Circuit Judges.

Affirmed in part and reversed in part by published opinions. A per curiam opinion announced the judgment of the court. Judge Traxler delivered the opinion of the court with respect to Parts I, II, IV, and V, in which Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, and Williams joined, and an opinion with respect to Parts III and VI, in which Judges Wilkins and Williams joined. Chief Judge Wilkinson wrote an opinion concurring in part in which Judge Niemeyer joined. Judge Widener wrote an opinion concurring in part and dissenting in part. Judge Luttig wrote an opinion concurring in the judgment in part and dissenting from the judgment in part. Judges Motz and King wrote a separate opinion in which Judges Michael and Gregory joined.

---

## COUNSEL

**ARGUED:** Stephen Luke Largess, James Elliot Ferguson, II, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina; John W. Borkowski, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellants. Allan Lee Parks, PARKS, CHESIN & MILLER, P.C., Atlanta, Georgia, for Appellees. **ON BRIEF:** John W. Gresham, C. Margaret Errington, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina; Elaine R. Jones, Director-Counsel, Norman J. Chachkin, Gloria J. Browne, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York; Allen R. Snyder, Maree Sneed, HOGAN & HARTSON, L.L.P., Washington, D.C.; James G. Middlebrooks, Irving M. Brenner, Amy Rickner Langdon, SMITH, HELMS, MULLISS & MOORE, L.L.P., Charlotte, North Carolina; Leslie Winner, General Counsel, CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, Charlotte, North Carolina, for Appellants. Kevin V. Parsons, PARKS, CHESIN & MILLER, P.C., Atlanta, Georgia; John O. Pollard, MCGUIRE, WOODS, BATTLE & BOOTHE, Charlotte, North Carolina; William S. Helfand, MAGENHEIM, BATEMAN, ROBINSON, WROTENBERY & HELFAND, Houston, Texas; Thomas J. Ashcraft, Charlotte, North Carolina, for Appellees. Bill Lann Lee, Acting Assistant Attorney General, Mark L. Gross, Rebecca K. Troth, UNITED STATES DEPARTMENT OF JUSTICE, Washington,

D.C., for Amicus Curiae United States. Michael Crowell, Lisa Luka-sik, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina; Allison B. Schafer, General Counsel, NORTH CAROLINA SCHOOL BOARDS ASSOCIATION, Raleigh, North Carolina; Julie K. Underwood, General Counsel, NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, for Amici Curiae Associations.

## OPINION

PER CURIAM:

This case was argued before the en banc Court on February 27, 2001. The parties presented a number of issues for our consideration, including whether the district court erred in (1) finding that unitary status had been achieved and awarding attorneys' fees to plaintiff-intervenors based on this finding; (2) holding that the establishment of a magnet schools program was an ultra vires, unconstitutional act justifying an award of nominal damages and attorneys' fees; (3) enjoining the Charlotte-Mecklenburg School Board from considering race in the future assignment of students or allocation of educational resources; and (4) sanctioning the Board for failing to comply with the district court's discovery order.

Having considered the briefs and arguments of the parties, a majority of the Court holds: (1) by a 7-4 vote (Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, Luttig, Williams and Traxler in the affirmative), the school system has achieved unitary status, but by a 6-5 vote (Chief Judge Wilkinson and Judges Niemeyer, Michael, Motz, King and Gregory in the affirmative) attorneys' fees for work done on the unitary status issue are denied; (2) by a 6-5 vote (Chief Judge Wilkinson and Judges Niemeyer, Michael, Motz, King, and Gregory in the affirmative), the Board did not forfeit its immunity for the establishment of the magnet schools program, and nominal damages and attorneys' fees in that regard are denied; (3) by a unanimous vote, the injunction is vacated; and (4) by a unanimous vote, the imposition of sanctions is affirmed.

The judgment of the district court is therefore affirmed on the finding of unitary status and the imposition of sanctions, reversed as to

the finding of liability for nominal damages for the establishment of the magnet schools program, reversed as to the imposition of attorneys' fees for any reason, and reversed on the issuance of the injunction.

Unitary status having been achieved, the judgment of the district court vacating and dissolving all prior injunctive orders and decrees is affirmed. The Board is to operate the school system without the strictures of these decrees no later than the 2002-2003 school year.

*AFFIRMED IN PART AND REVERSED IN PART*

TRAXLER, Circuit Judge:

This case is hopefully the final chapter in the saga of federal court control over the Charlotte-Mecklenburg Schools ("CMS"). Since 1971 CMS has operated under a federally supervised desegregation plan that included limited use of racial ratios, pairing and grouping of school zones, and extensive busing. So successful was the plan that the district court removed the case from the active docket in 1975, expressing its belief that the once reluctant school board was committed to achieving desegregation and was already well on the way toward a unitary school system. Since then, two generations of students have passed through CMS and, until the present case, not one person has returned to court alleging that segregative practices have been continued or revived.

Now, nearly three decades later and prompted by a lawsuit filed by a white student challenging the magnet schools admissions policy, the question of whether CMS has achieved unitary status has been placed before our courts. In 1999, the district court, after a lengthy hearing and searching inquiry, concluded that CMS had indeed achieved unitary status by eliminating the vestiges of past discrimination to the extent practicable. This conclusion was not reached in haste; it was the result of a two-month hearing and an examination of extensive testimony and evidence relating to every aspect of CMS's educational system.

A majority of this court now affirms the district court's holding on this issue, satisfied that CMS has dismantled the dual school system.

In sharp contrast to the situation in the late 1960s, when black students were segregated in black schools and taught by a predominantly black staff, CMS students today are educated in an integrated environment by an integrated faculty. Nor do we turn over control to an indecisive and uncommitted school board. CMS currently operates under the firm guidance of an integrated school board which has clearly demonstrated its commitment to a desegregated school system.

In sum, the "end purpose" of federal intervention to remedy segregation has been served, and it is time to complete the task with which we were charged—to show confidence in those who have achieved this success and to restore to state and local authorities the control of their school system. Consequently, a majority of this court affirms the district court's unitary status determination.

However, while a majority of my colleagues agree that CMS has achieved unitary status, and have graciously joined me on this point, I respectfully depart from a separate majority's decision to reverse the district court's holding that CMS's magnet schools program, which was implemented in 1992, was an ultra vires, unconstitutional act justifying an award of nominal damages and attorney fees. By denying children, on account of their race, an equal opportunity to compete for open, *unclaimed* slots in CMS's extraordinary magnet program, I believe the school board pushed too far and did more than either was required or permitted. Just as the educational process of the 1960s unconstitutionally deprived black children of educational opportunities *solely* on account of their race, the magnet schools admissions policy deprives white children of educational opportunities *solely* on account of their race. Consequently, I depart from the separate majority in that I would affirm the district court's conclusion that the magnet schools program violated the Equal Protection Clause of the Fourteenth Amendment and the liability of the school board for the violation.

### I.

In 1896, the Supreme Court upheld a Louisiana statute "providing for separate railway carriages for the white and colored races." *Plessy v. Ferguson*, 163 U.S. 537, 540 (1896). The *Plessy* majority charac-

terized the statute as "not necessarily imply[ing] the inferiority of either race," *id.* at 544, but the first Justice Harlan, in dissent, aptly described the true aim of the law: "Everyone knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons," *id.* at 557 (Harlan, J., dissenting). Justice Harlan further "den[ied] that any legislative body or judicial tribunal may have regard to the race of citizens when the civil rights of those citizens are involved." *Id.* at 554-55 (Harlan, J., dissenting). Unfortunately, the principle of "separate but equal" reached much farther than Louisiana railways, and was applied to other public services, including education. The march of progress eventually proved the correctness of Justice Harlan's principled stand. Segregation, in all of its manifestations, was "arbitrary" and "wholly inconsistent with the civil freedom and the equality before the law established by the Constitution." *Id.* at 561-62 (Harlan, J., dissenting).

Early efforts aimed at combating the injustice wrought by *Plessy* in educational settings often centered on state-funded graduate and professional schools. *See, e.g.*, *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938); *see generally* Mark V. Tushnet, *The NAACP's Legal Strategy Against Segregated Education 1925-1950* (1987). In *Gaines*, an African-American student was denied admission to the University of Missouri School of Law on account of his race. Missouri had no "separate but equal" law school for its African-American citizens and instead offered to pay Gaines' tuition and expenses for a legal education in another state. The Supreme Court held that Missouri's offer denied Gaines equal protection of the laws. The Court observed that "[t]he admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State." *Gaines*, 305 U.S. at 349. Though providing only small victories, cases like *Gaines* exposed "separate but equal" for the untenable proposition that it was.

In 1954, the Supreme Court recognized the futility of measuring equality in segregated facilities. *See Brown v. Board of Educ.*, 347 U.S. 483 (1954) (*Brown I*). Presented with a direct attack on *Plessy* in a secondary education case, the Court held that "segregation of

children in public schools solely on the basis of race" violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 493. The Court emphasized that an educational "opportunity, where a state has undertaken to provide it, is a right which must be made available to all on equal terms." *Id.* Recognizing that segregation differed from locality to locality, the Supreme Court subsequently declined to craft a broad, one-size-fits-all remedy, and instead instructed the federal district courts to oversee the implementation of appropriate relief based on the dictates of local circumstances. *See Brown v. Board of Educ.*, 349 U.S. 294, 299 (1955) (*Brown II*) ("Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform th[e] judicial appraisal."). The district courts were directed to make use of the "traditional attributes of equity power," *id.* at 300, to ensure that students were "admit[ted] to public schools on a racially nondiscriminatory basis," *id.* at 301. However, under the *Brown* opinions it was unclear whether a school district was required to take affirmative steps to remedy the constitutional violation, *see, e.g.*, *Briggs v. Elliott*, 132 F. Supp. 776, 777 (E.D.S.C. 1955) (holding that *Brown* merely prohibited school districts from using the force of law to separate the races), and very little progress resulted.

Before the Supreme Court provided further guidance to the lower federal courts, in 1965 the *Swann* plaintiffs, who were the original class action plaintiffs representing the interests of African-American children in the district, challenged as constitutionally inadequate the efforts of CMS in complying with *Brown*. The school district's desegregation plan was based on freedom of choice whereby "any child, without regard to race, and without regard to minority or majority of race in any particular school, might freely transfer to another school of his choice." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 243 F. Supp. 667, 668 (W.D.N.C. 1965). The district court approved the plan, observing that more could be done "to increase mixing of the races," but that the law imposed "no such duty upon . . . the School Board." *Id.* at 670.

Concerned at the slow pace of school desegregation throughout the nation, the Supreme Court held in 1968 that school boards had an "affirmative duty" to end the state-imposed dual system of education. *Green v. County Sch. Bd.*, 391 U.S. 430, 437 (1968). The Justices

underscored that "in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself." *Id.* at 440. The *Swann* plaintiffs then filed in the district court a motion for further relief "seek[ing] greater speed in desegregation of the Charlotte-Mecklenburg schools, and request[ing] elimination of certain other alleged racial inequalities." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 300 F. Supp. 1358, 1360 (W.D.N.C. 1969). The district court, guided by the mandate of *Green*, *see Swann*, 300 F. Supp. at 1362, made a number of factual findings and concluded that the school district remained highly segregated.

The district court noted that over half of CMS's 24,000 African-American students "attend schools that are all black, or very nearly all black, and most of the 24,000 have no white teachers." *Id.* at 1360. However, the court found no violations "in the use of federal funds; the use of mobile classrooms; quality of school buildings and facilities; athletics; PTA activities; school fees; free lunches; books; elective courses; nor in individual evaluation of students." *Id.* at 1372.

The district court directed CMS to submit "a positive plan for faculty desegregation effective in the fall of 1969, and a plan for effective desegregation of pupil population, to be predominantly effective in the fall of 1969 and to be completed by the fall of 1970." *Id.* at 1360. The board procrastinated, but eventually submitted an enervated desegregation plan that the district court approved "with great reluctance" on a temporary basis. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 306 F. Supp. 1291, 1298 (W.D.N.C. 1969). CMS officials, however, continued to drag their feet, and the district court was forced to appoint its own expert, Dr. John A. Finger, to craft an efficacious desegregation plan. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 311 F. Supp. 265 (W.D.N.C. 1970). Dr. Finger's plan, adopted by the district court, included limited use of mathematical ratios, pairing and grouping of school zones, and busing. *See id.* We affirmed a portion of the plan, but vacated provisions dealing with the busing of elementary school students because of the perceived burdens on small children and the cost of purchasing new buses. *See Swann v. Charlotte Mecklenburg Bd. of Educ.*, 431 F.2d 138, 147 (4th. Cir. 1970) (en banc). We remanded "for reconsideration of the assignment of pupils in the elementary schools." *Id.* The Supreme Court granted certiorari and reinstated the district court's plan pending further proceedings. *See Swann v. Charlotte-Mecklenburg Bd. of*

*Educ.*, 399 U.S. 926 (1970). The district court conducted eight days of hearings and examined five different desegregation plans. The district court concluded the Finger plan to be the best of the five, encompassing "a reasonable . . . collection of methods for solving the problem" of the dual system. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 318 F. Supp. 786, 800 (W.D.N.C. 1970). As for busing and the cost of new buses, the district court found that the Finger plan took "proper advantage of traffic movement" and that new buses would cost only $660,000, a far cry from the millions of dollars that CMS had originally estimated. *See id.* at 797-98. Two months later, the Supreme Court granted certiorari and undertook an in-depth review of the power of the federal district courts to craft such sweeping desegregation remedies. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971).

The Supreme Court affirmed the desegregation plan adopted by the district court, and in the course of its opinion identified and offered guidance in "four problem areas." *Id.* at 22. First, the Court addressed the issue of the district court's use of racial ratios. While the Supreme Court approved of a limited use of mathematical ratios in a plan crafted by a district court, it emphasized that such ratios were "a starting point . . . rather than an inflexible requirement." *Id.* at 25. The Court reminded district courts that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Id.* at 24. Second, the Court dealt with single-race schools. Though the Court concluded that schools consisting of predominantly one race were not per se unconstitutional, the Court instructed the district courts to utilize "close scrutiny to determine that school assignments are not part of state-enforced segregation." *Id.* at 26. Third, the Court considered alterations of attendance zones. The Court held "that the pairing and grouping of noncontiguous school zones is a permissible tool," *id.* at 28, but declined to craft "rigid rules" in light of differing local circumstances, *id.* at 29. Finally, the Court tackled the busing issue. The Court confirmed that a district court could order "bus transportation as one tool of school desegregation," but within reasonable time and distance restrictions. *Id.* at 30.

Shortly after the Supreme Court issued its landmark *Swann* opinion, CMS asked the district court to abandon the Finger plan and per-

mit the substitution of a "feeder plan" whereby schools would draw pupils from designated attendance areas in an effort to keep children together for their entire public school career. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 328 F. Supp. 1346 (W.D.N.C. 1971). Citing concerns of resegregation and the placement of additional burdens on African-American children, the district court questioned the feeder plan. *See id.* at 1350-53. CMS then withdrew its original feeder plan and began work on a modified version. *See id.* at 1353. The district court eventually approved a revised feeder plan that reopened several former black schools and prevented over- and under-utilization of facilities. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 334 F. Supp. 623 (W.D.N.C. 1971).

However, within just two years it became clear that CMS's revised feeder plan was inadequate "for dealing with foreseeable problems" in the dismantling of the dual system. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 362 F. Supp. 1223, 1229 (W.D.N.C. 1973). The district court found "that various formerly black schools and other schools will turn black under the feeder plan," *id.*, and that "[r]acial discrimination through official action has not ended in this school system," *id.* at 1230. The district court again instructed CMS to design a new pupil assignment plan "on the premise that equal protection of laws is here to stay." *Id.* at 1238.

In 1974 CMS adopted and the district court approved new guidelines and policies for pupil assignment. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 379 F. Supp. 1102 (W.D.N.C. 1974). The plan was designed by a citizens advisory group working with the board in an effort to reach "an acceptable consensus" on school desegregation in CMS. *Id.* at 1103. The plan's most promising features were the avoidance of any majority black schools (with the exception of Hidden Valley, an exempted school), and a more equal distribution of the busing burden. *See id.* at 1105 1110. Praising the board for making "a clean break with the essentially 'reluctant' attitude which dominated Board actions for many years," the district court predicted that the policies and positive attitude would eventually result in a unitary school system. *Id.* at 1103.

The district court closed *Swann* in 1975 and removed the case from the active docket. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*,

67 F.R.D. 648 (W.D.N.C. 1975). In so doing, the district court observed that the board was "actively and intelligently addressing" recurrent problems related to dismantlement of the dual system. *Id.* at 649. The district court was so satisfied with the progress being made that it questioned whether it would ever be confronted with a motion to reopen the litigation. *See id.*

For three years there was no action in the case. This changed in 1978 when a group of white parents sought to enjoin CMS from reassigning over 4000 students in an effort to maintain racial balance in certain schools. *See Martin v. Charlotte-Mecklenburg Bd. of Educ.*, 475 F. Supp. 1318 (W.D.N.C. 1979). The parents attacking the 1978 student assignment plan "offered no live evidence but offered and relied upon a few written exhibits and admissions from the pleadings." *Id.* at 1321. Not surprisingly, the district court rejected the parents' challenge to the student assignment plan and praised CMS for its zeal in dismantling the dual system.

In 1980, CMS and the *Swann* plaintiffs again returned to the district court. The parties informed the district court that the African-American student population in CMS's elementary schools had grown from twenty-nine percent to forty percent, making it difficult to avoid predominantly black student bodies. To provide the board with some flexibility, the district court permitted operation of elementary schools with African-American student bodies of plus fifteen percent above the district-wide average. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, No. 1974 (W.D.N.C. Apr. 17, 1980).

Since 1980, neither the board nor the *Swann* plaintiffs have approached the district court regarding alteration of the earlier desegregation orders. And, until the present litigation, the *Swann* plaintiffs have never attempted to reopen the case in order to address any alleged failure by the board to comply with the district court's desegregation orders.

The controversy before us today arose in September 1997 when William Capacchione ("Capacchione") filed suit against CMS on behalf of his daughter, Cristina, alleging that she had been unconstitutionally denied admission to a magnet school program on account of her race. In 1992, without prior court approval, CMS had adopted a

desegregation plan focused mainly on the use of magnet schools. In filling magnet schools, CMS had instituted a black and a non-black lottery to achieve racial balance. If a sufficient number of blacks or whites did not apply and fill the seats allotted to their respective races, then CMS would actively recruit children of the desired race despite lengthy waiting lists made up of children of the other race. If the recruitment drive failed, CMS usually left the available slots vacant. Cristina, who is white, was placed on a waiting list and eventually denied admission to a program at the Olde Providence magnet school, which CMS marketed as "a school to benefit everyone." J.A. XXXII-15,670.

The original *Swann* plaintiffs moved to reactivate *Swann* and to consolidate it with Capacchione's suit. They asserted that the vestiges of the dual school system had not been abolished and that the use of race in the magnet admissions policy was necessary for the school district to comply with the prior desegregation orders. The district court granted the motion and later permitted Capacchione to intervene in the *Swann* litigation. Seeking a finding that CMS had eradicated the vestiges of past discrimination, another group of parents, led by Michael P. Grant ("Grant"),[1] was also permitted to intervene in the litigation.

After a two-month bench trial, the district court determined that CMS had achieved unitary status, that the race-based admissions policy for CMS's magnet schools fell outside prior orders and was not narrowly tailored to achieve a compelling state interest, and that an injunction was warranted. The district court "enjoin[ed] CMS from any further use of race-based lotteries, preferences, and set-asides in student assignment." *Capacchione v. Charlotte-Mecklenburg Sch.*, 57 F. Supp. 2d 228, 292 (W.D.N.C. 1999). Citing interests in stability, the district court concluded that the injunction would not affect student assignments for the 1999-2000 school year, but would apply to student assignments for the 2000-2001 school year. *See id.* at 292 n.52. The district court awarded Capacchione nominal damages in recognition of the constitutional violation and also awarded the plaintiff-intervenors attorney fees. CMS and the *Swann* plaintiffs filed

---

[1]Those represented by Capacchione and Grant will be referred to as the "plaintiff-intervenors."

notices of appeal, and CMS moved to stay the injunction, except as applied to the magnet schools, until the 2001-02 school year. The *Swann* plaintiffs moved for a complete stay pending appeal. On November 15, 1999, the district court denied the motions. CMS and the *Swann* plaintiffs, pursuant to Federal Rule of Appellate Procedure 8(a)(2), moved this court for a stay. On December 30, 1999, we stayed the district court's injunction pending further order of this court.

After briefing and appellate arguments, a divided panel of this court vacated and remanded the district court's unitary status determination, holding that the district court's findings were insufficient in the areas of student assignment, facilities and resources, transportation, and student achievement. As for CMS's magnet schools admissions policy, the panel held that the policy was specifically permitted by prior court orders and that the policy did not violate the Constitution. The panel also vacated the district court's injunction, the award of nominal damages, and the award of attorney fees. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 233 F.3d 232 (4th Cir. 2000). A majority of the active circuit judges thereafter voted to hear this appeal en banc.

## II.   Unitary Status

The district court's unitary status finding is reviewed for clear error. *See Riddick v. School Bd.*, 784 F.2d 521, 533 (4th Cir. 1986); Fed. R. Civ. P. 52(a). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir. 1984). In clarifying the clearly erroneous standard, the Supreme Court has explained:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). The Supreme Court also stressed that even when appellate review is based primarily on documentary evidence, the clearly erroneous standard of review remains the same. *See id.* at 574. So long as the district court's unitary status determination rests on a permissible view of the evidence, it must be affirmed.

The Supreme Court has declined to define or provide a "fixed meaning" for the term "unitary." *Freeman v. Pitts*, 503 U.S. 467, 487 (1992). However, in light of the aim of *Brown I*, which was "the elimination of state-mandated or deliberately maintained dual school systems," *Milliken v. Bradley*, 418 U.S. 717, 737 (1974) (*Milliken I*), a school system must be declared unitary when it no longer discriminates between children on the basis of race, *see Green*, 391 U.S. at 442. The burden of proof falls on the party seeking an end to court supervision. *See Freeman*, 503 U.S. at 494.

In undertaking a unitary status inquiry, a court must ask "whether the Board ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Board of Educ. v. Dowell*, 498 U.S. 237, 249-50 (1991). Implicit in the Supreme Court's use of the term "practicable" is "a reasonable limit on the duration of . . . federal supervision." *Coalition to Save Our Children v. State Bd. of Educ.*, 90 F.3d 752, 760 (3d Cir. 1996); *see also Dowell*, 498 U.S. at 247 ("From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination."). Hence, the goals of a desegregation order not only encompass a remedy for the violation, but also prompt restoration of local control. *See Freeman*, 503 U.S. at 490 ("Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. . . . Where control lies, so too does responsibility."); *Milliken I*, 418 U.S. at 741-42 ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.").

Among the most important reference points in determining whether a school board has fulfilled its duties so that local control may be

resumed are the factors set out in *Green*: student assignment, faculty assignment, facilities and resources, transportation, staff assignment, and extracurricular activities. *See Green*, 391 U.S. at 435. In its discretion, a court conducting a unitary status hearing may consider other relevant factors not mentioned in *Green*. *See Freeman*, 503 U.S. at 492. We address the district court's consideration of each factor in turn, but only to determine whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573-74.

### A.    Student Assignment

Student assignment is perhaps the most critical *Green* factor because state-mandated separation of pupils on the basis of race is the essence of the dual system. *See Freeman*, 503 U.S. at 474 (observing that the issue of student assignment is "fundamental" because "under the former de jure regimes racial exclusion was both the means and the end of a policy motivated by disparagement of . . . the disfavored race"). To determine whether a school was racially balanced or imbalanced, the district court adopted a plus/minus fifteen percent variance from the district-wide ratio of black to white students. *See Capacchione*, 57 F. Supp. 2d at 246. However, the district court emphasized "that there is no level of compliance with the standard that is determinative." *Id.* When schools are outside the variance, a "reasonable and supportable explanation[ ]" will suffice. *Id.*

The district court did not err in adopting a plus/minus fifteen percent variance. Considering that the only variance ever approved by the district court in the course of the *Swann* litigation was a "'plus 15%' from the district-wide average," *id.* at 245, the addition of a minus fifteen percent is reasonable. Moreover, the Supreme Court has permitted a "limited use . . . of mathematical ratios" by district courts, *Swann*, 402 U.S. at 25, and much higher variances have been used to define desegregation, *see Manning v. Hillsborough County Sch. Bd.*, 244 F.3d 927, 935 (11th Cir. 2001) (using a plus/minus twenty percent variance); *see generally*, David J. Armor, *Forced Justice: School Desegregation and the Law* 160 (1995) (observing that in over seventy percent of the school districts with desegregation plans where racial balance is measured by numerical standards, a variance of

plus/minus fifteen percent or greater is used).**²** In sum, the plus/minus fifteen percent variance is clearly within accepted standards, and provides a reasonable starting point in the unitary status determination.

### 1.   CMS's Compliance Record

The district court began by observing that since 1970, of the 126 schools in operation, "only twenty schools (16%) have had black student bodies higher than 15% above the district-wide ratio for more than three years, and only seventeen schools (13%) have had black student bodies lower than 15% below the district-wide ratio for more than three years." *Capacchione*, 57 F. Supp. 2d at 248 (footnote omitted). In addition, the district court found that CMS has not operated a single-race school since 1970. *See id.*

The district court also turned to two desegregation indices: the dissimilarity index and the index of interracial exposure. The former "measures the degree of racial imbalance, and it is derived by comparing the racial composition of each school to the districtwide composition," J.A. XXXIII-16,172, and the latter measures "the average percent white in schools attended by black students, weighted by the proportion of black students in each school." J.A. XXXIII-16,172. According to the report of the plaintiff-intervenors' expert witness, Dr. David J. Armor, a dissimilarity value of twenty or below signifies

---

**²**At trial, Dr. Eric Smith, the current superintendent of CMS, testified that unitary status depended on every school being in balance. *See* J.A. XV-7187 & 7239. This is not the law. *See Swann*, 402 U.S. at 24 ("The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.").

We find equally erroneous the *Swann* plaintiffs' assertion at appellate argument before the panel that "[t]he issue of how many schools are balanced has never been a question in this case." App. Tr. 91. The racial composition of schools goes to the heart of a desegregation case, and is very much key to a review of the district court's declaration of unitary status. *See Swann*, 311 F. Supp. at 268 (ordering CMS to assign pupils "in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students").

"a highly balanced school system" and a score under thirty signifies "a substantially desegregated system." J.A. XXXIII-16,172. CMS's dissimilarity score was sixteen in 1980 and twenty-six in 1995. From this it is clear that CMS quickly desegregated in the 1970s and continues to maintain a "substantially desegregated system." The dissimilarity index also indicates that CMS has better racial balance than several comparable districts did when they were declared unitary. *See* J.A. XXXIII-16,173.

The index of interracial exposure, like the dissimilarity index, shows that CMS has made great leaps of progress. A score of zero on the exposure index signifies total segregation, while a score of fifty or above indicates a "highly desegregated system." J.A. XXXIII-16,172. Schools in CMS typically score above fifty, whereas before the desegregation order the schools' scores hovered near twenty or below. *See* J.A. XXXIII-16,194-96.

CMS and the *Swann* plaintiffs correctly point out that the data suggest that in recent years racial imbalance has increased in some schools. Aware of this trend, the district court made a number of findings on growth and demographic change in the Charlotte-Mecklenburg area. The most revealing findings are as follows:

- the county population has increased from 354,656 in 1970 to 613,310 in 1997

- in 1970 the school district was the forty-third largest in the nation and is today the twenty-third largest

- among cities with more than 500,000 people, Charlotte ranks second in population growth in the 1990s

- the racial composition of the county has changed from seventy-six percent white and twenty-four percent black in 1970 to sixty-eight percent white, twenty-seven percent black, and five percent other in 1997

- the current racial composition of schoolchildren is fifty percent white, forty-two percent black, and eight percent other

- as the county has become more suburban the inner city and nearby suburbs have lost large numbers of white res-

idents as they spread farther out into the formerly rural sections of the county

- some middle suburban communities that were once all white are now predominately black

- the rural black population in the southern part of the county has remained relatively constant while the white population has tripled because of suburbanization

*See Capacchione*, 57 F. Supp. 2d at 236-39. These findings are supported by the report of the plaintiff-intervenors' expert in demographics, Dr. William Clark. *See* J.A. XXXIII-16230-306. Accordingly, the district court concluded that "[t]here can be no doubt that demography and geography have played the largest role in causing imbalance." *Capacchione*, 57 F. Supp. 2d at 250.

Testimony from Dr. John Murphy, CMS's superintendent from 1991 to 1995, corroborates the district court's conclusion. Dr. Murphy testified that when he assumed his duties he "was quite concerned about the increasing difficulty in bringing about racial balance . . . because of the demographic shifts that were occurring." J.A. VI-2712. Population growth translated into more automobiles on the road, making increased busing impracticable because "the travel time to move youngsters from the suburbs into the city with the flow of rush hour traffic was a problem." J.A. VI-2732. In the fall of 1991, CMS hired Dr. Michael J. Stolee to examine the problem and offer solutions. Dr. Stolee also concluded that CMS's task "has been complicated by population growth," J.A. XXXII-15,571, and he recommended the adoption of a magnet schools program, which CMS promptly implemented.

The Supreme Court has dealt with similar population growth and shifting demographics in the context of unitary status. In *Freeman*, the court unequivocally stated that "racial imbalance . . . [is] not tantamount to a showing that the school district [is] in noncompliance with the decree or with its duties under the law." 503 U.S. at 494. *Brown I*, of course, does not mandate that racial balance be pursued in perpetuity. Once the original racial imbalance caused by a constitutional violation has been rectified, "the school district is under no duty to remedy imbalance that is caused by demographic factors." *Freeman*, 503 U.S. at 494.

The *Swann* plaintiffs contend that consideration of demographics and the rationale of *Freeman* are misplaced because the growth and shifting demographics of DeKalb County, Georgia, the school district under court order in *Freeman*, exceeded that of Charlotte-Mecklenburg. While CMS's growth rates and demographic shifts certainly do not equal those experienced in DeKalb,[3] we can find nothing in *Freeman* limiting its holding to the specific facts of DeKalb County or establishing DeKalb as the standard for measuring imbalance caused by demographic factors. On the contrary, the opinion speaks in general terms. The Supreme Court observed that in the United States "it is inevitable that the demographic makeup of school districts, based as they are on political subdivisions such as counties and municipalities, may undergo rapid change." *Id.* at 495. Mobility, the Court noted, "is a distinct characteristic of our society." *Id.* at 494.

Similarly, the *Swann* plaintiffs contend that unlike DeKalb County, Mecklenburg County has become more integrated as the black population has increased. This is simply not true. For example, a report prepared in 1992 by the Charlotte-Mecklenburg Planning Staff for Chairman Arthur Griffin concluded that "Charlotte-Mecklenburg continues to be a city of segregated neighborhoods" with "[c]oncentrations of Black households . . . generally located in the central city." J.A. XXI-10,485; *see also* J.A. XXVIII-13,803 (1992 student assignment plan stating that "housing across the county is not racially integrated. Approximately 50% of all black students live within one district, while only 10% of white students reside in that district."); J.A. XXII-10,575 (CMS report chronicling growth of the black population and decline of the white population in the inner city). Clearly, increased housing integration is not necessarily a corollary of African-American population growth. Hence, despite the *Swann* plaintiffs' best efforts, *Freeman* cannot be distinguished into nothingness, nor does the standard of review permit this court to reweigh the evidence of the changes in CMS.

We also note that when confronted with growing imbalance in certain schools, the district court demanded cogent and supportable

---

[3]For example, the population of DeKalb County grew from 70,000 in 1950 to 450,000 in 1985, and the percentage of black students in the district grew from 5.6 percent in 1969 to forty-seven percent in 1986. *See Freeman*, 503 U.S. at 475.

explanations from the plaintiff-intervenors, paying special attention to the former de jure schools still in use. *See Capacchione*, 57 F. Supp. 2d at 246. Evidence presented at trial indicated that "[o]f the 16 former black schools that are still open, 13 are currently balanced and have been desegregated for periods ranging from 22 to 28 years. Of the 3 that currently exceed the +15% black variance, each has been balanced for at least 22 years." J.A. XXXIII-16,176. Interestingly, of the seventy-two former white schools that are still open, fifteen are now majority black and were in balance for periods of twelve to twenty-five years. *See* J.A. XXXIII-16,176.

In addition, Dr. Armor examined the seventeen schools in CMS that exceeded the plus fifteen percent variance for three or more years during the last decade. *See* J.A. XXXIII-16,174-76.[4] Sixteen of the seventeen were balanced for periods ranging from nineteen to twenty-six years, with one school experiencing balance for sixteen years. To the extent that CMS's pupil reassignments could be assessed, Dr. Armor concluded that changes instituted by CMS were "attempts to maintain or restore racial balance in the face of overwhelming demographic growth and mobility." J.A. XXXIII-16,176. Indeed, Dr. Armor concluded that imbalance had been reduced in several of the schools because CMS's magnet program attracted white students from the outer reaches of the county.

---

[4]Dr. Armor did not include the predominantly white schools in this analysis on three grounds:

> (1) the court order did not establish a minimum percent black enrollment, (2) the half-dozen schools that have had low black enrollment for the past three or more years and that were operating in 1972 have been racially balanced for at least ten years[,] and (3) the demographic analysis of Dr. Clark shows that these schools have become imbalanced or were opened imbalanced because of the substantial white enrollment growth in the outskirts of the county.

J.A. XXXIII-16,174 (footnote omitted); *see also Swann*, 402 U.S. at 26 (observing "that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law").

Long periods of almost perfect compliance with the court's racial balance guidelines,[5] coupled with some imbalance in the wake of massive demographic shifts, strongly supports the district court's finding that the present levels of imbalance are in no way connected with the de jure segregation once practiced in CMS. *See Freeman*, 503 U.S. at 495 ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications."); *Manning*, 244 F.3d at 944 ("Where a [party seeking a finding of unitary status] shows that demographic shifts are a substantial cause of the racial imbalances, [the party] has overcome the presumption of *de jure* segregation."); *United States v. Meriwether County*, 171 F.3d 1333, 1339 (11th Cir. 1999) (observing that a "school district need not wage a battle against demographics to achieve perfect racial balance"). The evidence presented at trial adequately explained why a few schools have become imbalanced, and we can discern no evidence or omissions that indicate clear error has been committed in this regard.

### 2.  *Martin* and Unitary Status

The *Swann* plaintiffs also point to school sitings, transportation burdens, and school transfers as evidence that the growing imbalance is caused by state action rather than private choices, and that CMS has not complied with the district court's orders in good faith. In advancing their argument, the *Swann* plaintiffs rely chiefly on *Martin v. Charlotte-Mecklenburg Board of Education*, 475 F. Supp. 1318 (W.D.N.C. 1979), in which a group of parents sought to enjoin CMS from reassigning over 4000 students in order to maintain racial balance in certain schools. The plaintiffs in *Martin* based their position on *Pasadena City Board of Education v. Spangler*, 427 U.S. 424 (1976), and *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). In the former case, the Supreme Court reaffirmed that district courts could not order a school district "to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity," *Spangler*, 427 U.S. at 436,

---

[5]Even the *Swann* plaintiffs admit that ten years after the district court charged the board with taking affirmative steps to desegregate schools, the system "w[as] nearly 100% statistically compliant with the court's orders." Plaintiff-Appellants' Brief at 38.

and in the latter the Court struck down a medical school admissions policy that reserved sixteen of one hundred seats in the entering class for applicants who were "'economically and/or educationally disadvantaged'" and who were members of certain minority groups, *Bakke*, 438 U.S. at 274. The district court in *Martin* distinguished *Spangler* by observing that it was but a restatement of the *Swann* Court's admonition about the use of racial quotas and that, unlike Pasadena City, CMS had not achieved racially neutral attendance patterns. *See Martin*, 475 F. Supp. at 1340. As for the *Bakke* decision, the district court pointed out that no student in CMS was denied "an equal educational opportunity" and that the admissions policy in *Bakke* was implemented "against a backdrop devoid of specific judicial findings or administrative acknowledgments of the prior segregated status of the school system." *Id.* at 1345. Accordingly, the *Martin* court concluded that CMS's reassignment of students was "within constitutional limits and should be upheld." *Id.* at 1321. The district court took pains to ensure that its opinion would not be interpreted too broadly: "This order simply upholds the actions of the 1978 Board against the attacks by the plaintiffs." *Id.* at 1347. In the course of the *Martin* opinion, the district court observed that CMS had fallen short in four areas: construction and location of facilities in parts of the county likely to enhance desegregation, placement of elementary and kindergarten grades in schools throughout the county, monitoring of student transfers so as to prevent resegregation, and allocation of the burdens of busing. *See id.* at 1328-29. However, the district court also noted that CMS had made great progress and that a return to the old system of segregation "has not tempted the present School Board, who are standing fast in their endeavor to run the schools according to law while providing quality education." *Id.* at 1347.

In *Capacchione*, the district court correctly observed that "*Martin* was not a unitary status hearing," *Capacchione*, 57 F. Supp. 2d at 250, and that because "the desegregation plan was still in its fledgling stages, the Court was inclined to keep the pressure on CMS," *id.* at 251. The *Capacchione* court further observed that post-*Martin* changes in Charlotte-Mecklenburg counseled looking at the "concerns [of *Martin*] in a new light." *Id.* The district court's interpretation of *Martin* is reasonable and in accord with the rule in this circuit that a district court, as a continuous institution, is "best able to interpret its own orders." *Vaughns v. Board of Educ.*, 758 F.2d 983, 989 (4th Cir.

1985) (school desegregation case). Moreover, the *Martin* order was issued thirteen years before the Supreme Court made clear in *Freeman* that the affirmative measures mandated by *Green* are not meant to remedy "private choices" that lead to resegregation. *Freeman*, 503 U.S. at 495. The state of the law and the understanding of duties upon school districts were far different when *Martin* was handed down. Hence, a number of assertions in *Martin* cannot be squared with the present state of the law. *See, e.g.*, *Martin* 475 F. Supp. at 1346 (stating that segregated housing patterns must necessarily lead to the unconstitutional segregation of schools). Ignoring the changes in Charlotte-Mecklenburg and in the law by erecting *Martin* as the framework for unitary status, as the *Swann* plaintiffs urged below, would defy common sense and run afoul of developments in the Supreme Court's school desegregation jurisprudence. *See United States Gypsum Co. v. Schiavo Bros.*, 668 F.2d 172, 176 (3d Cir. 1981) (concluding that a successor judge "is empowered to reconsider [the legal conclusions of an unavailable predecessor] to the same extent that his or her predecessor could have"); *see also Meriwether County*, 171 F.3d at 1339 ("The law does not make a school district a prisoner based on factors, such as demographic tendencies, that are beyond its control."). We will examine the district court's *Martin* findings in turn.

### a.    School Siting

The district court found that CMS had not shirked its duties under the law with regard to school sitings. *See Capacchione*, 57 F. Supp. 2d at 251-53. The record reveals that CMS has, to the extent practicable, continually endeavored to site schools in order to foster integration, and has adopted a policy of building schools in areas equally accessible to blacks and whites. Testimony of current board members indicated that in efforts to fulfill this policy, CMS has purchased property in low growth areas for school construction even though schools in predominantly white high growth areas were overcrowded. *See* J.A. V-1986-87. In 1992 CMS reaffirmed its siting policy and resolved that, "whenever possible," new schools would be built in areas that would "provide black student enrollment of not less than 10 percent from the census tracts serving the new school." J.A. XXXII-15,686. The impetus behind the resolution was growth in the periphery of the county which the board speculated would continue patterns of housing segregation, thus making it more difficult to maintain

racial balance in the schools. Evidence presented at trial indicated that the ten percent rule was destined for failure because it was not possible to implement the rule and still "meet the 60-minute bus ride limit." J.A. XXII-10,869. Nevertheless, extensive evidence was presented showing that CMS never sited schools in order to foster segregation and that "every effort was made to try to find school sites that would bring people together in balanced numbers." J.A. VI-2752; *see Meriwether County*, 171 F.3d at 1337 (stating that "the absence of evidence indicating that racial motives played any part in the Board's decisionmaking process" is relevant in accessing compliance with desegregation orders). For example, CMS's executive director of planning and student placement testified that in siting schools CMS "looked at both African-American and all populations not only in the vicinity of the site, but in the entire district." J.A. VII-2920. So dedicated was CMS to siting schools in integrated areas that it contemplated refusing a gift of land for school use because the land was in a predominantly white area. *See* J.A. V-1985.

Faced with growth in the predominantly white regions of the far south and north, *see* J.A. XXXIII-16,261, CMS was compelled to serve populations in those areas via school sitings. CMS's data show that in the late 1990s, student population was "growing at nearly 4,000 students per year," J.A. XXIX-14,133, and consequently the board was "just trying to keep up" with the population explosion in building schools, J.A. V-2249. Overcrowding was a problem, and in the late 1990s "the average high school expected to operate at 109 percent of its capacity." J.A. XXIX-14,133. Even though CMS was forced to build schools at a rapid rate to serve an expanding student population, pupil assignment plans in which CMS described population growth as a "major consideration[ ]" are replete with efforts to improve racial balance. J.A. XXIX-14,133. For example, the 1997-98 assignment plan highlighted the creation and expansion of several magnet programs specially designed to reduce the black ratio in a number of schools. *See* J.A. XXIX-14,147-51. To the extent practicable, CMS did not sacrifice racial balance concerns to population growth. Though the two often pulled CMS in different directions, the record indicates that the board coordinated racial balance and school sitings as best it could under the circumstances. The evidence does not indicate that the abandonment of the ten percent rule or other

decisions regarding school siting were the result of a desire to perpetuate the dual school system or circumvent the district court's orders.

CMS and the *Swann* plaintiffs, citing to prior orders, counter that the board has not done all that it could do in the area of school siting. Erection of such a standard, however, would effectively replace *practicability* with *possibility*. *See Manning*, 244 F.3d at 945 (observing that "the law does not require a defendant school board to take every conceivable step in attempting to desegregate"). The former implies measures that can be reasonably implemented under the circumstances, while the latter omits the reasonableness requirement. For instance, it was possible for CMS to adhere to the ten percent rule while ignoring growth in the far north and south of the county. Youngsters would have been compelled to ride buses for long periods while traveling with the flow of rush hour traffic, but it was nonetheless possible to adhere to the ten percent rule. Of course, the practicability of a refusal to respond to growth in Charlotte-Mecklenburg is another matter.

In the same vein, the *Swann* plaintiffs contend that school siting decisions were a response to white flight, which is an impermissible reason for failing to comply with a desegregation order. Growth, of course, is far different from flight. And experts offered evidence of "the economic boom in the Charlotte Metropolitan area in the last decade." J.A. XXXIII-16,233. Charlotte-Mecklenburg is one of the most dynamic areas in the South; it is far different from the Charlotte-Mecklenburg of *Swann*, and much changed from that of *Martin*. In light of the growth in the county and a plethora of evidence demonstrating that the board used its best efforts to site schools in order to foster integration, the district court did not commit error when it concluded that there is no "continuing constitutional violation[ ] in the area of school siting." *Capacchione*, 57 F. Supp. 2d at 253.

### b.    Burdens of Busing

As for the burdens of busing, the district court found that in the most recent school year, 15,533 black students and 11,184 non-black students were bused for balancing purposes. *Id.* As stated earlier, traffic patterns make busing suburban students into the inner city far more difficult than busing inner-city children into the suburbs. *See*

J.A. VI-2732; J.A. V-2228. Though a disproportionate number of African-American students are bused, the growth, housing patterns, and traffic patterns support the district court's conclusion that the realities of the current situation should not block a unitary status determination. *See Meriwether County*, 171 F.3d at 1341 (finding no constitutional violation when white students are "somewhat less burdened by the transportation scheme" because of demographic factors).

### c.   Student Transfers

Finally, *Martin*'s concern with student transfers appears to have been based on the assumption that CMS would experience average growth. Courts are not omniscient, and the district court in 1979 could not have foreseen the changing demographics that would make student transfers the least of CMS's worries. In the present litigation, the district court observed "that CMS 'kept an eye on [magnet transfers] so that there wouldn't be a run on the bank so to speak from any one school.'" *Capacchione*, 57 F. Supp. 2d at 250 n.10 (alteration in original). This finding is not clearly erroneous, nor can we discern the need for more findings on this issue in light of post-*Martin* changes.

### 3.   Conclusion

In sum, the district court's findings on student assignment are "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573. The dual system of student assignment in CMS has been eradicated "to the extent practicable." *Dowell*, 498 U.S. at 250. The imbalance existing in some schools is not traceable to the former dual system or to renewed discriminatory actions, but rather is a result of growth and shifting demographics. Consequently, we hold that the district court's findings on student assignment are not clearly erroneous.

### B.   Faculty Assignment

In examining faculty assignment, the district court again used a plus/minus fifteen percent variance. Of the 126 schools operating in CMS, the district court found that in 1997-98 only ten schools were out of balance. The *Swann* plaintiffs point out that this number grew

to sixteen in 1998-99, but this means that a mere twelve percent of the schools were out of balance. This is a far cry from the dual system in which "most of the 24,000 [black students] ha[d] no white teachers." *Swann*, 300 F. Supp. at 1360. There is simply no evidence that CMS assigns black teachers to predominantly black schools and white teachers to predominantly white schools. Thus, the district court's conclusion that this *Green* factor has been satisfied is not clearly erroneous.

### C.   Facilities and Resources

The *Swann* plaintiffs and CMS contend that the district court impermissibly shifted the burden of proof on this factor. As a result of the alleged error of law, CMS and the *Swann* plaintiffs contend that this issue must be remanded to the district court.

This court has previously made clear that "once a court has found an unlawful dual school system, [those alleging the existence of racial disparities] are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants." *School Bd. of the City of Richmond v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987). In this case, however, the district court noted that none of the prior orders entered in the long history of the *Swann* litigation had ever found racial disparities to exist with regard to school facilities and concluded that CMS and the *Swann* plaintiffs bore the burden of establishing discrimination with regard to facilities. *See Capacchione*, 57 F. Supp. 2d at 263 ("[I]t would defy logic to place now the burden of proof on the Plaintiff-Intervenors, requiring them to prove that vestiges of discrimination in facilities have been remedied, when the Court originally found no vestiges to exist."). In our view, this erroneous assignment of the burden of proof, which did not affect the manner in which the parties tried the case or otherwise prejudice their rights, is harmless and does not undermine the district court's factual conclusions regarding the facilities factor.[6]

---

[6]Given the counter-intuitive alignment of the parties in this case, it could be argued that the presumption and burden allocation set forth in *Baliles* should not be applied, and that CMS should instead be required to prove the existence of racial disparity in its facilities. *See United States v. City of Yonkers*, 181 F.3d 301, 309-11 (2d Cir. 1999), *vacated on reh'g*, 197 F.3d 41 (2d Cir. 1999).

Immediately after assigning the burden to CMS and the *Swann* plaintiffs, the district court's order nonetheless summarized and weighed the facilities evidence presented by the parties. The district court carefully analyzed the testimony and report of Dr. Dwayne Gardner, an expert witness for CMS. Dr. Gardner analyzed seventy-three schools—every identifiably black school in CMS and a sampling of balanced schools and predominantly white schools. Dr. Gardner measured the adequacy, safety, healthfulness, accessibility, flexibility, efficiency, expansibility, and appearance of the schools. Based on the inspection he grouped schools as follows: "0-44 (suggests replacement), 45-59 (needs major improvement), 60-74 (needs minor improvement), 75-89 (serves program needs), and 90-100 (exceptional quality)." *Id.* at 264. The survey revealed that of the four schools that warranted replacement, two were majority white, and two were imbalanced black. *See* J.A. XXV-12,182-86. Thirty-four schools fell into the "needs major improvement" category, of which sixteen were imbalanced black and eighteen identifiably white.

The district court determined that Dr. Gardner's testimony established that any current disparities were functions of the age of the facilities at issue, because

> different building standards apply when a new facility is constructed as compared to when an older facility is renovated or upgraded. In other words, the renovation of an older facility usually complies with the code under which the facility was built. Because most facilities in the predominately black inner city are older while facilities in the predominately white suburbs are newer, the inference is that differences in building standards tend to affect black students disproportionately. This does not amount to racial discrimination. Indeed, this practice applies regardless of the racial composition of the school. Thus, older schools that are predominately white—several of which were built in the 1920s—are likewise affected by this practice.

*Capacchione*, 57 F. Supp. 2d at 265 (footnote and transcript references omitted). Thus, the district court concluded from Dr. Gardner's testimony and report "that CMS's facilities needs are spread across the system without regard to the racial composition of its schools." *Id.*

The district court also considered the testimony of CMS's assistant superintendent of building services, who testified that out of 108 schools in need of renovations, eighty-one percent were racially balanced or identifiably white. *See* J.A. VIII-3810 & 3818. The district court concluded that this witness's testimony likewise demonstrated that the deficiencies in CMS's facilities were unrelated to the former de jure system.

Finally, the court considered CMS's track record in renovating old facilities, praising its practice of allocating funds on a per-pupil basis and noting that "CMS has spent a large portion of [its] bond money on improving schools in predominantly black areas." *Capacchione*, 57 F. Supp. 2d at 266.

After an extensive discussion of this evidence, the court made the following finding of fact with regard to facilities:

> Just as Judge McMillan found thirty years ago, the Court finds today that inequities in facilities exist throughout the system regardless of the racial makeup of the school. These disparities are generally the result of the relative ages of the facilities, combined with an ongoing lack of funding and the need to accommodate unprecedented growth.

*Id.*

This finding is clearly determinative of the question of unitary status as to facilities, regardless of which party carried the burden of proof. That is, the district court, after carefully considering and weighing all the evidence presented on this factor, concluded that any disparity as to the condition of the facilities that might exist was not caused by any intentional discrimination by CMS, but instead was a function of the age and location of the facilities and the ever-present problem of allocating all too scarce funds. Even if the district court had assigned the burden of proof to the plaintiff-intervenors, this factual finding would have compelled a ruling in their favor. In fact, the district court acknowledged as much, stating "that the Plaintiff-Intervenors have proven, to the extent possible, the absence of intent and causation." *Capacchione*, 57 F. Supp. 2d at 267 n.38.[7]

---

[7]From this footnote and the district court's detailed discussion about the cause of any disparity in CMS's facilities, it appears that the district

Therefore, because the district court's findings, which were based on the court's weighing of all of the relevant evidence presented at trial, would have yielded the same conclusion under a proper assignment of the burden of proof, any error with regard to the burden of proof is harmless. *See Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 801 (9th Cir. 1995) (finding district court's improper assignment of the burden of proof to be harmless because review of the entire record established "that under the proper assignment of the burden of proof, the district court would have reached the same decision"); *Applewood Landscape & Nursery Co. v. Hollingsworth*, 884 F.2d 1502, 1506 (1st Cir. 1989) (concluding that, if the district court improperly allocated burden of proof on a particular issue, the error was harmless because the district court's decision on that issue turned on the weight of the evidence in the record and not on burden of proof rules); *cf. Vaughns*, 758 F.2d at 992 (recognizing that an error in shifting the burden of proof in a school desegregation case may be harmless if the record is such that the court can conclude that substantial rights have not been prejudiced).

Because any error associated with the burden of proof is harmless, the only question that remains is whether the district court's factual findings about the facilities are clearly erroneous. Though the evidence could have been weighed differently on this factor, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. In 1969, the district court found that there was no constitutional violation in the "quality of school buildings and facilities." *Swann*, 300 F. Supp. at 1372. The *Capacchione* court found that this remains true today, and the evidence as a whole indicates that this finding is not clearly erroneous.

---

court really made alternative rulings on the facilities question: The court first concluded that CMS and the *Swann* plaintiffs bore the burden of proof with regard to facilities and that they failed to carry that burden. *See Capacchione*, 57 F. Supp. 2d at 267 ("[T]he *Swann* Plaintiffs have failed to overcome the Court's previous findings on facilities by establishing the requisite discriminatory intent and causation."). The court then ruled in the alternative, as indicated by the footnote and the findings, that the plaintiff-intervenors proved that any disparities were the result of factors unrelated to state action.

### D.    Transportation

During the 1998 school year, five out of every six students in CMS rode a school bus. *See Capacchione*, 57 F. Supp. 2d at 267. The parties do not dispute the district court's finding that "CMS provides free bus transportation to all students who do not live within a mile and a half of their schools." *Id.* The focus of the *Swann* plaintiffs' argument on this factor deals with the *Martin* opinion. As previously discussed, *Martin* does not provide the framework for a unitary status determination and the district court's interpretation of *Martin*, along with the finding that the present state of busing "may be about the best CMS can do," *Capacchione*, 57 F. Supp. 2d at 253, does not constitute error.

### E.    Staff Assignment

The district court, noting that findings of discrimination in school staffing were never made, concluded that CMS has complied with its constitutional duties. The parties point this court to no contrary evidence, nor have we discovered such in the record. Therefore, we hold that the district court's findings regarding the fifth *Green* factor are not clearly erroneous.

### F.    Extracurricular Activities

The district court concluded that there was no discrimination or vestiges of discrimination with regard to extracurricular activities. The evidence presented at trial showed that the ratios of blacks and whites participating in extracurricular activities, though varying somewhat from year to year, is approximately equal. *See* J.A. XXIV-11,634. Areas where there are disparities were not shown to be linked to the former dual system. For example, blacks often outnumber whites in holding elective offices in student government, but whites have a higher level of representation in honors programs. No evidence is found in the record to indicate that CMS somehow pushes African-Americans toward student government and away from honors programs. Consequently, the district court's conclusion that CMS has satisfied this *Green* factor is not clearly erroneous.

### G.   Ancillary Factors

#### 1.   Teacher Quality

The district court found that there was no discrimination in the quality of teaching. The *Swann* plaintiffs contend that this finding is clearly erroneous because students in imbalanced African-American schools are more likely to have inexperienced teachers. This "experience gap," to the extent it exists, is minuscule. The district court found that "teachers in imbalanced-black schools had 0.7 to 1.3 fewer years experience than the district averages and had 1.6 to 2.9 fewer years experience than teachers in imbalanced-white schools." *Capacchione*, 57 F. Supp. 2d at 271. To use middle school teachers as an example, the statistics reveal that the average middle school teacher in an imbalanced African-American school had 8.2 years experience versus 9.8 years for his counterpart in an imbalanced white school. *Id.* These numbers clearly support a finding of equality rather than disparity, and cannot undermine the district court's conclusion on this factor.

The district court also pointed to evidence indicating that experience does not necessarily relate to competency. For example, according to former Superintendent Murphy, it is not uncommon to have "excellent first-year teachers" and "very weak 35th-year teachers." J.A. VI-2795. Other witnesses observed that the newer teachers had better "knowledge of various teaching strategies" and were more comfortable with diverse classrooms. J.A. VII-3275.

The *Swann* plaintiffs also assert that imbalanced African-American schools have fewer teachers with advanced degrees. For instance, in imbalanced black high schools only thirty-one percent of the teachers held advanced degrees, while forty-six percent of the teachers in imbalanced white high schools held advanced degrees. *See Capacchione*, 57 F. Supp. 2d at 271. As it was with teacher experience, testimony was offered establishing that the number of degrees a teacher possesses does not necessarily translate into competence or quality instruction. *See* J.A. VII-3276. According to former Superintendent Murphy, "the degree level was not a significant indicator of getting better performance on the part of the teacher." J.A. VI-2795. Expert reports submitted by the plaintiff-intervenors also indicated that there

is "no significant relationship" between black achievement and teacher education levels. J.A. XXXIII-16,221. In sum, the district court's conclusion that African-American students receive equal access to quality teachers is not clearly erroneous.

## 2.   Student Achievement

The district court found that the existence of an achievement gap between black and white students was not a vestige of the dual system or evidence of discrimination in the current operation of CMS. This was an area of immense disagreement at trial, and the parties presented a mountain of data on this subject. Though the Fourteenth Amendment guarantees equal protection but not equal outcomes, if low African-American achievement is a result of the former de jure system, it must be eliminated to the extent practicable. *See Dowell*, 498 U.S. at 249-50. Conversely, to the extent that low achievement is linked to other factors, it is beyond the reach of the court's authority. Most courts of appeals confronting this issue, including this court, have declined to consider the achievement gap as a vestige of discrimination or as evidence of current discrimination. *See Baliles*, 829 F.2d at 1313 (upholding lower court's findings that low achievement is "primarily attributable to the high incidence of poverty" in the school district); *see also United States v. City of Yonkers,* 197 F.3d 41, 54 (2d Cir. 1999) (observing that "using achievement test scores as a measure, either direct or indirect, of a school system's movement away from segregation is deeply problematic"), *cert. denied*, 120 S. Ct. 2005 (2000); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537 (7th Cir. 1997) (explaining that a number of variables, other than discrimination, account for the achievement gap); *Coalition to Save Our Children*, 90 F.3d at 778 (finding "a causal link between . . . socioeconomic factors and student achievement").

The plaintiff-intervenors' expert witness, Dr. Armor, presented evidence indicating that there is no correlation between African-American performance and the racial balance of schools. *See* J.A. XXXIII-16,178. For example, Dr. Armor's studies showed that African-American students in the third through fifth grades attending schools sixteen to twenty-five percent African-American scored the same on standardized tests as their counterparts in schools seventy-five percent black or greater. *See* J.A. at 16,214. Similarly, African-

American students in the sixth through eighth grades attending schools sixteen percent black or less scored the same on standardized tests as their counterparts in schools seventy-five percent black or greater. *See* J.A. XXXIII-16,215.

In order to shed light on the true causes of the achievement gap, Dr. Armor turned to socioeconomic factors. The data revealed startling differences between black and white children in CMS.

> Average black family income is $31,000 compared to $59,000 for whites, and only 15 [percent] of black parents are college graduates, compared to 58 percent for white parents. A huge poverty gap is also revealed, with 63 percent of black students on free lunch compared to only 9 percent of white students. Finally, 83 percent of white students have both parents at home, compared to only 42 percent for black students.

J.A. XXXIII-16,179. According to Dr. Armor, the socioeconomic factors plus the second grade scores, which are the earliest available, explain "nearly 80 percent of the reading gap and over 70 percent of the math gap." J.A. XXXIII-16,180. Former Superintendent Murphy testified that in his experience "[p]oor students come behind and stay that way. And in Charlotte, a majority of poor students happen to be African-American." J.A. VI-2696. Dan Saltrick, former assistant superintendent for instructional services, also testified that in his experience low student test scores related to parental support which in turn was "a matter of . . . socioeconomic levels." J.A. VII-3280. While socioeconomic disparities between black and white pupils are troubling, they are not the result of CMS's actions or inactions and therefore are beyond the scope of the original desegregation order. *See Baliles*, 829 F.2d at 1314 ("Educational deficiencies that result from problems such as poverty are best remedied by programs directed toward eliminating poverty, not by indirect solutions through school programs.").[8] Accordingly, the district court did not clearly err

---

[8]Despite evidence that the achievement gap results from factors outside CMS's control, the district court found that CMS has undertaken sundry measures to eliminate the gap. For example, CMS adopted financial incentives for teachers and principals tied to student performance, urged black students to take advanced placement and other higher level

in finding that the achievement gap between black and white students is not a vestige of past discrimination or evidence of present discrimination.

### 3.   Student Discipline

The district court found "that any disparities that exist in the area of discipline are not causally related to the dual system." *Capacchione*, 57 F. Supp. 2d at 281. In none of the court's prior orders is there any indication that CMS has ever discriminated in meting out punishment for disruptive students. However, recent statistics show that of the 13,206 students disciplined from 1996-98, sixty-six percent were African-American. *See* J.A. XXIV-11,637. As the district court noted, "disparity does not, by itself, constitute discrimination." *Capacchione*, 57 F. Supp. 2d at 281. The idea that CMS should have a disciplinary quota is patently absurd, and there is no evidence in the record that CMS targets African-American students for discipline. Instead, the evidence indicates that CMS has adopted guidelines whereby students receive the same level of punishment for certain offenses to ensure that the amount of punishment will not vary from school to school. A student charged with a disciplinary infraction may also appeal the charge "and may assert that the charge was due to racial bias." *Id.* There is simply no evidence in the record that CMS treats African-American students differently in disciplinary matters. Hence, the district court's conclusion that the disciplinary disparities are unrelated to the former de jure system is not clearly erroneous.

### H.   Good Faith

Lastly, the district court found that CMS has complied with the desegregation decree in good faith. *See Freeman*, 503 U.S. at 491 (requiring school board "to demonstrate its good-faith commitment to a constitutional course of action"). Seven factors supported the district

---

classes, challenged all students by removing "fluff courses" from the curriculum, provided tutors and other forms of staff support to accelerate student preparedness, and adopted pre-kindergarten programs to accelerate preparedness for the youngest of students. *See Capacchione*, 57 F. Supp. 2d at 273-275.

court's good-faith finding: (1) no further relief has been sought since the district court removed the case from the active docket in 1975; (2) CMS has gone above and beyond the court's orders by continually striving to achieve balance even when the imbalance was unconnected to the dual system; (3) the board has been open to community input and sought community support for its integrative efforts; (4) the board has repeatedly reaffirmed its commitment to desegregation through various resolutions; (5) African-Americans currently occupy four of the nine seats on the school board, including the chair; (6) the board's actions over the past thirty years do not evince discriminatory motives; and (7) "no evidence has been presented that school authorities were guilty of easily correctable errors." *Capacchione*, 57 F. Supp. 2d at 282-83.

Testimony from former board members indicated that the court's order has been "institutionalized," J.A. V-2222, and that the board "always stuck to what the rules were." J.A. V-2234. Former Superintendent Murphy testified that when he arrived in Charlotte-Mecklenburg he found a "unique" environment where "everybody wanted to make sure that their schools were racially balanced." J.A. VI-2686. In 1992, Dr. Stolee suggested a magnet plan to increase integration, and, in the course of his recommendations, observed that "[f]or the last twenty years, the Charlotte-Mecklenburg Board of Education and the Charlotte-Mecklenburg community have, in good faith, complied with the orders of the court." J.A. XXXII-15,570. He further observed "that the Charlotte-Mecklenburg Board and community have a great deal of pride in the fact that they successfully met a challenge and made the solution work." J.A. XXXII-15,571.

Of course, both in the district court and in appellate arguments, current CMS officials engaged in much self-recrimination and claimed that they had not pursued the dismantlement of the dual system with the requisite zeal. Right on cue, the *Swann* plaintiffs describe this case as "unique" because CMS "has acknowledged its own failure to comply with specific directives" of the district court. *Swann* Plaintiffs' Response to Petition for Rehearing at 10. The district court gave little weight to CMS's assertions that the board had not put forth enough effort, and the evidence presented at trial amply supports the district court in this regard. Former Superintendent Murphy testified that despite a report indicating that CMS was unitary and his belief that CMS "w[as] definitely in compliance," no effort was

made to dissolve the court order. J.A. VI-2706. Dr. Murphy gave three reasons for the avoidance of a unitary status hearing. First, he advised board members that the court hearing would be "a long, drawn-out process which would cost millions of dollars, and that would be money taken away from the instructional program." J.A. VI-2706. Second, Dr. Murphy feared that if CMS was declared unitary "we would not be eligible for federal funding for our magnet schools." J.A. VI-2706; *see also* J.A. XXII-10,563 (CMS report observing that "school districts that intend to use magnet schools for desegregation purposes can apply for grants from the federal government"); J.A. XXI-10,521 (1996-1997 Federal Magnet School Assistance Program Evaluation Report in which CMS describes federal funding as "an integral part" of its pupil assignment plan). Finally, Dr. Murphy thought it best to remain under court order so CMS could continue to racially balance schools even though the de jure violation had been remedied.

Dr. Susan Purser, the current associate superintendent of education services of CMS, expressed a similar desire for CMS to remain under court order. Though Dr. Purser testified that she believed that the school board, superintendent, and administration were dedicated to enhancing educational opportunities for all of CMS's students regardless of race, she nonetheless expressed a preference for court supervision. Dr. Purser pointed out that the current "Board has only a limited time, because these are elected positions," J.A. XVII-8076, and that over time "superintendents will change, [and] the people involved in [CMS] will change." J.A. XVII-8077. At this point in the cross examination, counsel asked Dr. Purser: "But you don't know what any future School Board or administration will do either way, do you?" J.A. XVII-8077. Dr. Purser responded: "That's exactly my point." J.A. XVII-8077. Dr. Purser's testimony and that of Dr. Murphy exemplify why the Supreme Court has stressed that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Dowell*, 498 U.S. at 247; *see also Coalition to Save Our Children*, 90 F.3d at 761 n.6 (warning of "the potential for the entrenchment of [a] putatively transitional desegregation scheme"). The district court's desegregation orders were not intended to continue after CMS remedied the de jure violation, nor were they intended to suspend the democratic process with no prospect of restoration. Yet the orders have been institutionalized to the point that

CMS officials cannot imagine life without them. Once a yoke meant to steer CMS towards compliance with the Constitution, the orders are now used by CMS officials as mechanisms for the attainment of different goals. In truth, CMS officials have little desire for a unitary status determination and are struggling to keep the orders firmly in place.

Ironically, CMS's clinging to the temporary desegregation orders buttresses the district court's finding that it is unlikely "CMS would return to an intentionally-segregative system." *Capacchione*, 57 F. Supp. at 284. If CMS will go to such lengths to keep the court's orders in place so that it may continue racial balancing and other policies, it is unthinkable that CMS will attempt to revive the dual system. Accordingly, the district judge's finding of good faith is not clearly erroneous.

## I.   CMS's Remedial Plan

As a response to the plaintiff-intervenors' push for unitary status, CMS developed a "remedial plan" addressing many of the *Green* factors and other ancillary factors. *See* J.A. XXIII-11,028. The district court dismissed the remedial plan as a "'litigation strategy' plan" and declined to consider it. *Capacchione*, 57 F. Supp. 2d at 256. CMS and the *Swann* plaintiffs characterize the district court's treatment of the remedial plan as a fundamental error of law that requires reversal of the unitary status determination. First, CMS and the *Swann* plaintiffs aver that the district court misconstrued the test for unitary status. Adopting the test crafted by the panel opinion, CMS and the *Swann* plaintiffs assert that a district court must consider (1) what a school district has done, and (2) what a school district may do in the future. *See Belk*, 233 F.3d at 252-53. Because the district court did not undertake the latter inquiry as to the remedial plan, CMS and the *Swann* plaintiffs argue that the district court's order must be reversed. This proffered two-part test is divined from Supreme Court cases which have instructed district courts to ask "whether the Board ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Dowell*, 498 U.S. at 249-50; *see also Freeman*, 503 U.S. at 491.

While we agree with the first prong of the test, we do not agree that examining "whether the vestiges of past discrimination ha[ve] been

eliminated to the extent practicable," *Dowell*, 498 U.S. at 249-50, requires a district court—as a matter of law—to consider a remedial plan conceived, drafted, and offered by one of the parties during the lawsuit as an obvious defense to it. The plain meaning of the relevant language is that in some desegregation cases simple compliance with the court's orders is not enough for meaningful desegregation to take place. *See Swann*, 402 U.S. at 25 (stating that "a district court's remedial decree is to be judged by its effectiveness"). For example, a decree entered in the 1960s or 1970s could have underestimated the extent of the remedy required, or changes in the school district could have rendered the decree obsolete. In either case, a district court must look beyond mere compliance with the original decree and ask whether the vestiges of the dual system have been eliminated to the extent practicable. In the present case, the district court undertook such an inquiry. Not only did the district court address compliance, but it also looked beyond the original decree and examined how the extensive changes in the Charlotte-Mecklenburg area have affected the dismantling of the former dual system. Hence, the district court was not required under *Dowell* and *Freeman* to have considered CMS's eleventh-hour remedial plan.

Likewise, the district court did not run afoul of Federal Rule of Evidence 402 when it refused to consider the remedial plan. Rule 402, of course, declares that "[a]ll relevant evidence is admissible." Fed. R. Evid. 402. Even relevant evidence may be excluded, however, when its probative value is substantially outweighed by considerations of the needless presentation of cumulative evidence. *See* Fed. R. Evid. 403. And CMS's remedial plan was certainly cumulative, citing and summarizing several expert reports which had been admitted into evidence. For example, the plan's discussion of faculty assignment is based on the reports of Dr. William Trent, Dr. Robert Peterkin, and Dr. Roslyn Mickelson; the plan's discussion of facilities is based on Dr. Gardner's report; the plan's discussion of the achievement gap between blacks and whites is based on the reports of Dr. Trent, Dr. Peterkin, and Dr. Mickelson; and the plan's student assignment discussion is based on Dr. Gordon Foster's report. All of the aforementioned reports were admitted into evidence and the authors of the reports testified at the hearing and were subject to cross-examination. Hence, much of the remedial plan was cumulative, pro-

viding the district court with but a rehashing of expert reports and testimony.

To the extent that the remedial plan contained relevant evidence appearing nowhere else in the record, we hold that the exclusion of such evidence was harmless. According to Federal Rule of Civil Procedure 61, a "court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Listing myriad deficiencies, objectives, and strategies, the thirty-one page remedial plan is often short on specifics. Considering the amount of evidence presented on every aspect of CMS's operations during other phases of the two-month bench trial, we cannot hold that the exclusion of the remedial plan affected CMS's substantial rights. *See Ingram Coal Co. v. Mower, L.P.*, 892 F.2d 363, 366 (4th Cir. 1989) (applying Rule 61). Because the exclusion of the remedial plan in no way renders the judgment below suspect, the district court's treatment of the plan cannot support reversal.

## J.   Conclusion

Pursuant to the foregoing, we affirm the district court's unitary status determination in toto. The district court's findings on the *Green* factors and the ancillary factors are bereft of clear error and we cannot discern any error of law affecting the substantial rights of the parties. After more than three decades of federal court supervision, CMS has complied in good faith with the mandate of *Brown* embodied in the district court's desegregation orders to achieve a unitary school system. The dual system has been dismantled and the vestiges of prior discrimination have been eliminated to the extent practicable.

This is not to say that CMS is a perfect school system—it is not. Like school systems across the nation, CMS faces an expanding pupil population, aging facilities, and a scarcity of funds. These difficulties, however, are not vestiges of the former de jure system and therefore do not have constitutional implications. Considering CMS's exemplary efforts in eradicating the segregated school system, we are confident that de jure segregation is history.

## III.   Magnet Schools

I turn now to Capacchione's challenge to CMS's 1992 magnet schools plan. Specifically, Capacchione contends that his daughter

Cristina was unconstitutionally denied admission to a magnet school program on account of her race. Capacchione does not argue that race should not have been a factor in the magnet admissions process, but that the inflexible quotas, which operated to leave seats in these specialized schools vacant despite long waiting lists, went beyond what was permissible under prior court orders and the Constitution.

As noted previously, CMS operated its schools in nearly perfect racial balance for almost twenty years under a pupil assignment plan, adopted by the board and approved by the district court in 1974, which primarily utilized paired elementary schools, satellite attendance zones, a feeder system, and three experimental "optional schools." *See Swann*, 379 F. Supp. at 1103-05; J.A. XXVIII-13,536-44. In 1991, however, CMS hired Dr. Stolee to examine racial imbalance that was being caused anew by the demographic shifts and population growth in Mecklenburg County. The result of Dr. Stolee's labors was a new pupil assignment plan, entitled "CMS Student Assignment Plan: A New Generation of Excellence." This new plan emphasized the use of magnet schools, which would allow CMS to phase out the unpopular paired elementary schools. Magnet schools, many of which were located in predominately black neighborhoods, offered a specialized curriculum or innovative instructional styles not found in the other schools in the system.

Former Superintendent Murphy oversaw implementation of the Stolee plan and testified that the magnet program was adopted because CMS "wanted to attract more white youngsters into the inner city schools" in order to meet CMS's racial-balance goals. J.A. VI-2709. Dr. Stolee observed in his report that "Charlotte-Mecklenburg has had a long and successful experience with mandatory school assignments," but that in order to combat demographic shifts CMS should adopt a plan based on voluntarism. J.A. XXXII-15,581; *see also Missouri v. Jenkins*, 515 U.S. 70, 92 (1995) (*Jenkins III*) ("Magnet schools have the advantage of encouraging voluntary movement of students within a school district in a pattern that aids desegregation on a voluntary basis, without requiring extensive busing and redrawing of district boundary lines."); J.A. XXVIII-13,796 (student assignment plan boasting that "Charlotte, the city which prides itself on leading the nation in integration through busing, now has the opportunity to become the city to lead the nation in voluntary busing"). A desegregation plan using magnet schools, according to Dr.

Stolee, would "give[ ] each parent an opportunity to make a choice between a school serving the area in which the family resides, a school in some other area, or a school offering a very specific attractive program." J.A. XXXII-15,580. Dr. Stolee also recognized that the magnet-centered plan would be a dramatic shift from the prior desegregation plan which featured paired elementary schools, satellite attendance zones, and a feeder system. Thus, as part of the plan, he recommended that CMS secure approval from the district court before making any changes. Indeed, Dr. Stolee's "RECOMMENDATION #1," out of forty-four, read:

> THE SCHOOL BOARD, THROUGH LEGAL COUNSEL, SHOULD APPROACH THE FEDERAL COURT TO SECURE APPROVAL TO CHANGE THE COURT-ORDERED DESEGREGATION PLAN.

J.A. XXXII-15,578. This recommendation was consistent with the prior district court order directing CMS to apply to the district court "before making any material departure" from the approved desegregation plan. *Swann*, 311 F. Supp. at 270; *see also* J.A. XXVIII-13,790 (board member requesting that Dr. Stolee "review the federal court order" to determine if the magnet plan was permissible). However, CMS ignored Dr. Stolee's advice and the district court's instruction, choosing instead to withhold these changes in the desegregation plan from the district court.

The crux of the problem with CMS's magnet school plan is its admissions process. As aptly described by the district court, it operates as follows:

> At the start of the process, CMS first fills seats with preferences based on whether the applicant lives in close proximity to the school and whether the applicant has any siblings in the school. CMS then fills the remaining seats by selecting students from a black lottery and a non-black lottery until the precise racial balance is achieved.

*Capacchione*, 57 F. Supp. 2d at 287 (internal citations omitted). As originally explained to the board, the plan sought a balance of sixty percent white and forty percent black in the magnet schools with a plus or minus fifteen percent deviation. *See* J.A. XXVIII-13,705. Unfortunately, CMS opted for a strict ratio of sixty percent white and forty percent black, and decreed in its 1992 student assignment plan

that magnet "slots reserved for one race will not be filled by students of another race." J.A. XXXII-15,702. The result of this policy was that if a sufficient number of blacks or whites did not apply and fill the seats allotted to their respective races, then those seats would be left vacant. Though some exceptions were made, Superintendent Eric Smith testified that CMS generally adhered to the policy. *See* J.A. XV-7217.

The district court appropriately examined the magnet schools through a pre-unitary status lens, observing "that the current litigation started not as a petition for unitary status but as a discrimination suit arising out of Cristina Capacchione's denial of admission to a magnet school based on her race." *Capacchione*, 57 F. Supp. 2d at 284. The district court recognized that school officials acting pursuant to a desegregation order were immune from liability for actions taken consistent with that order. *See Fowler v. Alexander*, 478 F.2d 694, 696 (4th Cir. 1973) (law enforcement officials who confined the plaintiff pursuant to a court order were immune from § 1983 suit); *see also Wolfe v. City of Pittsburgh*, 140 F.3d 236, 240 (3d Cir. 1998) (officials acting pursuant to court order establishing quotas for promotions are not subject to § 1983 liability); *Turney v. O'Toole*, 898 F.2d 1470, 1472-73 (10th Cir. 1990) (holding that so long as a court order is facially valid, officials acting pursuant to that order are immune from a damages suit); *Coverdell v. Department of Soc. & Health Servs.*, 834 F.2d 758, 764 (9th Cir. 1987) (social worker is immune from § 1983 liability when executing a facially valid court order). However, the district court concluded that the use of magnet schools had never been approved and that the rigid racial limitations of the magnet admissions policy were "beyond the scope of the Court's mandate." *Capacchione*, 57 F. Supp. 2d at 285. The district court then subjected the admissions policy to strict scrutiny, holding that the policy violated the Equal Protection Clause of the Fourteenth Amendment because it was not narrowly tailored to achieve the compelling state interest of remedying past discrimination. This court reviews the district court's findings of fact for clear error and its legal conclusions de novo. *See Rutherford Hosp., Inc. v. RNH Partnership*, 168 F.3d 693, 698 (4th Cir. 1999).

### A.   Immunity

I begin with the question of whether CMS officials are entitled to immunity because their actions in adopting and implementing the Stolee magnet program in 1992 were taken pursuant to and were consistent with the desegregation orders and opinions issued by the district court and Supreme Court in the early 1970s. In the main, CMS asserts that it is entitled to immunity for its act of implementing the 1992 magnet schools program without court approval because the prior desegregation orders authorized the use of "optional schools" and a racial balance goal for filling them. Like the district court, I conclude that the magnet schools plan, as implemented, was not authorized by the prior court orders and that, for the reasons stated hereafter, the CMS officials are not entitled to immunity.

### 1.   Magnet-Centered Program

As an initial matter, I note that prior court orders did not countenance implementation of a desegregation plan based primarily on magnet schools. Never was CMS given carte blanche to adopt such a program absent court review and approval. CMS counters that a magnet-centered plan was permissible insofar as the district court approved the establishment of a few experimental optional schools in 1974 as part of a plan utilizing paired elementary schools, satellite

attendance zones, and a feeder system. *See Swann*, 379 F. Supp. at 1103-04. What CMS fails to recognize is that optional schools were but a small part of the plan approved in 1974, likely because the district court was very skeptical about their efficacy as a desegregation technique. In the course of its order, the district court noted that the history of optional schools was marked by "failure" in a number of regards and warned CMS to be cautious in creating them. *Id.* at 1103. Consequently, CMS began with three experimental optional schools in 1974 and increased the number to only six by the early 1990s.

The optional schools created in the wake of the 1974 order placed more "emphasis on open or traditional education than normally offered in conventional schools." J.A. XXXII-15,683. The optional schools' traditional programs "offer[ed] an enriched and highly structured education," J.A. XXXII-15,732, whereas the open programs offered a "student-centered" environment that "encouraged [students] to take responsibility for their behavior and for their own learning." J.A. XXXII-15,733. The optional schools approved by the 1974 order were not as diverse and specialized as the magnet school program implemented in 1992. The program suggested by Dr. Stolee offered schools specializing in traditional and open educational methods and created specialized schools featuring the Montessori method; science, mathematics, and technology; foreign language immersion; learning immersion programs for young children; enhanced education for academically gifted students; and communication studies programs. *See* J.A. XXXII-15730-41. However, both the optional schools and the magnet schools were designed to achieve the same end result—the attraction of students to a school in a particular location by using a specialized curriculum or teaching technique. Thus, Dr. Stolee, in recommending the magnet program in 1992, observed that CMS, via its optional schools, "had some experience in such specialized schools." J.A. XXXII-15,580.

Despite the district court's 1970 directive that CMS obtain court approval for material modifications to the court-imposed desegregation plan, the court's skepticism of optional schools, the approval process that took place in the ensuing years, and Dr. Stolee's specific recommendation in 1992 that CMS seek court approval for the new magnet schools program, CMS inexplicably chose not to return to the district court to obtain approval of the magnet schools plan. At appel-

late argument before the entire court, CMS contended that the language in the 1970 order requiring court approval for material departures was superceded by the 1974 order. CMS points to no language in the 1974 order supporting this argument and its repeated citations to and reliance on pre-1974 orders regarding other aspects of this case further call into doubt this new line of argument. Moreover, the 1974 order made clear that "[e]xcept as modified herein, *all previous orders of court remain in effect.*" *Swann*, 379 F. Supp. at 1105 (emphasis added). Hence, the 1970 order's requirement that CMS obtain leave of court "before making any material departure from any specific requirement set out in the order" remained binding on school officials. *Swann*, 311 F. Supp. at 270.

Nevertheless, I recognize that magnet schools are frequently used by school districts under a desegregation order, *see Milliken v. Bradley*, 433 U.S. 267, 272 (1977) (*Milliken II*) (approving of magnet schools as a desegregation tool), and that the district court "encouraged [CMS officials] to use their full 'know-how' and resources to attain" a desegregated school system, *Swann* 311 F. Supp. at 269. Indeed, the plaintiff-intervenors' own expert has touted magnet programs as an "effective way to attract sizable numbers of white students to predominately minority schools." David J. Armor, *Forced Justice: School Desegregation and the Law* 223 (1995). Thus, a magnet schools program, properly implemented, can no doubt be an effective desegregation tool. However, a conclusion that CMS was free to adopt any form of magnet school program it might wish to see in place does not flow from this general proposition.

I must forcefully disagree with CMS's contention that the mention of optional schools in the 1974 order provided legal cover for the implementation of an assignment plan depending almost entirely on magnet schools. The portions of the district court order authorizing "optional schools" could perhaps be read in isolation as authorizing CMS's use of "magnet schools" in more diverse, specialized areas, but the order did not authorize CMS to unilaterally abandon pairing, satellites, and feeders in exchange for a magnet-centered plan. Despite the import of the 1974 order, and without even a nod to the district court, CMS in 1992 abandoned the approved desegregation plan in favor of magnets. By the end of the decade CMS had created fifty-eight magnet programs—a far cry from the six optional schools

in operation in the school year just prior to the adoption of the Stolee plan. *See* J.A. XXXIV-16,721-30. CMS describes this abandonment of the prior plan as but an expansion of the approved use of optional schools. Clearly, this "expansion" was in reality a substantial restructuring and cannot be squared with the unambiguous directives of prior orders.

## 2.   Strict Ratios

Even if I could conclude that a magnet-centered plan was permitted under prior court orders, the plan implemented by CMS is nonetheless *ultra vires* because it combines a rigid ratio of sixty percent white and forty percent black with a policy decreeing that "slots reserved for one race will not be filled by students of another race." J.A. XXXII-15,702.[9] In 1970, the district court issued a desegregation order to CMS, noting that the order was "not based upon any *requirement* of 'racial balance.'" *Swann*, 311 F. Supp. at 267 (emphasis added). The court reiterated "that efforts should be made to reach a 71-29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others, but . . . that variations from the norm may be unavoidable." *Id.* at 267-68 (internal quotation marks omitted). On appeal, the Supreme Court affirmed the guidelines set forth in the district court's order and also addressed the subject of racial quotas. *See Swann*, 402 U.S. at 23-25.

With regard to the district court's goal of achieving a racial balance of seventy-one percent white and twenty-nine percent black, the Court took care to note that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann*, 402 U.S. at 24. But central to the issue now before us, the Court held that had the district court

---

[9]My colleagues in the majority on this issue eloquently argue that CMS was permitted to take race-conscious measures when complying with desegregation orders. With this I agree—a school district under order to desegregate must of course take race into account when assigning students. The primary question regarding the magnet program, however, is whether CMS ran afoul of the Supreme Court's prohibitions against inflexible ratios, not whether race-conscious measures are permissible.

require[d], as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse.

*Id. See also Winston-Salem/Forsyth County Bd. of Educ. v. Scott*, 404 U.S. 1221, 1227 (1971) (Burger, C.J., in chambers) (describing as "disturbing" the school board's "understanding that it was *required* to achieve a fixed 'racial balance' that reflected the total composition of the school district"). The goal was upheld, only upon the condition that "use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement." *Swann*, 402 U.S. at 25.

Just two years after the Supreme Court, in this very case, made clear that strict ratios were unacceptable, the district court, in a carefully worded order permitting CMS to create optional schools, approved an intentionally flexible enrollment formula of "*about or above* 20% black students." *Swann*, 379 F. Supp. at 1104 (emphasis added). The district court recognized that the "actual enrollment of the optional school may have to be guided by its racial composition and by the number drawn from each other school area, not by considerations of space and program only." *Id.* at 1108. Additionally, the district court's order directed that "[r]eassignments to optional schools must not jeopardize the racial composition of any other school." *Id.* These modifications, however, at no time set a racial ratio of the type disapproved of by the district court in its earlier orders and by the Supreme Court in its 1971 review of the district court's 1970 order.[10]

---

[10]I also disagree with the assertion that the Supreme Court's disapproval of inflexible racial quotas as a desegregation tool is solely a limitation on a district court's remedial power. While the *Swann* Court did imply that a school board, exercising its discretion, could "conclude . . . that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole," 402 U.S. at 16, this is certainly not the state of the law today nor was it the state of the law in 1992 when the magnet plan was adopted. At the very least, the Supreme Court decisions in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 283 (1986) (plurality opinion applying strict scrutiny to a school board's

CMS asserts that the inflexible racial limits adopted in the 1992 magnet-centered plan were countenanced by the 1974 order discussing optional schools.[11] In making this argument, CMS ignores the district court's choice of words in the 1974 order ("about or above 20% black students"), *see Swann*, 379 F. Supp. at 1104, and points to an attachment to the order designated as Exhibit A. This exhibit, a proposed pupil assignment plan drafted by CMS and a citizens advisory group, called for optional school enrollment "at or above *approximately* a 20% black ratio." *Id.* at 1108 (emphasis added). From this language, CMS concludes that strict quotas were permitted. CMS's concentration on just a portion of the relevant language ("at or above") edits out the word "approximately," which does not suggest rigidity. Even if Exhibit A could be read as requiring rigid quotas, CMS disregards the fact that the district court approved the guidelines "subject to the further conditions stated" in the 1974 order. *Id.* at 1103. With the Supreme Court's admonition about strict quotas in mind, the district court chose its language carefully, observing that optional schools should "have about or above 20% black students." *Id.* at 1104. Hence, it is the district court's understanding and modification of the pupil assignment plan that controls, not CMS's tortured reading. Under a just construction, it is clear that the 1974 order did not approve a use of race to the extent that CMS could deny eager

---

race-based layoff program), and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494 (1989) (applying strict scrutiny to a racial set-aside program), should have alerted CMS that it could not rely on the "pluralistic society" passage from the 1971 opinion when crafting a magnet admissions policy that was outside the scope of the desegregation orders. By 1992 such a use of race was not merely discretionary. Prevailing case law required that the racial classification be narrowly tailored to achieve a compelling state interest. *See J.A. Croson Co.*, 488 U.S. at 494. And as demonstrated in section III.B, the admissions policy was in no sense narrowly tailored.

[11]In contending that rigid ratios were not used by CMS, several of my colleagues observe that not a single magnet school achieved the precise ratio of sixty percent white students and forty percent black students. This is not surprising insofar as the policy was designed to leave seats vacant. The very act of leaving seats vacant will compel a deviation from the stated goal. However, this in no way undermines a finding of rigidity. Instead, such a result illustrates the policy's inflexibility.

applicants an otherwise available slot in a magnet program solely on account of the applicant's race. Both the district court and the Supreme Court in this very case consistently rejected the use of such rigid racial quotas.

I also find no authorization for the board's adoption of the magnet schools program in the Supreme Court's 1971 approval in *Swann* of a majority-to-minority transfer policy that would prevent, for example, an African-American child in a majority white school from transferring to a majority black school because the transfer would increase the degree of segregation in the affected schools. *See Swann*, 402 U.S. at 26. Because the majority-to-minority transfer policy, like the magnet admissions policy, prevents a child from enrolling in the public school of his choice, CMS argues that the magnet admissions policy is permissible. By definition, however, CMS's specialized magnet programs are not tantamount to conventional public schools. While a child denied a transfer from one conventional school to another still receives the same general education, a child denied admission to a specialized magnet program does not receive a similar benefit in a conventional school. In other words, an education in a magnet school offering, for example, foreign language immersion, is not interchangeable with an education in a conventional public school.[12] Hence, the effect of the magnet admissions policy is far different from the majority-to-minority transfer policy.

Unfortunately, the end result of the challenged magnet schools admissions policy is placement of racial quotas ahead of educating students—an inappropriate result nowhere countenanced in the district court's orders or in the Supreme Court's desegregation decisions. *Cf. Wright v. Council of the City of Emporia*, 407 U.S. 451, 463 (1972) (holding that courts should not approve a desegregation plan

---

[12]I recognize that parents might perceive that one "fungible" conventional school is superior to another because of a number of intangibles such as the reputation of teachers or the newness of facilities. However, these "personal preferences" do not rise to a level of constitutional significance. *See Hampton v. Jefferson County Bd. of Educ.*, 102 F. Supp. 2d 358, 380 n.43 (W.D. Ky. 2000). Magnet schools, on the other hand, are a completely different animal and therefore the admissions process used must be more closely scrutinized.

if the plan offers "'quality education' to some children, [but] has a substantial adverse effect upon the quality of education available to others"). In fact, *Brown I* struck down segregated schooling because children were denied equal educational opportunities. *See Brown I*, 347 U.S. at 493. While school boards were permitted to use race in assigning students in order to convert to a unitary system, *see North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 46 (1971) (holding that the use of race in pupil assignments is "one tool absolutely essential to fulfillment of [a school board's] constitutional obligation to eliminate existing dual school systems"), neither the *Brown* opinions nor the district court orders implementing them ever contemplated that remedial use of race, like the old dual system, would deny some students educational opportunities solely because of their race. *See Brown I*, 347 U.S. at 493 (holding that an educational opportunity provided by the state "must be made available to all on equal terms"); *see also Bakke*, 438 U.S. at 305 (Powell, J.) ("When a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, it must be regarded as suspect.").[13] Indeed, in bringing suit in 1965, the *Swann* plaintiffs, in accord with the *Brown* opinions, simply asked that CMS convert "into a unitary nonracial system wherein the educational opportunities offered by [CMS] are made available to students without regard to race or color." J.A. XXXIII-16,162 (original complaint filed by the *Swann* plaintiffs).

An admissions policy that uses rigid racial quotas to deny an available, unclaimed slot in a specialized magnet school to a child, whether black or white, on account of the child's race cannot be squared with the district court's orders or the Supreme Court's desegregation decisions. Since 1971 it has been perfectly clear that mathematical ratios may be used as "a starting point in the process of shaping a remedy," but not as "an inflexible requirement." *See Swann*,

---

[13]Though the present case was brought on behalf of a white child denied admission to a magnet school, the policy as written could have just as easily denied a black child admission to the magnet school. *See Hampton v. Jefferson County Bd. of Educ.*, 102 F. Supp. 2d 358, 377 (W.D. Ky. 2000) (racial quota in a magnet school resulting in black students being denied admission even though the school was several hundred students below capacity).

402 U.S. at 25. The district court took heed of this admonition in 1974 when it permitted the creation of optional schools with "*about or above* 20% black students." *Swann*, 379 F. Supp. at 1104 (emphasis added). However, CMS in 1992 ran afoul of the rule announced by the Supreme Court when it crafted strict racial ratios designed to leave open magnet school seats empty, rather than permitting wait-listed students to compete for the slots. Because nothing short of intellectual gymnastics can transform the clear meaning of the Supreme Court's *Swann* opinion or the district court's 1974 order into vehicles countenancing the rigid use of racial ratios, I agree with the district court that the policy is *ultra vires* and that CMS officials are not entitled to immunity.

## B.   Equal Protection

Having determined that the CMS officials are not entitled to immunity for the implementation of the strict race-based magnet school assignment policy, I now turn to the question of whether the officials' act of implementing the policy without prior court approval, albeit while under an order to desegregate schools, runs afoul of the Equal Protection clause. I would hold that it does.

Under the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. By guaranteeing equal protection, the Amendment recognizes that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). The Supreme Court has refused to make exceptions for so-called "benign" racial classifications, *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995), and the Court has made clear that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny," *id.*[14]

[14]The Supreme Court's application of strict scrutiny has indeed been unwavering. In *Adarand*, the Court refused to apply a lesser standard of scrutiny to racial classifications enacted by Congress. Though Congress itself is charged with enforcing the Fourteenth Amendment's promise of

To survive strict scrutiny, CMS's use of race in the magnet admissions program "must (1) serve a compelling governmental interest and (2) be narrowly tailored to achieve that interest." *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 704 (4th Cir. 1999), *cert. dismissed*, 120 S. Ct. 1552 (2000). CMS avers that the magnet admissions policy was adopted to remedy the effects of the dual school system previously operated in Mecklenburg County. Without question, remedying

---

equal protection via "appropriate legislation," U.S. Const. amend. XIV, § 5, the Supreme Court in interpreting the Fifth Amendment held Congress to the same rigorous standards applicable to states and localities. *See Adarand*, 515 U.S. at 224 (observing "that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny").

CMS and the *Swann* plaintiffs contend that strict scrutiny does not apply when a school district is under court order to dismantle the dual system. Such an approach, however, ignores two of the three pillars of Supreme Court's equal protection analysis: skepticism of all racial preferences and consistent application of heightened scrutiny regardless of the race of the person burdened or benefitted. *See Adarand*, 515 U.S. at 223-24. Contrary to the assertions of CMS and the *Swann* plaintiffs, the approach I would adopt does not deprive a school board under court order of the necessary tools required to establish a unitary school system.

> The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in governmental decisionmaking. . . . Strict scrutiny does not "trea[t] dissimilar race-based decisions as though they were equally objectionable"; to the contrary, it evaluates carefully all governmental race-based decisions *in order to decide* which are constitutionally objectionable and which are not.

*Id.* at 228 (internal citations omitted) (alteration in original). This careful evaluation demanded by the Supreme Court will preserve inviolate proper desegregation remedies while ensuring that in the process of desegregating a government actor does not stand equal protection on its head by denying some students educational opportunities solely because of their race.

the effects of past discrimination is a compelling state interest. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

In reviewing whether a policy is narrowly tailored to serve a compelling state interest, a court considers factors such as:

(1)   the necessity of the policy and the efficacy of alternative race neutral policies;

(2)   the planned duration of the policy;

(3)   the relationship between the numerical goal and the percentage of minority group members in the relevant population;

(4)   the flexibility of the policy, including the provision of waivers if the goal cannot be met; and

(5)   the burden of the policy on innocent third parties.

*See United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion). Like the district court, I would hold that the CMS magnet admissions policy is not narrowly tailored to the compelling interest of remedying past discrimination.

First, the magnet admissions policy was not necessary to comply with the court's order to dismantle the dual educational system. CMS had a number of options available to it that would not have deprived children, solely on account of their race, an available seat in a specialized magnet program. Instead, CMS opted for rigid racial limits that were clearly prohibited by the district court's orders and the Supreme Court's desegregation decisions. Nor is there evidence in the record that added flexibility or a waiver provision would have undermined the use of magnet schools as a desegregation technique. The evidence simply does not reveal that the magnet admissions policy used was the only efficacious option available to CMS.

Second, this circuit has emphasized that "[t]he use of racial preferences must be limited so that they do not outlast their need; they may

not take on a life of their own." *Hayes v. North State Law Enforcement Ass'n*, 10 F.3d 207, 216 (4th Cir. 1993) (internal quotation marks omitted). Like the district court, I can find "no mention of the duration that CMS would use racially segregated lotteries, vacancies, and waiting lists." *Capacchione*, 57 F. Supp. 2d at 290. In light of CMS's desire to remain under court order for the indefinite future, *see supra* Part II.H, the lack of a duration for the magnet admissions policy is not surprising. CMS was apparently content, in a number of instances, to leave available magnet seats empty despite the waiting lists.

Third, I agree with the district court that "the 60-40 numerical goal is related to the relevant population, i.e., the racial composition of schoolchildren in CMS." *Capacchione*, 57 F. Supp. 2d at 289. However, there is no evidence that CMS considered the "practicability of achieving this precise ratio in every magnet school," *id.* at 290, or the very real danger that magnet schools would be underutilized because seats would be left open despite an abundance of applicants. The result of the admissions policy is but another indication that the CMS administration, in the words of former Superintendent Murphy, "was more focused on balance than on [educational] outcomes." J.A. VI-2687.

Fourth, the district court aptly described the inflexibility in the magnet admissions policy: "The Court is hard-pressed to find a more restrictive means of using race than a process that results in holding seats vacant while long waiting lists full of eager applicants are virtually ignored." *Capacchione*, 57 F. Supp. 2d at 289. The policy is indeed "restrictive," but it also borders on obduracy. The policy contained no written waiver provision which, once again, shows a lack of concern that these highly specialized schools could and would be underutilized.

Finally, the innocent parties affected are children denied magnet slots solely because of their race and parents who "must wait for months without knowing where their children eventually will be placed." *Id.* at 290. A child's education is one of the greatest concerns of the family, and CMS unnecessarily causes much agonizing when it places children of the "wrong color" on waiting lists while it

actively recruits children of the "right color" to fill empty magnet school seats.

In sum, the magnet admissions policy is not narrowly tailored. The policy is not necessary to dismantle the de jure system, is for an unlimited duration, provides for virtually no flexibility, and burdens innocent children and their families. The policy quixotically purports to establish equal protection of the laws in the realm of public education by denying children an equal opportunity to compete for open, unclaimed slots in CMS's extraordinary magnet schools. The withholding of seats from white students after all African-American children wishing seats have been given them is most certainly not a narrowly tailored program. Such a result calls to mind why strict scrutiny is used in the first place: "Of all the criteria by which men and women can be judged, the most pernicious is that of race." *Maryland Troopers Ass'n v. Evans*, 993 F.2d 1072, 1076 (4th Cir. 1993). Teaching young children that admission to a specialized academic program with available seats is contingent on their race is indeed pernicious, and CMS's magnet admissions policy can in no way be described as narrowly tailored to achieve the compelling interest of remedying past discrimination.[15]

## C.   Award of Nominal Damages

After finding a constitutional violation in the magnet schools, the district court held CMS "nominally liable in the amount of one dollar." *Capacchione*, 57 F. Supp. 2d at 290. CMS argues that the nominal damages awarded were unjustified because the actions resulting in a constitutional violation were taken in good faith. CMS fears that

---

[15]CMS also presented diversity as an alternative compelling state interest. *See Capacchione*, 57 F. Supp. 2d at 289. In this circuit, it is unsettled whether diversity may be a compelling state interest. *See Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123, 130 (4th Cir. 1999), *cert. denied*, 120 S. Ct. 1420 (2000). Assuming without deciding whether diversity may be a compelling state interest, I would hold that the magnet admissions policy again fails because it is not narrowly tailored. Whether the interest is remedying past discrimination or diversity, the admissions policy as currently written is in no sense narrow. It is difficult to imagine any interest for which the magnet admissions policy is narrowly tailored.

the damages award will "open the door to numerous suits by other students who could claim that they did suffer actual damages and argue that collateral estoppel prevents CMS from denying liability." Defendants-Appellants' Brief at 24. Regarding nominal damages, the Supreme Court has observed:

> Common-law courts traditionally have vindicated deprivations of certain "absolute" rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. 247, 266 (1978) (nominal damages available for denial of procedural due process rights) (footnote omitted); *see also Price v. City of Charlotte*, 93 F.3d 1241, 1246 (4th Cir. 1996) (stating that "the rationale for the award of nominal damages being that federal courts should provide some marginal vindication for a constitutional violation").

In the present case there was indeed a constitutional violation. CMS ran afoul of the Equal Protection Clause when it adopted a strict racial quota designed to deny an available, unclaimed slot in a specialized magnet school to a child on account of the child's race. In order to recover nominal damages, Cristina Capacchione need not prove that absent the unconstitutional policy she would have been admitted to the magnet program. The injury in the present case is not the ultimate inability to enroll in the magnet school, but the inability to compete for seats on an equal basis. *See Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Though the two open "black seats" at the Olde Providence magnet school were eventually awarded to white children, the fact remains that the official magnet admissions policy prohibited children like Cristina from competing for the open slots. In fact, CMS left the two available "black seats" at Olde Providence

unfilled for most of the summer while Cristina and over one hundred other white children languished on a waiting list. In Orwellian fashion, CMS marketed Olde Providence as "a school to benefit everyone," but in reality permitted only a select few to compete for the benefits bestowed.

The nominal award in this case recognizes the importance of equal protection under the law and provides some measure of vindication. As for CMS's worry about collateral estoppel, liability has already been established, and vacating the nominal damages would not change this. Consequently, I would affirm the district court's award of nominal damages.

## IV.    Injunctive Relief

After recounting the unitary status determination and the constitutional violation in the magnet admissions policy, the district court enjoined "CMS from any further use of race-based lotteries, preferences, and set-asides in student assignment." *Capacchione*, 57 F. Supp. 2d at 292. CMS challenges the district court's injunction as unwarranted and overbroad. We review the grant of a permanent injunction for an abuse of discretion. *See Tuttle*, 195 F.3d at 703.

Before a court grants a permanent injunction, the court must first find necessity—a danger of future violations. *See Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (stating that an injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future"); *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or to recur."); *Bloodgood v. Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986) ("An injunction is a drastic remedy and will not issue unless there is an imminent threat of illegal action."). Though a flexible tool, an injunction may not be used for "punishment or reparations for . . . past violations." *Oregon State Med. Soc.*, 343 U.S. at 333.

The district court's finding of a threat of future violations centered on CMS's offering of diversity as a compelling state interest. This interest was offered after the district court decided that the admissions

policy should be reviewed using strict scrutiny. Because in this circuit it is unsettled whether diversity may be a compelling state interest, *see Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123, 130 (4th Cir. 1999), *cert. denied*, 120 S. Ct. 1420 (2000), it was improper for the district court to base its injunction on CMS's unsuccessful defense of the policy. At this point, we can discern nothing in the record indicating that CMS will ignore the district court order and continue to use race in an unconstitutional manner in the operation of the magnet schools or other schools in the system. CMS represented to the district court both during and after trial that it had no intention of continuing the magnet plan. In moving for a stay of the injunction, CMS did not ask that the injunction be stayed as to the magnet schools, and was prepared to comply immediately with the court's order. CMS requested a stay as to the non-magnet schools because over 50,000 students were likely to be reassigned in a short period of time. Moreover, there was no evidence presented at trial about what CMS proposed to do as a unitary school system. A post-unitary status student assignment plan was never given to the district court, and the evidence simply does not indicate that "there is an imminent threat of illegal action." *Bloodgood*, 783 F.2d at 475.

A finding of unitariness brings a fresh start for the school board—an opportunity to operate a school system in compliance with the Constitution. The prospective relief awarded by the district court is in tension with the resumption of local control, which is one of the ultimate goals of any desegregation order. *See Freeman*, 503 U.S. at 490. Freeing the school district from one court order only to shackle it with another was here an abuse of the district court's discretion, and we therefore vacate the grant of injunctive relief.

## V.   Discovery Sanctions

The district court sanctioned CMS for failing to supplement its answers to interrogatories that sought a list of witnesses. We review the district court's management of discovery under the abuse of discretion standard. *See Anderson v. Foundation for Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998). The record reveals that no list of fact witnesses was presented to the plaintiff-intervenors until five days before the trial date. At that time, CMS presented a list of 174 witness, which was later cut to twenty-

six. The plaintiff-intervenors moved for sanctions and the district court granted the motion in part. The district court continued the trial for one week so that the plaintiff-intervenors could depose the newly disclosed witnesses, and the court held CMS accountable for the fees and expenses of these depositions.

We have developed a four-part test for a district court to use when determining what sanctions to impose under Federal Rule of Civil Procedure 37. Specifically, "[t]he court must determine (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Id.* An examination of the four factors reveals no abuse of discretion by the district court.

First, there is ample evidence of bad faith. Early in the case, the plaintiff-intervenors presented CMS with an interrogatory asking for disclosure of trial witnesses. In response to the interrogatory, CMS stated that it would provide appropriate information concerning witnesses at the time and in the manner specified by the district court. The plaintiff-intervenors moved to compel discovery, and the court agreed with CMS that the request was premature. However, the court instructed CMS to "supplement its responses [to the interrogatories], as it promised, when such information becomes known." J.A. I-195. As an excuse for its untimely disclosure of fact witnesses, CMS relies on the district court's pre-trial order, which provides that "[a] witness list containing the name of every proposed witness" should be filed with the court on the first day of trial. J.A. I-150. This provision of the pre-trial order was clearly for the court's convenience and could not reasonably be interpreted to apply to disclosures to the other parties. Besides, even if such an interpretation were reasonable, the district court's command to supplement interrogatories superceded the pre-trial order. Accordingly, bad faith is evident.

Second, the presentation of such a lengthy witness list on the eve of trial to the plaintiff-intervenors was prejudicial. Without the action of the court, the plaintiff-intervenors would have had no opportunity to depose the witnesses, much less properly prepare for trial. Thus, CMS's failure to supplement interrogatories was prejudicial.

Third, such non-compliance with the district court's orders certainly needed to be deterred. The district court's condonation of CMS's bad faith at a time so close to the beginning of trial could have encouraged repetition of improper conduct. As found by the district court, the record indicates that the failure to supplement interrogatories was not the first time CMS "was lacking in candor in disclosing relevant and important information." J.A. I-305. Hence, deterrence was essential to a proper management of this case.

Finally, less drastic sanctions would not have been effective. Permitting the plaintiff-intervenors to depose witnesses and requiring CMS to pay fees and expenses for the depositions was appropriate. CMS was fortunate to receive such a light sanction, and it is doubtful whether lesser measures would have had any effect on CMS's conduct.

In sum, the discovery sanctions imposed did not amount to an abuse of the district court's discretion.

## VI.   Attorney Fees

CMS argues that the district court erred in awarding attorney fees to the plaintiff-intervenors. While conceding that Grant is entitled to fees if the district court's unitary status finding is upheld, CMS argues that Capacchione cannot be a prevailing party on this issue. CMS also challenges Capacchione's receipt of fees based on the district court's magnet schools ruling because (1) Capacchione received only nominal damages, and (2) young Capacchione would not have been admitted to the magnet program even if race was not a factor insofar as her lottery number was so high. The district court's decision to award attorney fees is reviewed for an abuse of discretion. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 631 (4th Cir. 1999). I would affirm.

### A.   Attorney Fees for Unitary Status

#### 1.

In my view, the plaintiff-intervenors are entitled under § 1988 to attorney fees for their successful litigation of the unitary status issue.

Indeed, CMS has *conceded* that if we upheld the declaration of unitary status, Grant would be entitled to attorney fees.

> Unlike Capacchione, the Grant intervenors were granted declaratory and injunctive relief related to the issues of unitary status and CMS' magnet school admission policies. Therefore, the entitlement of the Grant intervenors to recover attorneys' fees is tied directly to the merits of those claims.

CMS's Brief at 39-40. Surprisingly, despite CMS's concession, a majority of this court vacates the award of fees to both Capacchione and Grant.

By obtaining a declaration of unitary status, the Grant plaintiffs, along with Capacchione, finished what the original *Swann* plaintiffs started. If we deny the plaintiff-intervenors the ability to be compensated in a situation such as this—where an incredible amount of legal work is required and the board, for improper reasons, clings to the court's order—then we give to litigants like the *Swann* plaintiffs effective control over the decision of "when" or even "if" a unitary status hearing will be sought because they would be the only ones who could ever obtain reimbursement for their legal fees. The practical consequences are scarcely more apparent than in this case, where the only party ruled entitled to obtain attorney fees for finishing the job was opposed to seeing unitary status declared. This, coupled with the fact that the plaintiff-intervenors received a court order in their favor on the unitary status question as a continuation of the original § 1983 action, leaves me at a loss to see how the district court's award of attorney fees to them under § 1988 can be reversed.

Under 42 U.S.C.A. § 1988(b) (West Supp. 2000), "[i]n any action or proceeding to enforce a provision of [§ 1983 and other civil rights laws] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." To be considered a prevailing party, a party must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (internal quotation marks omitted).

This case began in 1965 as a § 1983 action with the *Swann* plaintiffs seeking conversion of CMS "into a unitary nonracial system wherein the educational opportunities offered by [the board] are made available to students without regard to race or color." J.A. XXXIII-16,162 (original *Swann* complaint commencing an action under § 1983); *see also Monell v. Department of Social Servs.*, 436 U.S. 658, 697 (1978) (observing that school desegregation actions "have almost without exception been § 1983 suits"). In essentially a continuation of what was begun in 1965, Capacchione, believing that CMS had established a unitary school system, brought suit pursuant to § 1983 and prayed that the district court enter a declaration of unitary status. *See* J.A. I-110 (Capacchione amended complaint seeking a declaration of unitary status); *see also* JA. I-140 (Grant complaint seeking a declaration of unitary status); *cf. Waste Mgmt. Holdings, Inc. v. Gilmore*, No. 00-1185, 2001 WL 604325 (4th Cir. June 4, 2001) (§ 1983 action seeking declaratory relief). Shortly after Capacchione filed suit, the *Swann* plaintiffs moved to reactivate *Swann* and to consolidate it with Capacchione's action. The district court granted the *Swann* plaintiffs' motion and later permitted Capacchione to intervene in *Swann*. Grant, who also sought a declaration of unitary status, then moved to intervene in the consolidated action, and the district court granted his motion. After months of litigation, the plaintiff-intervenors succeeded in having CMS declared unitary, and this court has affirmed on appeal.

With the prior court orders now dissolved, CMS must cease using the orders to assign Grant's children as well as all other public school students on account of their race.[16] A unitary school system is what

[16]CMS argues that because Capacchione no longer resides in North Carolina the unitary status declaration does not alter CMS's behavior toward young Capacchione and consequently Capacchione is not a prevailing party entitled to fees. In other words, CMS contends that Capacchione's lack of standing counsels against an award of fees. I disagree. At the very least, because of Capacchione's status as a plaintiff-intervenor in *Swann*, Capacchione is still entitled to fees. *See Shaw v. Hunt*, 154 F.3d 161, 167 (4th Cir. 1998) (noting that when plaintiffs with standing "secure[ ] precisely the relief that they sought," plaintiff-intervenors who lack standing but contributed to the litigation may also be awarded attorney fees). Grant, who CMS concedes has standing and is entitled to fees, achieved the relief originally sought—a declaration of unitary status. Capacchione greatly contributed to this result, and under *Shaw* is entitled to fees just as Grant.

the original plaintiffs sought in 1965, and the plaintiff-intervenors have greatly assisted in the final stages of this litigation in making unitariness a reality. Henceforth, unless CMS's use of racial classifications satisfies the requirements of strict scrutiny, the color of a child's skin will no longer be a permissible basis for assigning, or refusing to assign, a child to a conventional public school or a specialized magnet program. *See Farrar*, 506 U.S. at 110 (observing that declaratory relief may constitute relief under § 1988 "if[ ] it affects the behavior of the defendant toward the plaintiff") (internal quotation marks omitted). Moreover, this declaration of unitary status is enforceable against CMS in the unlikely event it later attempts to continue prior assignment polices, say, on the ground that vestiges of prior discrimination have not been eradicated. *See id.* at 111 (explaining that to be a prevailing party an enforceable judgment must be obtained).

In the present case, with its counter-intuitive alignment of parties, the plaintiff-intervenors have stepped into the shoes of the *Swann* plaintiffs, continued the original § 1983 action, and brought this case to a close. Just as the *Swann* plaintiffs, prior to removal of the case from the active docket, were compensated for their services, *see Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 66 F.R.D. 483 (W.D.N.C. 1975) (awarding the Swann plaintiffs $204,072.33 in fees and costs), so too should the plaintiff-intervenors be compensated for a continuation of the legal efforts to achieve a unitary school system and to remove federal court control. In this regard the plaintiff-intervenors have acted as "private attorney[s] general," *Independent Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758-60 (1989) (internal quotation marks omitted) (alteration in original), and obtained a finding of unitariness, which was the ultimate objective of the original action. *See* J.A. XXXIII-16,162 (original complaint seeking "reorganization of the school system into a unitary nonracial system"). Indeed, no one disputes that the *Swann* plaintiffs would have been entitled to fees if they had taken the initiative to petition for a declaration of unitary status instead of acting to oppose the result we reach today.

Without question, the monitoring of a school desegregation decree is crucial to the dismantling of the dual system. *See Jenkins v. Missouri*, 967 F.2d 1248, 1251 (8th Cir. 1992) (awarding fees in desegre-

gation case pursuant to § 1988). Accordingly, efforts "to insure full compliance and to ensure that the plan is indeed working to desegregate the school system[ ] are compensable services." *Northcross v. Board of Educ.*, 611 F.2d 624, 637 (6th Cir. 1979). Here, the plaintiff-intervenors observed CMS's progress in dismantling the dual system, and once convinced that full compliance had been achieved, they moved for a declaration of unitary status. In so doing, the plaintiff-intervenors were faced with a recalcitrant school board that insisted none of the *Green* factors had been satisfied. The *Swann* plaintiffs, though having never returned to court to complain about the continuation or revival of segregative practices, suddenly claimed that the dual system was not being dismantled and joined the school board in the quest for continuation of court supervision. Though most of the vital information was in the hands of CMS's officials, who were often uncooperative in the discovery process, *see Capacchione*, 57 F. Supp. 2d. at 292-293 (cataloging sanctions and threats of sanctions against CMS), the plaintiff-intervenors persevered and ultimately obtained a declaration of unitary status. But for the actions of the plaintiff-intervenors, CMS, though having dismantled the dual system, would still be using the district court's orders as mechanisms for attaining other goals. Despite the progress of the last three decades, CMS was apparently content to forestall a finding of unitariness for the foreseeable future. *See Freeman*, 503 U.S. at 490 (observing that restoration of local control "at the earliest practicable date" is a goal of any desegregation order). Consequently, I believe that the plaintiff-intervenors, for stepping in and finishing what was begun in 1965, are entitled to attorney fees under § 1988 for their litigation of the unitary status issue.

2.

I would also affirm the plaintiff-intervenors' award of attorney fees, based on the unitary status declaration, under this circuit's exceptional circumstances doctrine. *See Rolax v. Atlantic Coast Line R. Co.*, 186 F.2d 473, 481 (4th Cir. 1950) (holding that absent a statute attorney fees are normally unavailable unless "the taxation of such costs is essential to the doing of justice . . . in exceptional cases"). To avoid a declaration of unitary status, CMS has clung to the desegregation decree for improper reasons, *see supra* part II.H, and the equitable remedy ordered in 1969 "would be far from complete, and justice

would not be attained, if reasonable counsel fees were not awarded" to the plaintiff-intervenors. *Bell v. School Bd. of Powhatan County*, 321 F.2d 494, 500 (4th Cir. 1963) (en banc) (awarding attorney fees in school desegregation case based on exceptional circumstances when the school board engaged in a "pattern of evasion and obstruction" which "cast[ ] a heavy burden on the children and their parents"). A contrary result would hamper the involvement of concerned citizens in school desegregation litigation and permit school boards that are inclined to remain under court order to eschew a unitary status hearing.

I recognize that the Supreme Court recently rejected the catalyst theory as a basis for awarding attorney fees. *See Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*, 121 S. Ct. 1835 (2001). However, the award of fees in the present case has never been based on the catalyst theory, "which posits that a plaintiff is a prevailing party if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at 1838 (internal quotation marks omitted). In this case, there was no voluntary change in CMS's conduct. CMS clung to the desegregation orders and put up a vigorous defense in the course of a two-month trial. A final judgment was handed down, and any change in CMS's behavior will be due to the district court's decree, not a voluntary act. While a "voluntary change in conduct . . . lacks the necessary judicial *imprimatur* on the change" for a plaintiff to be considered a prevailing party, a declaration of unitary status is far different. *Id.* at 1840. Once found to be in violation of the Constitution, a school district cannot be declared unitary without the order of a court. Because the district court's order, and not a voluntary act, is the impetus behind any change, the rejection of the catalyst theory in *Buckhannon* does not undermine an award of attorney fees based on the exceptional circumstances doctrine of *Rolax*.

### B.    Attorney Fees for the Magnet Schools Litigation

I would also find that Capacchione is entitled to fees because he is a prevailing party on the magnet schools issue. The district court held that the magnet schools admissions policy violated the Equal Protection Clause of the Fourteenth Amendment and awarded nominal damages in light of the constitutional violation. In *Farrar*, the

Supreme Court specifically addressed the issue of nominal damages and prevailing party status:

> We therefore hold that a plaintiff who wins nominal damages is a prevailing party under § 1988. . . . A plaintiff may demand payment for nominal damages no less than he may demand payment for millions of dollars in compensatory damages. A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.

506 U.S. at 112-13 (internal citations omitted). The award of nominal damages constitutes relief on the merits and affects CMS's behavior toward Capacchione if only by forcing CMS to pay. Hence, Capacchione is a prevailing party. *See also Shaw v. Hunt*, 154 F.3d 161, 164 (4th Cir. 1998) (noting that "persons within the generic category of plaintiff-intervenors have often been found by courts to fit within the rubric 'prevailing party' for fees purposes"). That young Capacchione had a high lottery number is irrelevant for a determination of prevailing party status. As previously stated, the injury in this case was the inability to compete for open magnet seats, not the denial of admission to a magnet program. Because I would find that Capacchione rightly prevailed on the magnet schools issue, I would affirm the district court's award of attorney fees for work in this area as well.

## VII.

For the foregoing reasons, a majority of this court affirms the district court's declaration of unitary status and the imposition of discovery sanctions. We vacate the district court's injunction because we can discern no danger of future violations. Additionally, I would affirm the finding of a constitutional violation in the magnet schools admissions policy, the award of nominal damages, and the attorney fees awarded pursuant to 42 U.S.C.A. § 1988.

WILKINSON, Chief Judge, concurring in part:

I concur in Parts I, II, IV, and V of Judge Traxler's thorough opinion. With respect to Parts III and VI, I respectfully take a different view.

## I.

There can be no doubt that if the 1992 Charlotte-Mecklenburg magnet school program were adopted today, it would be unconstitutional and in violation of our holdings in *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698 (4th Cir. 1999), and *Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123 (4th Cir. 1999). Those holdings properly emphasize the ecumenical premise of the Fourteenth Amendment that every American citizen regardless of race or ethnicity is deserving of equal dignity under the law.

The more difficult question is whether the adoption of the magnet school program in 1992, at a time when the school board was under a court desegregation order, stripped the Board of its immunity. I would hold that it did not. Inasmuch as the Board did not forfeit its immunity, I would vacate the award of damages against it and the fees and costs assessed thereon.[1]

Both the Supreme Court's *Swann* opinion and various lower court opinions relied for many years upon numerical benchmarks as an indicia of progress in achieving school desegregation. That emphasis, however, was primarily the work of the courts, not the school board. And judicial decisions further made clear that the Charlotte-Mecklenburg school board could take the numerical approach of the courts even further in the course of devising desegregative remedies of its own.

For instance, in *Swann*, the Supreme Court itself held that: "School authorities are traditionally charged with broad power to formulate

---

[1]Although the Grant plaintiffs have prevailed with regard to the unitary status determination, their basis for prevailing was not an action under 42 U.S.C. § 1983. Accordingly, there exists no statutory basis here for deviating from the American Rule. Under this rule, fees are not generally awarded to prevailing parties "absent explicit statutory authority." *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. ___, No. 99-1848, slip op. at 3-4 (May 29, 2001) (internal quotation omitted). And the Supreme Court has emphasized that the judiciary enjoys no "roving authority" to award counsel fees "whenever the courts might deem them warranted." *Id.* at 12.

and implement educational policy and might well conclude . . . that in order to prepare students to live in a pluralistic society *each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole*. To do this as an educational policy is within the broad discretionary powers of school authorities." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) (emphasis added).

Likewise, in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 501 F.2d 383 (4th Cir. 1974) (en banc) (per curiam), parents of white students brought suit against the school board because it allegedly had established a set-aside for African-American students to take part in its gifted students program. *Id.* at 383. This court affirmed an injunction prohibiting the plaintiffs from proceeding in state court. We held that the plaintiffs' suit could affect the school board's efforts to comply with prior federal court desegregation orders, including one which required the Board to assign students in such a manner that the schools would have about the same proportion of African-American and white students. *Id.* at 384.

And the district court's desegregation orders in this case can fairly be read to encourage, rather than foreclose, the conduct in which the school board here engaged. For instance, in 1970, Judge McMillan ordered that "the defendants maintain a continuing control over the race of children in each school, . . . *and maintain the racial make-up of each school* . . . . The defendants are encouraged to use their full 'know-how' and resources to attain the results above described, and thus *to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the results*." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 311 F. Supp. 265, 268-69 (W.D.N.C. 1970) (emphasis added). And four years later, in an order addressing optional schools, which were the precursors of the magnet schools, Judge McMillan ordered that: "Strict and central control must be exercised over all admissions (reassignments) to each optional school in order to fulfill the necessary ends that these schools . . . be integrated by grade *at or above approximately a 20% black ratio*." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 379 F. Supp. 1102, 1108 (W.D.N.C. 1974) (emphasis added).

While this case was removed from the active docket in 1975, Judge McMillan noted that: "This case contains many orders of continuing

effect, and could be re-opened upon proper showing that those orders are not being observed." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 67 F.R.D. 648, 649 (W.D.N.C. 1975); *see also Martin v. Charlotte-Mecklenburg Bd. of Educ.*, 475 F. Supp. 1318, 1340 (W.D.N.C. 1979) (upholding the school board's 1978 pupil assignment plan which took into consideration the race of the student).

Magnet schools are a widely used desegregation device. It is true that in the early 1990's, the school board in its magnet program eagerly accepted the courts' invitation to rely upon numerical benchmarks. I believe, however, that it is necessary to afford a school board some latitude in attempting to meet its desegregative obligations if we are not to undermine the rule of law. To do otherwise leaves the Board between a rock and a hard place. Namely, if the school board fails to carry out the court desegregation order, it can be cited for contempt or held not to have achieved unitariness. But if the Board acts aggressively to implement the court order, it risks facing judicial condemnation and the threat of litigation on the grounds that it was acting *ultra vires*. This is not the kind of quandary into which we should force institutions that are, for better or worse, under judicial decree.[2] Such an approach risks undermining respect for courts and, indeed, encouraging just the opposite.

My fine colleague, Judge Luttig, insists that the issue here has solely to do with racial quotas. I have strongly disapproved of the use of such quotas. *See, e.g.*, *J. A. Croson Co. v. City of Richmond*, 822 F.2d 1355 (4th Cir. 1987), *aff'd*, 488 U.S. 469 (1989); *Maryland Troopers Ass'n, Inc. v. Evans*, 993 F.2d 1072 (4th Cir. 1993). Indeed I believe them to be inimical to a national future founded, as the Fourteenth Amendment requires, upon individual respect and mutual self-regard. Yet to see the sole issue here as racial quotas is to miss the forest for the trees. The cumulative message of innumerable court orders conveyed to the Charlotte-Mecklenburg board over the course of many years was to do everything possible to desegregate Charlotte schools. *See, e.g.*, *Swann*, 402 U.S. at 15 ("[S]chool authorities are 'clearly charged with the affirmative duty to take *whatever steps*

---

[2] The quandary in fact is illustrated by this very case where five members of the court feel the Board went too far in its remedial efforts, and four others believe just as strongly that the Board did not go far enough.

*might be necessary* to convert to a unitary system in which racial discrimination would be eliminated root and branch.'") (quoting *Green v. County Sch. Bd.*, 391 U.S. 430, 437-38 (1968)) (emphasis added). And the school board attempted to do just that. To now condemn the Board would be to sanction the future disrespect and disregard for court orders of all sorts. This I am unwilling to do.

If an existing court order is infirm, the better course is to modify it through customary court processes. Today, we follow this approach with our determination that the school district has attained unitary status. This holding puts the school district on a race-neutral footing going forward, thereby granting it a truly fresh start. The solution to the fundamental Fourteenth Amendment problems with the 1992 magnet school plan is not to hold the Board liable for its attempts to implement the very policies, and attain the very ends, which the courts had ordered it to do. The answer is to point to a unitary future in which the principle of non-discrimination will guide its public actions.

## II.

I concur fully in Judge Traxler's view that the Charlotte-Mecklenburg school system has achieved unitary status. I recognize that some citizens of Charlotte, aware of society's shortcomings on matters of race, may see in unitariness a mocking phrase. Others may view today's embrace of local governance as an act of judicial abandonment. The luminosity of *Brown v. Board of Education* is such that many have come to look at courts as our sole guiding lights. Yet they were never meant to be such. If it was important that courts nurture the task of desegregation in its infancy, it is equally essential that a school district one day depart the comforting judicial homestead and strike out on its own. School districts will be stronger for finding their own way. For in the long run, courts cannot serve as the sole source of hope in the difficult area of desegregation, nor democracy as the object of fear. "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system. When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held account-

able to the citizenry, to the political process, and to the courts in the ordinary course." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992).

The question then is whether the Charlotte-Mecklenburg system is ready for this step. The district court concluded that it was. *See Riddick v. School Bd. of the City of Norfolk*, 784 F.2d 521, 533 (4th Cir. 1986) (holding that the district court's unitary status finding is reviewed for clear error). It is, I suppose, possible for us to reweigh the evidence or to refract this or that school board decision through a myriad of lenses. While any record, thus dissected, would be found to reveal its share of imperfection, a reversal of the district court's finding of unitariness would do a profound disservice to the people of Charlotte. The recent history of Charlotte, as Judge Traxler's careful opinion demonstrates, is not one of resistance and intransigence. Rather it shows a community struggling to meet its desegregative obligations in a period of staggering demographic change. Most importantly, African Americans are vigorous participants both in the elective and deliberative process with regard to Charlotte's schools.

Of course, the majority's sense of progress may be the dissent's sense of great unfinished business. And let us suppose just for a moment that both are right. Still, I doubt that interminable court proceedings can convey to Americans the sense that we are in the enterprise of education together. For litigation depends for its energy on adversarial alignments, i.e., the school board and *Swann* plaintiffs are tentatively aligned, but the *Swann* plaintiffs and *Capacchione* plaintiffs are decidedly not. And while democracy has no shortage of conflict, reaching decision and compromise from within the community, as opposed to the external compulsion of court order, promises a better mutual understanding and a firmer common ground.

That at least is the hope. In this sense, then, unitariness is not an act of abandonment but a covenant of faith. It reflects a judicial belief, well supported by this record, that the invidious practices of an indefensible era have indeed been dismantled and that Charlotte has earned the right to begin anew. No decisions are more sensitive and difficult than those involving public schools, and no process is more wrenching than that of matching limited resources to a limitless array of educational needs. But these challenges are better met by communities than by courts and, after thirty-five years of sporadic judicial

supervision, the time has come to conclude. If not now, when? Each child is a human being to educate. If this essential task of education has become too daunting for democracy, then I know not who we are or what we shall become.

I am authorized to say that Judge Niemeyer joins in this opinion.

WIDENER, Circuit Judge, concurring and dissenting:

I concur in or dissent from parts of the various opinions of the court and its various members, as indicated below, and I also respectfully dissent to the failure of the court to review the items of the judgment of the district court from which appeal is taken.

I.

We review judgments, not opinions, e.g. *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984); *Hyatt v. Sullivan*, 899 F.2d 329, 337 n.10 (4th Cir. 1990). The judgment of the district court, a copy of which is attached hereto as Exhibit A, is divided into five parts, which are:

1.   The Charlotte-Mecklenburg schools are declared unitary in all respects;

2.   All prior injunctive orders or decrees in the *Swann* case are vacated and dissolved and the case is dismissed with prejudice;

3.   The Charlotte-Mecklenburg school system shall pay nominal damages to the Plaintiff-Intervenors in the amount of $1;

4.   Charlotte-Mecklenburg schools are enjoined from assigning children to schools or to allocate educational opportunities on the basis of race;

5.   The Charlotte-Mecklenburg school system will pay reasonable attorneys fees, expert fees and costs of the Plaintiff-Intervenors.

And the district court, in another order, imposed sanctions on the defendants. A copy of relevant parts of that order is also attached as Exhibit B.

I vote to affirm the *judgment* of the district court in each respect, including the sanctions order, except that I would vacate the judgment of the district court as to Item 4, listed in Part I above, only on the ground it is unnecessary, the school board having given no indication that it will not comply with the orders of the court in this case.

II.

Despite universally accepted appellate procedure that we review judgments, not opinions, the other members of this court, without mention of the judgment of the district court, have divided a per curiam opinion into four issues, only the last two of which, concerning injunctive relief and sanctions, relate directly to the judgment of the district court we are reviewing. The first two issues, as stated in the per curiam opinion of the court, are phrased by a floating majority.

Only because each of those majorities declines to vote to affirm or reverse the various items of the judgment of the district court, I will attempt to relate my votes to the per curiam opinion.

As to Item 1, I vote that the school system has achieved unitary status. Also as to Item 1, I vote that the attorneys' fees for work done on the unitary status issue, and any other issue tried in this case, except a few dollars relating to Miss Capacchione's moving, should be granted. The majority, however, while it denies fees on "the unitary status issue," apparently does not immediately mention the fees of Miss Cappacione's attorneys, amounting to the sum of about $700,000, and one might think from reading the per curiam opinion that they were yet awarded were it not for the next-to-the-last line of the per curiam opinion denying fees "for any reason."

As to Item 2 of the per curiam opinion, I am in agreement with the district court, that the school board should have come back to it for authority to establish magnet schools in which the race of the applicant was considered in deciding whether or not to grant admission. The district court so construed its own orders, which it is best able to do, and to which we must give due deference. *Anderson v. Stephens*, 875 F.2d 76, 80 n.8 (4th Cir. 1989); *Vaughns v. Board Educ. v. Prince Georges County*, 758 F.2d 983, 989 (4th Cir. 1985). I need go no fur-

ther to affirm the holding of the district court. I am of opinion that Miss Capacchione's Constitutional rights were violated when she was not considered for admission to the magnet school program notwithstanding her race and that she is entitled to nominal damages on that account. *Norwood v. Bain*, 166 F.3d 2213 (4th Cir. 1999) (en banc).

Also as to Item 2, although I feel that the question of immunity has little or nothing to do with this case, because it is being used to rationalize that the successful attorneys do not get their attorneys' fees and that nominal damages for a Constitutional violation are not due, I vote that the school board did not have immunity from the payment of attorneys' fees, nor immunity from nominal damages, that is to say, in the language of the per curiam opinion, it has been forfeited.

As to Items 3 and 4, the per curiam opinion correctly states my votes.

### III.

With only slight interruptions, this case had been on inactive status for 22 years until Christina Capacchione started the present litigation when she filed her first complaint on September 5, 1997, seeking to be considered for admission to the magnet school program without regard to her race. When, on March 6, 1998, the district court ordered the *Swann* litigation reactivated, upon the motion of the *Swann* plaintiffs, it consolidated the Capacchione suit with the *Swann* litigation. Miss Capacchione then amended her complaint on March 16, 1998, to request a declaration that the school system had reached unitary status and moved on March 19, 1998 to intervene in the reactivated *Swann* litigation, which motion was granted. The Grant plaintiffs subsequently filed their complaint and motion to intervene in the *Swann* litigation on April 8, 1998.

When Christina Capacchione filed her suit, the Charlotte-Mecklenburg schools were only admitting students to the magnet school program after having considered their race, and the school system was submitting itself to the racially-based pupil assignments imposed in response to the orders of the district court some years before, the suit having then been inactive for some 22 years. Now, four years and almost $1.5 million later, and over the determined

opposition of the school board, the school system has been held to be unitary and the magnet schools may no longer consider the race of the applicant in granting or denying admission. *All this is at the instance of Christina Capacchione.*

When the *Swann* plaintiffs filed their suit in 1965, more than 35 years ago, their complaint was that the race of students was considered in determining their assignment to schools, precisely the same complaint that Christina Capacchione had in 1997. When the *Swann* case was declared to be inactive in 1975, the district court, at that time, awarded attorneys' fees and costs to the plaintiffs' attorneys, for service through 1974, in the amount of $204,072.33, and there are doubtless other such items not presently readily available to me. For us to hold now that the Capacchione child and the Grant plaintiffs are not entitled to the same consideration, as were the *Swann* plaintiffs, for eradicating racial assignments is certainly not fair and not even legal, in my opinion. How we are able to hold that the Capacchione and Grant plaintiffs and intervenors in this case are not successful parties in a § 1983 action strains reason beyond the breaking point. In my opinion, they are due costs, expenses, and attorneys' fees, etc. under 42 U.S.C. § 1988.

Especially to the holding of the en banc court, that the Capacchione and Grant plaintiffs and intervenors are not entitled to attorneys' fees and costs, etc., I respectfully dissent.*

---

*My summary of such fees and costs is attached as Exhibit C.

## EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

William CAPACCHIONE,
Individually and on Behalf of Cristina
Capacchione,  a Minor,

    Plaintiff,

and

Michael P. Grant et al.,

    Plaintiff-Intervenors,

  v.

CHARLOTTE-MECKLENBURG
SCHOOLS et al.,

    Defendants.

3:97-CV-482-P

James E. SWANN et al.,

    Plaintiffs,

  v.

CHARLOTTE-MECKLENBURG
BOARD OF EDUCATION et al.,

    Defendants.

3:65-CV-1974-P

## JUDGMENT

In accordance with the Memorandum of Decision and Order filed simultaneously with this Judgment, IT IS ORDERED ADJUDGED, AND DECREED that the Charlotte-Mecklenburg Schools ("CMS") are hereby declared unitary in all respects.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all prior injunctive orders or decrees entered in *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* No. 1974 (W.D.N.C.), are VACATED AND DISSOLVED, and *Swann* is hereby DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Capacchione and Grant et al. (the "Plaintiff Intervenors") are not entitled to an award of actual damages, but CMS shall pay nominal damages to the Plaintiff-Intervenors in the amount of one dollar ($1.00).

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that CMS is enjoined from assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that CMS shall pay the reasonable attorneys' fees, expert fees, and costs of the Plaintiff-Intervenors.

This the 9th day of September 1999.

/s/

ROBERT D. POTTER
SENIOR UNITED STATES DISTRICT JUDGE

## EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

WILLIAM CAPACCHIONE,
Individually and on Behalf of
CRISTINA CAPACCHIONE, a
Minor,

      Plaintiff,

  v.

THE CHARLOTTE-
MECKLENBURG SCHOOLS, et al.,

      Defendants.

Case No. 3:97-CV-482-P

JAMES E. SWANN et al.,

      Plaintiffs,

  v.

THE CHARLOTTE-
MECKLENBURG BOARD OF
EDUCATION et al.,

      Defendants.

Case No. 3:65-CV-1974-P

MICHAEL P. GRANT et al.,

        Plaintiff-Intervenors,

  v.

THE CHARLOTTE-
MECKLENBURG BOARD OF
EDUCATION et al.,

        Defendants.

3:65-CV-1974-P

## ORDER

THESE MATTERS are before the Court on a Motion by Plaintiff Capacchione and Plaintiff-Intervenors Grant et al. (hereinafter collectively "Grant"), filed April 16, 1999, for Sanctions against Charlotte-Mecklenburg Board of Education for Non-Disclosure of Witnesses [document no. 152]. Defendants Charlotte-Mecklenburg Schools et al. ("CMS") filed a response on April 19, 1999.

\* \* \*

NOW, THEREFORE, IT IS ORDERED that Grant's Motion for Sanctions against Charlotte-Mecklenburg Board of Education for Non-Disclosure of Witnesses [document no. 152] be, and hereby is, GRANTED.

This the 23rd day of April 1999.

/s/

_____

The Honorable Robert D. Potter
Senior United States District Judge

## EXHIBIT C

*Fees and Hours by Firm*

Total expended on merits of the suit by both Grant and Capacchione = Fees and costs of $1,481,295.47 and 6,428.95 hours

Total expended on fee petition by both Grant and Capacchione = Fees and costs of $17,721.00 and 74.35 hours

Total expended on all litigation (including fee petition) by all plaintiffs = $1,499,016.47 and 6,503.2 hours

A. Counsel for Capacchione

    (1) McGuire Woods Battle & Booth (John Pollard & Kevin Parsons)
        *Fees on the merits = $390,791.98*
        *Attorney and staff Hours on the merits = 1,954.5*
        *Fees for bringing fee petition = $4,000.00*
        *Attorney and staff hours for bringing fee petition = 21.2*

    (2) Magenheim, Bateman, Robinson, Wrotenbery & Helfand (William Helfand)
        *Fees on the merits = $325,331.51*
        *Attorney and staff Hours on the merits = 1,553.85*
        *Fees for bringing fee petition = $3,372.50*
        *Attorney and staff hours for bringing fee petition = 17.8*

Total for Capaccione on the merits = $716,123.49 and 3,508.35 hours
Total for Capaccione for bringing fee petition = $7,372.50 and 38.9 hours

B. Counsel for Grant Plaintiffs

    (1) Parks, Chesin & Miller (A. Lee Parks)
        *Fees on the merits = $471,794.00*
        *Attorney and staff Hours on the merits = 2,160.7*

*Fees for bringing fee petition = $9,750.00*
*Attorney and staff hours for bringing fee petition = 32.50*

(2)   Thomas Ashcraft
*Fees on the merits = $159,579.00*
*Attorney and staff Hours on the merits = 759.9*
*Fees for bringing fee petition = $598.50*
*Attorney and staff hours for bringing fee petition = 2.85*

(3) In a supplemental order, Judge Potter awarded Parks and Ashcroft jointly $133,798.98 for expenses incurred litigating the merits.

Total for Grant Plaintiffs on the merits = $765,171.98 and 2,920.6 hours

Total for Grant Plaintiffs for bringing fee petition = $10,348.50 and 35.35 hours

LUTTIG, Circuit Judge, concurring in the judgment in part and dissenting from the judgment in part:

I concur in the opinion of the court that the Charlotte-Mecklenburg School System is now unitary, following 35 years of federal court supervision. I also agree with the conclusion reached by Judge Traxler that the School Board acted without the required authorization from the district court both when it created its expansive magnet school program and when it imposed a fixed quota to govern admissions to that program. Neither the creation of the magnet school program nor the imposition of a rigid quota governing admission into that program were authorized by the district court, and both clearly constituted "material changes" from the district court's prior remedial orders, requiring prior court approval. I also agree with Judge Traxler's narrowest conclusion that, absent a proven necessity for such, an admissions program that permanently employs fixed ratios to deny certain students, solely because of their race, the opportunity to compete for seats that will otherwise be left unfilled even after all targeted minorities have been allotted seats (and I assume fixed ratios in a remedial context to be constitutional), is insufficiently tailored to withstand scrutiny.

I address myself separately only to the question whether the district court authorized the strict mathematical quota adopted by the School Board in 1992 to govern admissions to Charlotte-Mecklenburg's mag-

net school program, a quota that, as noted, required officials literally to leave seats unfilled even after all interested minority students had been afforded an opportunity to attend the magnet school of their choice.

I.

With respect to the magnet school program's admission policy, the holding of the district court that we review is that that court had "firmly rejected the use of rigid racial quotas," 57 F. Supp. 2d 228, 286 (W.D. N.C. 1999), and that, in contravention of those orders and the Supreme Court's decision in *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25 (1971), the School Board had "us[ed] mathematical ratios not as a starting point but as an ending point." 57 F. Supp. 2d at 289. "In policy and in practice, the [magnet schools'] 60/40 ratio requirement [was] an inflexible quota[,]" the district court found, *id.* at 288, and "slots reserved for one race [would] not be filled by students of another race." *Id.* at 289. Indeed, the court observed, "it was not uncommon for the school year to begin with seats remaining vacant because students of one race would disrupt the desired racial balance." *Id.* Accordingly, the district court held that the magnet school program constituted a "material departure" from the court's prior remedial orders. *Id.* at 287.

As to whether the rigid quota imposed by the School Board was authorized by the district court, the question is not whether the court's orders authorized *race-conscious* admission decisions, as the School Board argues, *see* Br. of Appellants Charlotte-Mecklenburg Board of Education, *et al.* at 20 ("The particular desegregation tool struck down by Judge Potter — magnet schools with race conscious admissions guidelines — has been repeatedly recognized by the Supreme Court and other courts as a valid exercise of the broad remedial discretion of both district courts and school authorities."), and as Judge Motz and Judge Wilkinson contend by way of strawman. It is indisputable that race-conscious admission decisions were authorized by the district court's orders; not even the plaintiffs argue that they were not. Neither is the question whether parties are required to obey court orders, the only question addressed by the authorities relied upon by Judge Motz; of course, they are. Nor is the question whether quotas were "foreclosed" by the district court's orders, as Judge Wilkinson

alternatively maintains; it should be evident that a party does not receive immunity for any and all conduct that is merely unforbidden by judicial order.

And finally, the issue is not whether racial quotas are or are not constitutional. There simply is no occasion in this case for a general expression of viewpoint as to the use of racial quotas and, although I am given pause over Judge Wilkinson's express and categorical rejection of racial quotas, whatever the circumstance, I certainly express no such general view herein. I might well be presented with circumstances in which I would conclude that racial quotas were essential to the vindication of constitutional right. And I would be most reluctant to foreclose myself from such a conclusion in an appropriate circumstance by statements in a case in which the issue was not even before the court.

Rather, the only issue relevant to the question of whether the School Board is entitled to immunity is whether the district court *specifically authorized* the School Board's imposition of *rigid quotas* (*i.e.*, whether the Board was acting pursuant to court order in imposing the fixed quotas), which denied students the opportunity to compete for unfilled seats solely because of their race. If the court did specifically authorize the use of fixed quotas, then the School Board is entitled to immunity; if it did not, then immunity is unavailable. The authorities on this score are uniform. *See*, *e.g.*, *McCray* v. *Maryland*, 456 F.2d 1, 5 (4th Cir. 1972) (observing that the law provides immunity for those whose actions are taken "in obedience to a judicial order or under the court's direction"); *see also Rogers* v. *Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988) (holding that clerks of court are immune from damages arising from acts they are "*specifically required* to do under court order at a judge's direction") (internal citations omitted) (emphasis added); *Lockhart* v. *Hoenstine*, 411 F.2d 455, 460 (3d Cir. 1969) (providing immunity for officers who act "pursuant to" a court order); *cf. DeFelice* v. *Philadelphia Bd. of Educ.*, 306 F. Supp. 1345 (E.D. Pa. 1969) (extending immunity to school boards that take actions pursuant to an order of a state commission). *Compare Wilkinson* v. *Forst*, 832 F.2d 1330, 1334 (2d Cir. 1987) (granting immunity to officers who conducted searches "specifically authorized" by court orders) *with Wooley* v. *City of Baton Rouge*, 211 F.3d 913, 927 (5th Cir. 2000) (denying immunity to offi-

cers who removed a child from a home without "specific authorization" by a court). Whether racial quotas are, as a general matter, constitutional has nothing whatsoever to do with the resolution of this issue. If the district court authorized strict racial quotas, then the School Board is entitled to immunity *whether or not* such strict quotas are constitutional.

Judge Wilkinson misunderstands this issue altogether, as is evident from both his extended and unnecessary discussion of racial quotas in general and his mistaken observation that I "insist" "the issue here has solely to do with racial quotas." Judge Motz, in contrast, understands the issue presented, but errs in its resolution because of a reliance upon fundamentally inapplicable authorities.

## II.

Most certainly the district court did not specifically authorize the School Board to employ fixed quotas in the admission of students to its magnet schools, as the district court itself held. There is not even an argument that it did. Indeed, although fatal to their holding that the board is entitled to immunity, Judges Motz and Wilkinson do not even suggest otherwise. Nor could they.

Not only the very district court in question, but the Supreme Court of the United States itself in this very litigation, both explicitly and consistently disavowed the use and constitutional legitimacy of rigid quotas throughout the thirty-plus year history of Charlotte-Mecklenburg's desegregation efforts. In fact, in the course of this very litigation, even the Charlotte-Mecklenburg School Board has strenuously argued against the fact and the constitutionality of any judicially-imposed quotas by the district court.

## A.

Beginning over thirty-two years ago, in this identical litigation, Judge McMillan himself acknowledged the well-recognized and well-understood distinction between race-conscious decisions and rigid quotas, which is ignored by Judge Motz and variously ignored and misunderstood by Judge Wilkinson today. And he could not have

been clearer that he would permit the former in pursuit of integration of the Charlotte-Mecklenburg school system, but forbid the latter — and he never wavered from that position. Said Judge McMillan at that time, in terms whose import is unmistakable for the issue before us, although "[r]ace may be considered in eliminating segregation in a school system," *Charlotte-Mecklenburg Bd. of Educ.* v. *Swann*, 306 F. Supp. 1291, 1312 (1969), "*[f]ixed ratios of pupils will not be set.*" *Id.* (emphasis added). Judge McMillan's words bear repeating: "*Fixed ratios of pupils will not be set.*" And in emphasis of the distinction he drew between fixed ratios and race-consciousness, he noted that although "efforts should be made to reach a 71-29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others, *[it is necessary] to understand that variations from that norm may be unavoidable.*" *Id.* (emphasis added).

Only two months later, Judge McMillan repeated that his order "[was] not based upon any requirement of 'racial balance,'" *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 311 F. Supp. 265, 267 (1970). He explained in no uncertain terms that the earlier-referenced 71-29 ratio, which our court today holds specifically authorized imposition of an inflexible quota, was merely a starting point in pursuit of the goal of desegregation. *See id.* at 267-68.

And a year later, Judge McMillan again explicitly rejected fixed, rigid quotas, re-emphasizing that "'racial balance' is not required by this court." *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 318 F. Supp. 786, 792 (1970). Indeed, the court recited, the previous order "expressly contemplated wide variations in permissible school population." *Id.*

B.

Not only did Judge McMillan, in his own orders, repeatedly reject the use of fixed quotas, the Supreme Court of the United States, in reviewing Judge McMillan's orders, categorically rejected even an urged construction of these orders that would authorize fixed quotas. In reviewing Judge McMillan's Order of February, 1970 (*Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 311 F. Supp. 265 (1970)), the Supreme Court unambiguously stated, in a passage that should be dis-

positive of whether the district court previously, *and certainly at any time thereafter*, specifically (or otherwise) authorized the use of quotas, that it affirmed Judge McMillan's order only on the condition that it *not* be read to authorize fixed rigid quotas:

> *If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse.* The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

*Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 24 (1971) (emphasis added); *see also Winston-Salem/Forsyth County Bd. of Educ.* v. *Scott*, 404 U.S. 1221, 1227 (1971) (Burger, C.J., in Chambers) (describing as "disturbing" the School Board's "understanding that it was *required* to achieve a fixed 'racial balance' that reflected the total composition of the school district"). Only a "very limited use" of "mathematical ratios," as a "starting point," was within the "equitable remedial discretion of the District Court," *id.* at 25, held the Supreme Court.[1]

And, in perhaps the most powerful testament of all to the fact that this district court never intended, much less specifically authorized a quota of a type the majority holds today that it did, the School Board itself expressly argued to the Supreme Court of the United States in

---

[1]In the course of its opinion in *Swann*, the Court stated that a school board, as opposed to a federal court, would possess the discretionary power to direct that its schools maintain "a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole." 402 U.S. at 16. Both Judges Motz and Wilkinson seize upon this passage as if it supported their holding that the School Board's imposition of fixed quotas was permissible. Of course, as even the School Board realizes, this is misplaced reliance, for whether or not the Board possessed independent authority to impose the rigid quotas is entirely irrelevant to the only question before us of whether the Board is entitled to immunity because it was acting upon order of the district court.

*Swann* both that Judge McMillan "disclaim[ed] any intent to require racial balancing," Respondent's Br. at 24, and that the plain language of the district court order dealing with student enrollment ("about or above 20%") actually did not set quotas.[2] Indeed, the Board that before this court argues that racial quotas were authorized by Judge McMillan, argued before the Supreme Court that it was beyond the constitutional authority of the district court to impose quotas ("absolutes"), as such would have been based on the district court's own "subjective" notions of right and wrong, not on the mandates of the Constitution, Respondent's Br., at 35, and would violate individual rights guaranteed by the Fourteenth Amendment "of those blacks and whites caught up in the forced mass movement of children away from their neighborhoods." *Id.* at 52. In an observation that now acquires ironic overtones of its own in light of the School Board's current posture that quotas were authorized by the district court, the Board in *Swann* argued with respect to its position (also rejected by the Supreme Court) that, although not intended by Judge McMillan, his order should nonetheless be construed as effectively requiring racial balancing, that "[i]t is ironic that the counterpart of the compulsion outlawed by *Brown I* and *II* is now employed in the name of the Constitution. Is it trite to suggest that two wrongs do not make a right?" *Id.*

## C.

If there were any question as to Judge McMillan's rejection of fixed quotas, and frankly there can be none in the face of Judge McMillan's own disavowal and the Supreme Court's explicit condemnation of such in *Swann*, it was answered with equal clarity repeatedly by the district court in orders entered in the wake of

---

[2]The petitioners in *Swann*, like the School Board, also argued that Judge McMillan neither intended nor imposed a quota in his desegregation order. In a construction of the district court's order that not only tracked the order's unambiguous language, but was ultimately adopted by the Supreme Court, petitioners maintained that the court employed the 71%-29% ratio merely as a "starting guide," "a specific, yet flexible goal," "'expressed a willingness to accept a degree of modification,'" and "'departed from it where circumstances required.'" Petitioners' Br., at 36, 38, 66.

*Swann*, in which the court was at obvious and undeniable pains to respect the Supreme Court's injunction that inflexible quotas not be set.

In an order issued the same month after the Supreme Court's decision in *Swann*, Judge McMillan again confirmed that he neither authorized nor permitted strict racial quotas. First, when the School Board asked to close a school to improve racial balance, Judge McMillan rejected the proposal decisively, finding deviations from targeted percentages an insufficient justification for such action. *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 328 F. Supp. 1346, 1348 (1971) (refusing to close a school where the number of white students was less by two percent than that assigned to the school in the beginning of the year and one percent greater "than the proportion called for under the plan"). And in language that belies any contention that the court authorized strict quotas, Judge McMillan rejected a flat ban on any student transfers that would alter the targeted composition of a school, instead ordering only that the School Board could not assign a child to a school or allow that child to attend a school different from the one he was attending at the start of the school year, if "the cumulative result of such assignment in any given period tends *substantially* to restore or to increase the degree of segregation in either the transferor or the transferee school." *Id.* at 1350 (emphasis added).

Two years later, Judge McMillan employed essentially the same carefully crafted language, again distinguishing between "racial identifiability" on one hand and strict quotas on the other, *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 362 F. Supp. 1223, 1228-30 (1973), invoking the language of "reasonably stable [pupil distribution]," "substantial [leeway for use of discretion and common sense]," and "[remedy for] gross unfairness [as the 'legitimate target of a court,' as contrasted with 'perfect fairness' which is 'impossible to attain']." *Id.* at 1229, 1231, 1238.

And, finally, in 1974, the district court entered the order that the School Board contends, and Judges Motz and Wilkinson accept, authorized the rigid quotas in dispute. Contrary to the Board's assertion and my colleagues' belief, however, that order, too, likewise carefully and deliberately preserved the elementary distinction

between flexible ratios as a starting point to bring segregation to an end, which the Supreme Court had held were constitutionally permissible, and strict quotas, which the Supreme Court had held were constitutionally impermissible. Retaining just that amount of flexibility essential to the exercise of what the Supreme Court only two years before had admonished was the limit of its constitutional power, Judge McMillan ordered only "[t]hat the optional school enrollments will be controlled starting with 1974 so that they are open to all county residents and have *about or above* 20% black students." *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 379 F. Supp. 1102, 1104 (1974) (emphasis added). Fully aware that the Supreme Court had forbidden imposition of quotas, the School Board itself did not even request authorization to impose strict quotas. Tellingly, the Board only submitted for the district court's approval a policy requiring that each school maintain a black student population of "at or above *approximately* 20%." To anyone familiar with the history of the litigation, and especially the Supreme Court's then-recent explicit rejection of any construction of Judge McMillan's orders that would impose a quota on the School Board, as was the School Board, the purposeful distinction between race consciousness and rigid quota drawn by Judge McMillan in his 1974 order could not be any clearer.

III.

Indeed, foregoing the implausible arguments embraced by the majority, not even the School Board seriously argues before us that the district court authorized strict quotas — which should be unsurprising, given its own argument as early as 1970 that such were unconstitutional and its firsthand knowledge that the Supreme Court had categorically rejected the use of such in this very litigation. To the Board's credit, it does not even attempt the argument made by Judges Motz and Wilkinson that the language of the district court orders itself authorized quotas. Rather than focus on whether the district court orders imposed or authorized rigid quotas, as to which it says nothing, the Board noticeably and notably passes instead to the very different argument that its admission policies were not, as a practical matter, tantamount to insistence upon rigid quotas as evidenced by the ultimate variation in the racial make-up of the magnet schools. *See* Appellants' Reply Br. at 15; Appellants' Br. at 21 (suggesting that the "manner in which CMS admitted students to its magnet

schools was fully consistent with these orders and not rigid and inflexible" because of the existence of "[s]ignificant variance" from the initial goal). This "[s]ignificant variance," of course, is not due to the flexibility of the admissions process, but instead to its rigidity to the extent of leaving unfilled seats that were reserved for a particular race, even in the face of a waiting list of students of different races. In any event, the ultimate demographics have no relevance whatever to the threshold question before us of whether the district court did or did not specifically authorize the Board to employ rigid quotas in admissions to its magnet schools — a question as to which the School Board's silence speaks volumes.

## IV.

The facts of the repeated explicit and consistent rejection of quotas by this district court in this very litigation for over thirty years; the categorical rejection by the Supreme Court of the United States of any construction of the district court's orders that would require rigid quotas; the School Board's own argument before the Supreme Court in *Swann* that rigid quotas were never intended or ordered by the district court, and that, if they had been, such would be unconstitutional; and the Board's tacit (and frankly, candid, if indirect) concession in its briefs before this court that the district court did not authorize rigid quotas, renders beyond any argument the plaintiff's contention that the School Board acted outside the scope of the district court's orders when it adopted rigid quotas and refused to permit students to compete for open seats based upon their race alone. Not merely had the district court never authorized the School Board's use of rigid quotas. It had expressly stated that it would not do so, as the Board itself knew well. And, if this alone were not enough, at this very School Board's behest, the district court had been instructed by no less an authority than the Supreme Court of the United States that it would have been without the constitutional power to impose such an inflexible requirement on the county officials of Charlotte-Mecklenburg, even had it wanted to. The holding on this record that the district court authorized the use of strict quotas is, as best evidenced by the palpable lack of support summoned by the combined opinions of Judges Motz and Wilkinson on behalf of that holding, simply insupportable.

"The cumulative message of innumerable court orders conveyed to the Charlotte-Mecklenburg board over the course of many years" actually was not, as Judge Wilkinson asserts, "to do everything possible to desegregate Charlotte schools." *Post* at 74. It was to do "everything possible" to desegregate Charlotte-Mecklenburg's schools, *except employ strict racial quotas*.

DIANA GRIBBON MOTZ & ROBERT BRUCE KING, Circuit Judges:

A majority of the Court today reverses the district court's finding that the use of a race-based admission policy by the Charlotte-Mecklenburg Board of Education ("CMS" or "Board") in its expanded magnet schools program violated the Equal Protection Clause of the Constitution of the United States — and thus vacates the attendant injunction, monetary relief, and attorney's fees award. Every significant aspect of the expanded magnet schools program, including the use of racial proportions in assigning students to magnet schools, was authorized by the judicial desegregation orders governing this case. The Board's obligation to obey these court orders insulates it from constitutional attack for actions taken in compliance with them. It would be the rankest injustice to find the Board liable for a constitutional violation, and subject to monetary damages and enormous attorney's fees, when its expanded magnet schools program was simply a good-faith attempt to comply with the desegregation orders imposed by federal courts to remedy an unlawful dual school system. Thus, for the reasons more fully explained in parts III, IV, V, and VI of this opinion, the magnet schools ruling must be reversed and the accompanying injunction, monetary damages, and attorney's fees award must be vacated.

However, a separate majority severely errs in upholding the district court's determination that CMS has achieved unitary status. This majority expresses its "satisfaction that CMS has dismantled the dual school system." Traxler Op. at 7. For the reasons set forth in parts II and VIII of this opinion, no one should be satisfied at this time. Nothing yet demonstrates that CMS has eliminated all vestiges of the unlawful discrimination that has long permeated its school system. In holding to the contrary, the majority has only succeeded here in dashing the hopes of the citizens of Mecklenburg County, particularly

those of African-American descent, who have long fought for the fair and equitable implementation of the desegregation plan approved by Judge McMillan some thirty years ago. These successive generations of parents and children have been slowly starved by a well-meaning — but irresolute — governing body, whose sins have been absolved by the court below (and now by a majority of this Court) without anything but the most cursory examination. Although CMS has clearly achieved unitary status in certain respects, there remain several areas of primary concern that have not been subjected to anything approaching a proper constitutional analysis. We deplore, and believe the Court itself may one day regret, the refusal of a present majority to recognize this.

## I.

### A.

In order to better understand the issues presented in this case, we must briefly review our country's history of school desegregation litigation, in which CMS has played a prominent role.

Even after slavery had been abolished for almost a full century, African-American children were, for the most part, either excluded from the public schools or educated separately from white children. "In fact, any education of Negroes was forbidden by law in some states." *Brown v. Bd. of Educ.*, 347 U.S. 483, 490 (1954) ("*Brown I*"); *see also Martin v. Charlotte-Mecklenburg Bd. of Educ.*, 475 F. Supp. 1319, 1324 (W.D.N.C. 1979) ("For three centuries racial segregation was the law of the land."). Indeed, throughout the early part of the 1900s, CMS operated a segregated school system within the safe harbor created by the Supreme Court's doctrine of "separate but equal" articulated in *Plessy v. Ferguson*, 163 U.S. 537 (1896).

In the middle of the 1900s, the Supreme Court began dismantling the great wall of segregation constructed under the imprimatur of *Plessy*. The Court initially sought to determine whether various "separate" African-American schools were genuinely "equal" to white schools by evaluating the quality of physical facilities, curricula, faculty, and certain "intangible" considerations. *See*, *e.g.*, *Sweatt v. Painter*, 339 U.S. 629 (1950); *Sipuel v. Board of Regents of Univ. of*

*Okla.*, 332 U.S. 631 (1948). In each instance, the Court concluded that they were not. *Id.*

In 1954, the Supreme Court at last overruled *Plessy*, declaring that "in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Brown I*, 347 U.S. at 495. Just one year later, the Court mandated that federal courts and school authorities take affirmative steps to achieve desegregation. *Brown v. Bd. of Educ.*, 349 U.S 294, 299 (1955) ("*Brown II*"). Specifically, federal courts were to retain jurisdiction over desegregation cases during the period of transition, wielding their equitable powers to supervise school boards' efforts to effectuate integration. *Id.* at 300-01. One of the most important obligations of the federal courts was to ensure that school boards were proceeding in good faith to desegregate the public schools "with all deliberate speed." *Id.* at 301. With these seminal decisions — *Brown I* and *Brown II* — the Supreme Court promised the citizens of this country, and particularly African-American children, school systems "in which all vestiges of enforced racial segregation have been eliminated." *Wright v. Council of the City of Emporia*, 407 U.S. 451, 463 (1972).

Notwithstanding the Court's repeated admonition that segregation and its vestiges be eliminated "root and branch," *Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 437-38 (1968), many school boards — CMS included — adopted "an all too familiar" response to the mandate of *Brown II*, interpreting "all deliberate speed" "as giving latitude to delay steps to desegregate." *Freeman v. Pitts*, 503 U.S. 467, 472 (1992). And so, lower federal courts, with the guidance and oversight of the Supreme Court, began fashioning equitable remedies to contend with school board recalcitrance. For example, in *Green*, the Supreme Court held that a "freedom of choice" plan, which permitted students — regardless of race — to choose the school they would attend, was by itself insufficient to meet the mandate of *Brown*. 391 U.S. at 430. In so holding, the Court recognized that more intensive efforts would be necessary in order to make "meaningful and immediate progress toward disestablishing state-imposed segregation." *Id.* at 439. Subsequently, in this very case, the Court approved significant federal court intervention into a school system in order to eliminate segregation "root and branch," including the busing of students from schools close to their homes to schools farther away, the

use of race-based "mathematical ratios," and the alteration of student attendance zones. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. l, 15, 25, 28, 30-31 (1971).

The Supreme Court has made clear, however, that a federal court's "end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman*, 503 U.S. at 489. Hence, as a school system eliminates the vestiges of past official segregation from certain facets of its operations, courts possess the authority to relinquish supervision in a commensurate fashion. *Id.* at 489-91.

In this context, we examine the steps taken by CMS to eliminate the vestiges of segregation.

## B.

## 1.

North Carolina's most significant initial response to the mandate of *Brown II* was the "Pupil Assignment Act of 1955-56, under which [the Board had] the sole power to assign pupils to schools, and children [were] required to attend the schools to which they [were] assigned." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 300 F. Supp. 1358, 1361 (W.D.N.C. 1969). This was an ineffectual measure — perhaps intentionally so — and by 1964, no more than a few dozen (out of more than 20,000) African-American children in CMS were attending schools with white children. *Id.* at 1362.

## 2.

In 1965, the parents of African-American children attending CMS (hereinafter the "*Swann* plaintiffs")[1] filed a class action seeking injunctive relief, claiming that the Board's policies and practices were perpetuating a segregated school system. *Swann v. Charlotte-*

---

[1]Since this case was first filed in 1965, the various successor plaintiffs have been referred to as the *Swann* plaintiffs, a practice we continue to observe here.

*Mecklenburg Bd. of Educ.*, 243 F. Supp. 667, 668 (W.D.N.C. 1965). On July 14, 1965, the district court approved a Board-proposed plan that closed certain black schools, built new schools, and established school attendance zones based on neighborhoods. But the linchpin of this plan was its grant of permission to each student — regardless of race — to freely transfer to a different school (often described as a "freedom of choice" plan). *Id.* In approving this plan, the district court held that CMS had no affirmative duty to "increase the mixing of the races"; instead, the Board's obligation under *Brown II*, according to the court, was to act without the intent to perpetuate segregation. *Id.* at 670. The following year, this Court affirmed the district court's interpretation of *Brown II. See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 369 F.2d 29, 32 (4th Cir. 1966) ("Whatever the Board may do in response to its own initiative or that of the community, we have held that there is no constitutional requirement that it act with the conscious purpose of achieving the maximum mixture of the races in the school population.").

However, in the wake of the Supreme Court's 1968 decision in *Green*, which struck down a desegregation plan founded predominantly on "freedom of choice," it became clear that school boards did possess an affirmative obligation to desegregate, not merely an obligation to implement race-neutral policies. *Green*, 391 U.S. at 437-38. Invigorated by the developing law, the *Swann* plaintiffs promptly filed a motion for further relief with the district court, seeking to expedite the desegregation process.

3.

In 1969, Judge James B. McMillan, newly assigned to the *Swann* case,[2] reexamined the Board's actions in light of *Green* and determined that its "freedom of choice" plan, when coupled with geographic zoning, were "not furthering desegregation." 300 F. Supp. at 1372. On the fundamental matters of assigning students and faculty, and the siting of new schools, the court made the following findings:

_____

[2]For clarity's sake, we will often refer within to the presiding district judge by name.

- *Student assignment*: The court noted that a ratio of seventy percent white students to thirty percent black students, which approximated the ratio of white to black students in the county, tended to aid "better students [in holding] their pace, with substantial improvement for the poorer students." *Id.* at 1369.

- *Faculty assignment*: Although faculty members were not being assigned with a discriminatory purpose, there was also "no sustained effort to desegregate faculties." *Id.* at 1370. The court ordered CMS to work actively to integrate the faculties, so that "a child attending any school in the system will face about the same chances of having a black or a white teacher as he would in any other school." *Id.*

- *School siting*: The court underscored that the desirability of implementing a "neighborhood school" policy, under which efforts were made to locate schools in neighborhoods and within walking distance for children, could not override the constitutional duty to desegregate. *Id.* at 1369. At the same time, CMS was not to avoid locating new facilities in black neighborhoods. *Id.* at 1371.

In light of *Green*, Judge McMillan also ordered CMS to submit a new, amended desegregation plan, and he outlined certain possible remedies, including busing and re-zoning. *Swann*, 300 F. Supp. at 1360; *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 306 F. Supp. 1299, 1302 (W.D.N.C. 1969).

Once again, however, CMS was slow to respond, prompting Judge McMillan to impose a deadline of August 4, 1969, by which the Board was to submit a detailed desegregation plan to the court. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 300 F. Supp. 1381, 1382, 1386 (W.D.N.C. 1969). CMS complied, and its proposed desegregation plan appeared to accept, for the first time, the constitutional duty to desegregate students, teachers, principals, and staffs "'at the earliest possible date.'" *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 306 F. Supp. 1291, 1293 (W.D.N.C. 1969). The Board's proposed desegregation plan, approved by the district court on an interim

basis ("interim desegregation plan"), included programs for faculty desegregation, the closing of seven all-black schools, and the reassignment of pupils from the closed schools to outlying, predominantly white schools. *Id.* at 1298-99. In approving the plan on an interim basis, the district court noted that black children were bearing a disproportionate burden of the desegregation efforts, but the court nonetheless concluded that some action — even if interim — was preferable to none at all. *Id.* at 1298. Judge McMillan also ordered the Board to submit another desegregation plan within three months.

In November and December 1969, the district court determined that the school system's compliance with the interim desegregation plan was unsatisfactory, finding that the Board was continuing to perpetuate segregation:

> The School Board is sharply divided in the expressed views of its members. From the testimony of its members, and from the latest report, it cannot be concluded that a majority of its members have accepted the court's orders as representing the law which applies to the local schools. By the responses to the October 10 questions, the Board has indicated that its members do not accept the duty to desegregate the schools at any ascertainable time; and they have clearly indicated that they *intend not to do* it effective in the fall of 1970. They have also demonstrated a yawning gap between predictions and performance.

*Swann*, 306 F. Supp. at 1306. At that time, the district court also reviewed and rejected the Board's newly submitted amended desegregation plan. *Id.* at 1313-14. Then, the court appointed Dr. John A. Finger, Jr. as an expert consultant to prepare a more acceptable plan. This appointment came nearly two years after the Supreme Court's *Green* decision and more than fifteen years after Brown I.

The district court ultimately adopted Dr. Finger's proposed plan for elementary schools and the Board's plan, as modified by Dr. Finger, for secondary schools (collectively the "Finger Plan"). *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 311 F. Supp. 265, 268-70 (W.D.N.C. 1970). In doing so, the court again observed the Board's failure to make an effective beginning to desegregation: "The School

Board, after four opportunities and nearly ten months of time, have failed to submit a lawful plan (one which desegregates all the schools). This default on their part leaves the court in the position of being forced to prepare or choose a lawful plan." *Id.* at 267.

The Finger Plan included several components. First, students were to be assigned "in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students." *Id.* at 268. Second, "no school [could] be operated with an all-black or predominantly black student body." *Id.* Third, in redrawing the school system's attendance zones, the Board was authorized to use bus transportation and noncontiguous "satellite zones"[3] to accomplish its goals. *Id.* Fourth, the district court restricted the student transfer policy in order to safeguard against resegregation. *Id.* at 268-69. Fifth, the race of faculty members at each school had to approximate the ratio of black and white faculty members throughout the system. *Id.* at 268. Sixth, the overall competence of teachers at formerly black schools could not be inferior to those at formerly white schools. *Id.* Finally, the district court mandated that the Board monitor and report on its progress in implementing the plan. *Id.* at 269.

The Finger Plan was challenged on several occasions and, in 1971, the Supreme Court upheld it as a valid exercise of the district court's equitable powers. *Swann*, 402 U.S. at 31-32. Indeed, the Court specifically found that the district court's adoption of a student assignment plan that used race-based "mathematical ratios" as a starting point was well within the court's "equitable remedial discretion." *Id.* at 25.

---

[3]CMS used "satellite zones" in connection with elementary schools. Under this method, students from a small geographic area located outside an elementary school's primary attendance area were assigned to that school. J.A. 15571, 16052; *see also Swann*, 402 U.S. at 9 & n.3. The use of satellite zones was implemented by "pairing" elementary schools — students from a predominantly black neighborhood were bused to a school in a predominantly white neighborhood for grades K-3, and students from a predominantly white neighborhood were bused to a school in a predominantly black neighborhood for grades 4-6. J.A. 15571, 16052; *see also Swann*, 402 U.S. at 9-10.

Even after the Supreme Court's decision in *Swann*, the district court found that the Board's desegregation efforts failed to meet constitutional requirements. For example, Judge McMillan ordered student assignment proposals revised in June 1971, finding that the proposals "were discriminatory in detail and in overall result; they placed increasing burdens upon black patrons while partially relieving white patrons of similar burdens." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 328 F. Supp. 1346, 1347 (W.D.N.C. 1971). During the 1971-72 and 1972-73 school years, the district court attempted a "hands-off" approach, leaving the Board to remedy problems as they arose, but the court twice found that the Board still had not adopted sufficient measures to guard against resegregation and ensure that whites were bearing an appropriate share of the desegregation burden. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 362 F. Supp. 1223, 1230 (W.D.N.C. 1973); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 379 F. Supp. 1102 (W.D.N.C. 1974); *see also* discussion of specific findings *infra*.

The 1974 order expressed somewhat more optimism about the Board's desegregation efforts. In that order, Judge McMillan approved a student assignment proposal that, if implemented properly, would result in "a fair and stable school operation" and would permit the court to close the case as an active matter. *See* 379 F. Supp. at 1103. The proposal made provisions for several "optional schools" — schools that would offer some specialized program or curriculum and thereby attract students of all races from across Charlotte and Mecklenburg County. Although Judge McMillan approved the incorporation of these schools into the plan, he cautioned that the optional schools would be inconsistent with the school board's constitutional obligations if they merely served to re-institute "freedom of choice." *Id.* at 1104 ("'Freedom of choice' was a synonym for segregation for many years, and . . . it should not be resurrected at this late date sub nom. 'optional schools' without adequate safeguards against discriminatory results."). To ensure that the optional schools served their stated purpose of furthering the process of desegregation, Judge McMillan decreed that "optional school enrollments will be controlled starting with 1974 so that they . . . have about or above 20% black students." *Id.*

Finally, in July 1975, over twenty years after the mandate of *Brown II*, Judge McMillan for the first time observed, albeit with reserva-

tions, that the Board was actually working toward desegregation: "The new Board has taken a more positive attitude toward desegregation and has at last openly supported affirmative action to cope with recurrent racial problems in pupil assignment." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 67 F.R.D. 648, 649 (W.D.N.C. 1975). Although the district court cautioned that problems remained, the new vigor with which the Board was pursuing desegregation persuaded Judge McMillan to close *Swann* as an active matter of litigation and to remove it from the court's docket. *Id.* at 649-50. In so acting, the court reaffirmed that its orders still stood: "[t]his case contains many orders of continuing effect, and could be re-opened upon proper showing that those orders are not being observed." *Id.* at 649.

4.

Between 1975 and 1992, two significant actions were taken in connection with the CMS desegregation litigation.

a.

First, in 1978, a group of white parents and children brought suit against CMS, seeking an order prohibiting the Board from assigning children pursuant to the Board's latest student-assignment plan. *See Martin*, 475 F. Supp. at 1320. The *Martin* plaintiffs claimed that the Supreme Court's then-recent decisions in *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 436 (1976), and *University of Cal. Regents v. Bakke*, 438 U.S. 265, 305 (1978), prohibited any consideration of race in student assignment. 475 F. Supp. at 1321. The *Swann* plaintiffs intervened in *Martin*, joining the Board's opposition to the contentions of the *Martin* plaintiffs. *Id.*

A brief review of *Spangler* and *Bakke* is necessary to an understanding of *Martin*. In *Spangler*, the Supreme Court held that because the Pasadena Unified School District ("PUSD") had achieved racial neutrality in its school attendance pattern, "the District Court was not entitled to require the PUSD to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity." 427 U.S. at 436. All parties in *Spangler* agreed that the plan initially achieved racial neutrality in student attendance; nonetheless, the district court had believed it was empowered to annu-

ally readjust school boundaries to ensure in perpetuity that there would be no majority of any minority race at any Pasadena school. *Id.* at 433, 436. In *Bakke*, the Supreme Court determined that a public university with no history of discrimination could not constitutionally reserve sixteen out of one hundred admission slots for racial minorities. 438 U.S. at 319-20. In striking down this admissions plan, the Court had made clear that "[w]hen a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, [it must] be regarded as [constitutionally] suspect." *Id.* at 305.

Judge McMillan, who retained jurisdiction over *Swann* and presided over *Martin*, first held that because CMS had not achieved racial neutrality in student attendance, consideration of race in student assignment policies was appropriate under *Swann. See Martin v. Charlotte-Mecklenburg Bd. of Educ.*, 626 F.2d 1165 (4th Cir. 1980). He explained that because the student assignment policy in the CMS school system had been independently adopted *by the Board*, it was not established, as the *Spangler* policy had been, via judicial coercion or order. 475 F. Supp. at 1340-43. Second, Judge McMillan ruled that *Bakke* was inapposite to the claims of the *Martin* plaintiffs. Specifically, the court reasoned that no child was being denied access to equal educational opportunity because of race, *see id.* at 1321, and the actions of the Board were therefore not constitutionally suspect under *Bakke*.

In upholding the independent actions of the Board, Judge McMillan made several important findings. For example, he found that discrimination had not ended; indeed, it was this very finding that led the court to uphold the 1978 race-conscious student assignment policy. *Id.* at 1346-47. Also, although for the first time the district court praised the efforts of the Board without reservation, it underscored yet again the need for patience and continued efforts:

> It took three centuries to develop a slave culture, to fight a bloody civil war, and to live through the century of racial turmoil after that war.

* * *

> The culture and attitudes and results of three centuries of segregation cannot be eliminated nor corrected in ten years. Human nature and practices don't change that fast, even in the hands of people of good will like the members of the present School Board. They need time to work their own experiments, and to find their own ways of producing the sustained operation of a system of schools in which racial discrimination will play no part. I vote to uphold their efforts to date, and to give them that time.

*Id.* at 1347. In 1980, we affirmed the district court's decision in *Martin*. *See* 626 F.2d at 1165.

b.

The second significant phase of litigation between 1975 and 1992 was initiated in 1980. At that time, CMS and the *Swann* plaintiffs notified the district court that the black student population in CMS elementary schools had grown from twenty-nine percent to forty percent, making it increasingly difficult to comply with the desegregation order's mandate to avoid majority-black elementary schools. In response to this change, Judge McMillan approved a modification to the desegregation plan. Instead of prohibiting a "predominantly black student body," the court permitted CMS to operate elementary schools with a black student population of "plus 15 percent" above the district-wide average. Thus, if the school district averaged forty percent black students, any individual school could have fifty-five percent black students.

5.

From 1981 to 1992, the Board continued to operate its desegregation plan as approved by the district court, focusing, *inter alia*, on satellite attendance zones, a feeder plan (assigning middle-school students from a certain neighborhood to identified high schools), school closings, and construction of new schools. Then, in 1992, CMS substantially increased its reliance on "optional" or magnet schools (the "expanded magnet schools program"). The Board placed new emphasis on magnet schools in order to phase out "pairing" and heavy reliance on busing, and to give parents more choice in school

selection. It was the expanded magnet schools program that ultimately led to the present phase of this litigation.

6.

In September 1997, William Capacchione, individually and on behalf of his daughter Cristina, sued CMS claiming that Cristina was unconstitutionally denied admission to a magnet school. Christina is Hispanic and Caucasian, and her suit under 42 U.S.C. § 1983 sought declaratory, injunctive, and compensatory relief. In response, CMS moved to dismiss Capacchione's suit and, almost simultaneously, the *Swann* plaintiffs moved to reactivate *Swann*, claiming that CMS was not yet in compliance with past desegregation orders and had not yet achieved unitary status. Because Judge McMillan had died, the cases were assigned to Senior Judge Robert D. Potter, who restored *Swann* to the district court's docket, consolidated the cases, denied CMS's motion to dismiss, and granted Capacchione's motion to intervene.[4]

The *Capacchione* plaintiffs claimed that CMS had long since eliminated the vestiges of segregation in its schools, and that its formerly dual system of white and black schools had, for some time, been unitary. They also contended that CMS, while still operating under the court's desegregation orders, had violated those orders and the constitutional rights of white students in its efforts to desegregate the school system by employing a race-conscious assignment lottery in its expanded magnet schools program. The *Swann* plaintiffs countered that the school system had not yet achieved unitary status. CMS acknowledged that it was not yet in compliance with past desegregation orders and agreed that it should not be declared to have achieved

---

[4]Since filing suit, the Capacchiones have moved to California. Based on that fact and other findings, the district court determined that William Capacchione no longer possessed standing to seek injunctive or declaratory relief, but that he did have standing to pursue compensatory relief. *Capacchione v. Charlotte-Mecklenburg Schs.*, 57 F. Supp. 2d 228, 240 (W.D.N.C. 1999). Another group of white parents intervened in the consolidated action and that group, represented by plaintiff Michael Grant, claimed that CMS has achieved unitary status. The various groups of plaintiffs that have joined in Capacchione's claims are hereinafter referred to as "the *Capacchione* plaintiffs."

unitary status. CMS also contended that, in any event, the expanded magnet schools program constituted an entirely constitutional and appropriate integration tool authorized under the desegregation orders in this case. The *Swann* plaintiffs, while endorsing the concept of magnet schools, argued that the expanded magnet schools program, as implemented, was contributing to the resegregation of the school system.

Following a bench trial conducted from April 19 to June 22, 1999, the court, on September 9, 1999, filed its Memorandum of Decision and Order, from which this appeal is taken. *See Capacchione v. Charlotte-Mecklenburg Schs.*, 57 F. Supp. 2d 228 (W.D.N.C. 1999). Although the Board claimed that unitary status had not been achieved, the district court found that it had. In its ruling, the district court then found that the Board's expanded magnet schools program, even though instituted to effect court-ordered desegregation, was unconstitutional. Furthermore, the court enjoined the Board from "assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race." *Id.* at 294. Finally, the court awarded the *Capacchione* plaintiffs nominal monetary damages and substantial attorney's fees.

### C.

The Board and *Swann* plaintiffs appealed every portion of the district court's judgment. A panel of this Court, with one judge dissenting, vacated and remanded the district court's unitary status determination, holding that the district court's unitary status findings were insufficient with respect to student assignment, facilities, transportation, and student achievement. The panel also reversed the district court's holding that the expanded magnet schools program violated the Equal Protection Clause, reasoning that the program complied in all respects with court orders governing the case and did not in any way violate the Constitution. Finally, the panel vacated the district court's injunction, the award of nominal damages, and the award of attorney fees. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 233 F.3d 232 (4th Cir. 2000). Thereafter, on January 17, 2001, a majority of the active members of the Court voted to hear this case en banc.

II.

We first address the district court's unitary status decision. The determination of whether any part of a school system has achieved unitary status is a factual one; therefore, the district court's findings as to unitary status are reviewed for clear error. *See Riddick v. School Bd. of the City of Norfolk*, 784 F.2d 521, 533 (4th Cir. 1986); *see also Jacksonville Branch, NAACP v. Duval County Sch. Bd.*, 883 F.2d 945, 952 n.3 (11th Cir. 1989) (citing *United States v. Texas Educ. Agency*, 647 F.2d 504, 506 (5th Cir. Unit A 1981)). No deference, however, is owed to the district court on conclusions of law, including the district court's understanding of controlling law or the various burdens of proof and presumptions; consequently, all such conclusions of law are reviewed de novo. *See*, *e.g.*, *In re Brice*, 188 F.3d 576, 577 (4th Cir. 1999).

A.

1.

Indisputably, the school system of Charlotte-Mecklenburg County subjected African-Americans to nearly a century of segregation and discrimination. Indeed, the Supreme Court recognized as much in *Swann*, noting that North Carolina was one of the states with "a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race." 402 U.S. at 5-6. In this context the remedies forcefully endorsed in *Brown II*, including the use of race-conscious measures, are necessary to eradicate the invidious segregation at which they are aimed.

Moreover, court supervision over local school boards, also embraced in *Brown* and its progeny, is entirely appropriate whenever "school authorities fail in their affirmative obligations" "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated." *Swann*, 402 U.S. at 15. Not only are the federal courts entitled to supervise and direct the actions of local school boards under those circumstances, but the scope of federal authority is almost plenary: "Once a right and a violation have been shown, the scope of a district court's equitable pow-

ers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* There is no doubt that CMS was justifiably subjected to federal court supervision; in fact, even after the Board had been subjected to court supervision, it had to be repeatedly ordered to begin the process of desegregation.

Ultimately, however, the goal in a desegregation case such as this is to reach the point at which federal supervision is no longer warranted and the use of race-conscious measures is no longer necessary. *See Freeman*, 503 U.S. at 489. The Supreme Court has identified six factors (collectively the "original *Green* factors") that must be free from racial discrimination before the mandate of *Brown* is met: (1) student assignment, (2) physical facilities, (3) transportation, (4) faculty, (5) staff, and (6) extracurricular activities. *Green*, 391 U.S. at 435. Not only are reviewing courts to ascertain whether these original *Green* factors are free from racial discrimination, but courts also are entitled, in their discretion, to identify other factors ("ancillary factors")[5] and "determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree." 503 U.S. at 492.

## 2.

For school systems proceeding through the difficult process of desegregation, the Supreme Court has adopted the goal of achieving unitary status. *Freeman*, 503 U.S. at 486-87; *Board of Educ. of Okla. City v. Dowell*, 498 U.S. 237, 245-46 (1991). Although prior to the Court's *Dowell* and *Freeman* decisions federal courts used the term "unitary status" somewhat inconsistently, *see Freeman*, 503 U.S. at 486-87; *Green*, 391 U.S. at 437-38, the term has now come to mean that the school system has been unified such that the vestiges of segregation have been eliminated to the extent practicable. *Freeman*, 503 U.S. at 487; *Green*, 391 U.S. at 437-38. When a school system achieves unitary status, federal courts must withdraw supervision over the local school board.

---

[5]For convenience, we refer to the original *Green* factors and any ancillary factors identified by the district court as "*Green* factors."

In this case, Judge Potter declared that CMS had achieved unitary status in every respect. The Supreme Court has directed that an appellate court review a district court's unitary status determination by applying a two-part inquiry (the "*Freeman* inquiries"). An appellate court must determine if (1) a school Board has, in good faith, complied with the desegregation decree since it was entered; and (2) the vestiges of *de jure* segregation in the school system have been eliminated to the extent practicable. *See Freeman*, 503 U.S. at 492 (citing *Dowell*, 498 U.S. at 249-50).

If the party seeking a declaration of unitary status cannot demonstrate that the school system has achieved unitary status in its entirety, we then undertake to determine whether the school system has achieved unitary status with respect to one or some of the *Green* factors ("partial unitary status"). At that point, we apply, with respect to each *Green* factor, the two *Freeman* inquiries along with one additional *Freeman*-mandated inquiry: "whether retention of judicial control [over one aspect of the school system] is necessary or practicable to achieve compliance with the decree in other facets of the school system." *Freeman*, 503 U.S. at 491. This third *Freeman* inquiry recognizes that the *Green* factors are — to a great extent — interrelated, and when determining whether judicial supervision over a school board may be withdrawn, the overlap between the *Green* factors is a crucial consideration.

The *Freeman* analysis brings us to the most difficult questions presented in any desegregation case: whether present racial isolation is a vestige of past segregation and, if so, whether a school board can practicably reduce that racial isolation. It is even difficult to define "vestige" in this context. *See id.* at 502 (Scalia, J., concurring) ("We have never sought to describe how one identifies . . . a 'vestige' or a 'remnant' of past discrimination. . . ."). The vestiges "that are the concern of the law may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied." *Id.* at 496 (Kennedy, J.); *see also id.* at 512 (Souter, J., concurring) (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 & n.13 (1979) and *Keyes v. School Dist. No. 1, Denver*, 413 U.S. 189, 211 & n.17 (1973)) (court must order affirmative remedy where school board's conduct "create[d] or contribute[d] to" racial identifiability of schools). We adhere to the most common-sense meaning of

"vestige": it is a condition or occurrence causally related to the former de jure system of segregation.

Because a school system's duty to eliminate such vestiges is restricted by the availability of practicable measures for doing so, *see Freeman*, 503 U.S. at 492, it is also incumbent on us to consider practicability. In determining the practicability of further measures, the district court must look to numerous indicia of the system's operation. Practicability depends on the feasibility of the proposed method, from both a financial and an administrative perspective. *Cf. id.* at 481-83, 493-97. Whether a measure is practicable also depends on whether it is "directed to curing the effects of the specific violation," and whether it is likely to do so. *Id.* at 497.

Our duty, in reviewing Judge Potter's decision, *see Capacchione*, 57 F. Supp. 2d at 228, is clear. We must examine each *Green* factor and ascertain whether unitary status has been achieved with respect to any or all of them. Because the district court declared the entire CMS school system to have achieved unitary status, we must assess, with respect to each *Green* factor, whether the Board has complied, in good faith, with the desegregation decree and whether the vestiges of segregation have been eliminated to the extent practicable. *See Freeman*, 503 U.S. at 492 (citing *Dowell*, 498 U.S. at 249-50). If the school system has not achieved unitary status in its entirety, then, consistent with *Freeman*, we also must weigh the degree of interrelatedness existing between the various *Green* factors.

### B.

By way of introduction to our analysis of this case, we first address a fundamental flaw in the district court's proceedings — a flaw arising from the district court's failure to give any consideration to a remedial plan sought to be admitted as evidence by CMS. Following the filing of the *Capacchione* plaintiffs' Complaint in Intervention, the Board undertook to produce a comprehensive analysis of whether vestiges of de jure segregation existed in CMS and whether any such vestiges could be practicably remedied. The Board analyzed available data and identified several vestiges remaining; then, in line with the mandate of *Freeman*, the Superintendent of CMS developed a plan containing practicable remedial steps. The Board independently

reviewed this plan and, on March 30, 1999, adopted the "Charlotte-Mecklenburg Schools' Remedial Plan to Address the Remaining Vestiges of Segregation" (the "Plan" or "Remedial Plan"). J.A. 11029.

Consistent with pretrial deadlines, CMS filed the Remedial Plan with the district court as a potential exhibit at trial. J.A. 11028. At the pretrial conference conducted on April 13, 1999, the *Capacchione* plaintiffs moved in limine to exclude the Remedial Plan. In essence, the *Capacchione* plaintiffs maintained that the trial had been bifurcated into two phases and that only unitary status was at issue in the first phase. They further maintained that the Remedial Plan contained proposed remedies that could only be implemented if CMS was determined not to have achieved unitary status. Because the unitary status question had not yet been resolved, they claimed that the Remedial Plan (which the *Capacchione* plaintiffs characterized as a damages report) was irrelevant.

In opposing exclusion of the Remedial Plan, CMS and the *Swann* plaintiffs relied on the Supreme Court's *Freeman* analysis. J.A. 1421. Specifically, they asserted that each unitary status determination encompassed in the first phase of the trial turned on "whether the vestiges have been remedied *to the extent practicable*." *Id.* (emphasis added). The Remedial Plan, they claimed, was not merely relevant, but crucial, to establishing both the existence of vestiges of segregation and the practicability of remedial measures.

Judge Potter responded with two rulings. First, Judge Potter explained in assessing whether CMS had achieved unitary status that he believed *Freeman* required him to consider just one thing: "only . . . what CMS has done, not what it may do in the future." *See* Order of April 14, 1999 at 4. Second, based on this understanding of *Freeman* and the unitary status test, Judge Potter concluded that the Remedial Plan was irrelevant: "If the Court later determines that additional remedial measures are needed, it may consider the plan. Until that time comes, however, the Court will not get mired in the complex details and mechanics of a proposed plan." *Id.* at 5.[6]

---

[6]Judge Potter also chided CMS for proffering the Remedial Plan "after the deadline for fact discovery and expert witness discovery had

We believe Judge Potter erred in both of these rulings. First, he misapprehended *Freeman* and its test for unitary status. At the outset, *Freeman* explicitly rejects, as a matter of law, the very analysis adopted by the district court. That is, under *Freeman*, a district court must consider (1) compliance with prior orders (*i.e.*, "what CMS has done"), *and* (2) whether vestiges have been eliminated to the extent practicable (*i.e.*, "what [CMS] may do in the future"). *See Freeman*, 503 U.S. at 491; *see also* Order of April 14, 1999 at 4. By construing *Freeman*'s unitary status test to include the former ("what CMS has done") but not the latter ("what [CMS] may do in the future"), Judge Potter erred as a matter of law.

The Remedial Plan directly addresses the latter inquiry, and it does so in an apt, informed manner, relying on the considered opinions of highly capable professionals retained to analyze the latest available data. In other words, the district court's second reason for excluding the Plan — relevancy — also fails to withstand scrutiny.[7] There is no

expired." On the contrary, CMS fulfilled all of its duties under the federal rules, appropriately supplementing its responses to discovery requests as soon as the Remedial Plan had been adopted. Furthermore, a more precipitant proposal could not have incorporated the various expert perspectives developed during discovery. A similar plan submitted earlier in the course of the litigation necessarily would have been based largely on speculation and supposition, and therefore would have been far less useful and pertinent. As it was, the Plan was tendered in advance of the non-jury trial, and, of great significance, almost five months before the district court issued its decision. Neither the court nor the parties could have been inconvenienced by the necessary timing of the Remedial Plan's submission.

[7]Taking the district court at its word that the only question before it initially was the extent of the Board's compliance with the prior desegregation orders, the Remedial Plan was nonetheless highly relevant for even that purpose. The ease with which some of the proposed Plan remedies could be realized, *e.g.*, merely distributing available funding to address the stark disparity in basic resources such as instructional materials and media centers, *see* J.A. 11040, strongly suggests that the Board had not fully implemented the long-standing dictates of the prior orders. The court nonetheless observed that "while the goal of perfect compliance with court orders has remained elusive, no evidence has been pre-

doubt that Judge Potter had wide discretion on this issue, but relevancy is a fluid concept under the Federal Rules of Evidence. *See* Fed. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence" of any material fact "more probable or less probable than it would be without the evidence"). Consequently, relevancy typically presents a rather low barrier to admissibility. *See, e.g.*, *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998) (citing *United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995)).

However, we need not rely on the minimal threshold encompassed in the test for relevancy because this Remedial Plan would be relevant under any reasonable test. The Remedial Plan identified record evidence (including the deposition testimony of several experts) supporting the Board's belief that vestiges of de jure segregation in CMS remain apparent in (1) faculty assignment and quality, (2) physical facilities and the allocation of instructional resources, (3) student achievement, and (4) student assignment. More importantly, the Remedial Plan detailed specific steps that the Board proposed to undertake over the course of the ensuing five years "with a goal of achieving unitary status at that time." J.A. 11029.

Without a doubt, federal courts possess the final word in deciding whether a particular school system is operating within the parameters of the Constitution. Appreciable weight must be given, however, to the views of those selected by the community to administer the system. *See Dowell*, 498 U.S. at 248 (noting specialized knowledge possessed by local school officials).[8] In refusing to consider the Plan, the

---

sented that school authorities were guilty of easily correctable errors." *Capacchione*, 57 F. Supp. 2d at 283. To the contrary, the Plan thoroughly documented the Board's failings and the facility with which they could be rectified. The district court simply chose to ignore this highly relevant evidence.

[8]Though we need not grant CMS the same deference afforded the promulgations and adjudications of a federal administrative agency, the formal declarations of its governing Board "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Ritter v. Cecil County Office of Housing & Community Dev.*, 33 F.3d 323, 328 (4th Cir. 1994) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

district court erroneously failed to accord the Board's official position any weight, much less the respect that it was due.

That the district court so completely disregarded this crucial evidence is telling. Nonetheless, ever mindful of the deference accorded the factfinder, we embark upon the task of examining the court's conclusions.

### 1. Student assignment

Of all the *Green* factors, the most prominent is the degree of racial imbalance in student assignment. *Freeman*, 503 U.S. at 474. Uniformity in the racial composition of a given school was the hallmark of official discrimination, "for under the former de jure regimes racial exclusion was both the means and the end of a policy motivated by disparagement of, or hostility towards, the disfavored race." *Id.* Court-ordered desegregation was designed to meet the enemy head-on; the long-term stability of attempts at racial balancing in student assignment is often seen as the most conspicuous indication of the courts' success (or lack thereof) in combating the underlying societal evil.

The fundamental questions before us are whether present racial isolation in CMS may be a vestige of the former dual system, and, if so, whether there are practicable measures CMS could take to reduce or eliminate that isolation. In considering these questions, we are bound to focus particularly on the Board's record of compliance with the district court's desegregation orders. *See id.* at 492 (citing *Dowell*). Because significant and growing racial imbalances in student assignment do exist in CMS, because the Board for decades has failed to comply with certain specific decrees of the district court (particularly regarding the siting of new schools), because these failures may have contributed to current racial isolation, and because future compliance might practicably reduce this racial isolation, we would vacate the district court's finding that CMS has achieved unitary status with respect to student assignment.

### a.

In the wake of the 1970 desegregation order, virtually all of the

schools in CMS operated in racial balance for a considerable time. By 1998-99 however, nearly thirty percent of the schools in the system had become racially identifiable.[9] Of the 126 schools included in the CMS desegregation plan, twenty-three are identifiably black and thirteen more are identifiably white. J.A. 11587. Further, virtually all of the identifiably black schools are located in either the inner city or in the immediate northwest-to-northeast suburbs, the areas of Mecklenburg County with the highest concentration of African-Americans. In stark contrast, all thirteen of the identifiably white schools are found in the extreme northern and southern areas of the county, both of which (and particularly the latter) have seen dramatic increases in white population during the past thirty years. The trend in CMS toward resegregation of its schools has accelerated markedly since the move to de-emphasize satellite zones and mandatory busing in 1992. In the last seven years, the number of CMS African-American students who attend racially identifiable schools (now almost three in ten) has risen fifty percent. J.A. 9589.

Indisputably, from 1981 until 1997, the CMS school system went through significant demographic changes. For example, the total population of Mecklenburg County has grown from 354,656 in 1970 to 613,310 in 1997. J.A. 16247. Almost 100,000 children attend CMS, making it the twenty-third largest school system in the country. J.A. 7107. During the period from 1970 to 1997, the black school-age population (ages 5 through 17) in the county has increased by approximately 10,000. J.A. 16247. Over the same period, the corresponding white school-age population has decreased by approximately 3,000, *id.*, and by 1997, African-Americans comprised 34 percent of the county's school-age population, the total of which numbered approximately 108,600. Evidence before the district court revealed that, since 1970, the growing African-American population has migrated outward from the inner city into formerly white suburbs. In turn, many

---

[9]Judge McMillan's final desegregation order mandated, *inter alia*, that no school should become "racially identifiable." *Swann*, 311 F. Supp. at 268. Judge Potter interpreted the phrase synonymously with "racially imbalanced," which, as noted within, describes a school with an African-American student population deviating more than fifteen points in either direction from the county-wide norm. *See Cappachione*, 57 F. Supp. 2d at 246.

white citizens who formerly populated the city's periphery have moved even farther into the county's outlying reaches. Though parts of the county have become more integrated as the result of these shifts, a disproportionately large number of African-Americans still reside in contiguous clusters generally north and west of the downtown area.

The threshold issue to be addressed is whether the thirty-six racially identifiable schools in CMS represent a vestige of segregation — that is, whether the present racial isolation is causally related to the prior system of de jure segregation. The *Swann* plaintiffs argue, and CMS agrees, that current racial isolation, like the racial isolation of the 1960s and 1970s, results both from past inequities that, to some extent, have persisted to this day, and from the Board's failure to comply with certain specific directives in the remedial decrees in this case.

Because CMS has not previously been adjudged to have achieved unitary status in student assignment, we are bound under *Swann* to presume that the current racial imbalance in the school population constitutes a continuing vestige of segregation. 402 U.S. at 26. The *Capacchione* plaintiffs have the burden of showing that the present existence of predominantly one-race schools in CMS "is not the result of present or past discriminatory action." *Id.*; *see also Riddick*, 784 F.2d at 535.

Our unwillingness to conclude that CMS is unitary with respect to student assignment centers on the Board's failure to comply with court orders regarding selection of sites for the construction of new schools. The role of school siting in achieving sustainable desegregation should not be underestimated. In fact, the importance of site selection has been apparent since the early stages of this case. As the Supreme Court explained in 1971:

> In the past [site selection] choices . . . have been used as a potent weapon for creating or maintaining a state-segregated school system. . . . [S]chool authorities have sometimes, since *Brown*, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by

> building new schools in the areas of white suburban expan-
> sion farthest from Negro population centers in order to
> maintain the separation of the races with a minimum depar-
> ture from the formal principles of "neighborhood zoning."
> Such a policy does more than simply influence the short-run
> composition of the student body of a new school. It may
> well promote segregated residential patterns which, when
> combined with "neighborhood zoning," further lock the
> school system into the mold of separation of the races. . . .
> In ascertaining the existence of legally imposed school seg-
> regation, the existence of a pattern of school construction
> and abandonment is thus a factor of great weight.

*Swann*, 402 U.S. at 21.

Subsequent to the Supreme Court's decision in *Swann*, Judge
McMillan specifically ordered that site selection for new schools
could not "be predicated on population trends alone." 379 F. Supp. at
1107. New schools were "to be built where they can readily serve
both races." *Id.* In the 1979 *Martin* decision,[10] Judge McMillan
devoted an entire section of his opinion to demonstrating that "con-
struction, location and closing of school buildings continue to pro-
mote segregation." 475 F. Supp. at 1329. Judge McMillan explained
that "[t]he location of schools plays a large if not determinative role
in . . . insuring that any given assignment and feeder plan will provide
meaningful desegregation, rather than just the predictably short lived
*appearance* of desegregation." *Id.* at 1332.

In the years since this decree was issued, CMS has built twenty-
five of twenty-seven new schools in predominantly white suburban
communities. In the mid-1980s, CMS adopted a formal policy of

---

[10]Judge Potter incorrectly declared that "*Martin* was not a unitary sta-
tus hearing[.]" *Capacchione*, 57 F. Supp. 2d at 250. In fact, as the accom-
panying text indicates, the white parents in *Martin* contended, as the
*Capacchione* plaintiffs do today, that CMS had achieved unitary status.
Intervening African-American parents, like those herein, maintained to
the contrary. In actuality, there is little difference between today's case
and *Martin*, and Judge McMillan's findings in the latter are as binding
on the parties as any others made in the course of this litigation.

building "midpoint" schools — schools located midway between black and white population centers. There is little evidence, however, to suggest that CMS faithfully adhered to this policy. Rather, record evidence strongly indicates that the policy influenced the site selection for, at most, four of the twenty-seven new schools. *See* J.A. 15404-06. Meanwhile, as we discuss *infra*, there is substantial evidence that CMS has allowed many of its older school facilities in the city — schools attended in disproportionate numbers by African-American students — to fall into a state of disrepair.

The Board's record of building the great majority of its new schools on the predominantly white suburban fringe of the county supports two possible conclusions. On one hand, CMS could have been responding to demographic reality — a demand for new classrooms in areas of high population growth (although we note that the number of white students in CMS has decreased since 1970, while the black student population has greatly *increased*). On the other hand, the Board's pattern of school construction could have facilitated or even hastened white flight to the suburbs. As the Supreme Court explained in *Swann*, "[p]eople gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods." 402 U.S. at 20-21. The Board's school siting policies could well evidence its lack of political will in the face of pressure to abandon desegregative policies — pressure from families who "are concerned about the racial composition of a prospective school and [who] will make residential decisions accordingly." *Freeman*, 503 U.S. at 513 (Blackmun, J., concurring).

There is certainly no evidence that CMS has intentionally sought, through its school siting policies, to "lock the school system into the mold of separation of the races" in the way that the Supreme Court described in *Swann*, 402 U.S. at 21. But the actual choices the Board has made with regard to school siting may in fact be quite similar to the "pattern of school construction and abandonment" described by the Court, with the actual effect that the Court feared of "lock[ing] the school system" into a condition of racial isolation. 402 U.S. at 21. We cannot conclude, at least in the absence of further fact-finding, that CMS, in choosing sites for new schools, has pursued "meaningful

desegregation, rather than just the predictably short lived *appearance* of desegregation." 475 F. Supp. at 1332.

Rather, the Board's practice of siting new schools such that they could not reasonably be expected to serve a racially balanced student population and Judge McMillan's determination that this practice, in the past, represented the school system's failure to eliminate the vestiges of segregation, together raise a strong inference that those vestiges remain today. When this inference is viewed in combination with the burden borne by the *Capacchione* plaintiffs to show that current racial imbalances have *no* causal link to past discrimination, we are compelled to conclude that a remand to the district court is required.

Although we defer to a district court's findings of fact unless clearly erroneous, Judge Potter's error here came in his application of the legal standard to the evidence regarding the Board's school siting policies. Judge Potter found that (1) CMS had not discriminated on the basis of race in choosing sites for new schools and that (2) CMS had incorporated racial diversity as one of its factors in site selection. Even assuming arguendo that both findings are not clearly erroneous, neither is sufficient to support the legal conclusion that in siting new schools CMS acted in compliance with the governing court orders and Constitution to eliminate the vestiges of segregation to the extent practicable.

"To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system." *Harris v. Crenshaw County Bd. of Educ.*, 968 F.2d 1090, 1095 (11th Cir. 1992) (citing *Pitts v. Freeman*, 755 F.2d 1423, 1427 (11th Cir. 1985)). Therefore, CMS had to do more than merely select sites for new schools on a nondiscriminatory basis. It had to do more, too, than simply give some consideration to "diversity" in its selection of sites. To the extent practicable, CMS had to site new schools "where they can readily serve both races." 379 F. Supp. at 1107; *see also Swann*, 402 U.S. at 21; *Martin*, 475 F. Supp. at 1329-32. Judge Potter never found that CMS had met this standard, and as outlined within, there is substantial record evidence that CMS did not do so.

In accordance with *Swann*, the burden is on the *Capacchione* plaintiffs to prove that vestiges of past discrimination do not remain, or that nothing can practicably be done to remedy them. We note that Judge McMillan, in his last published decision in this case, clearly evidenced his understanding both that CMS had *not* done all that it could do in the area of school siting and that future school siting decisions could practically advance the process of desegregation. It was thus incumbent on the *Capacchione* plaintiffs to demonstrate that conditions in Charlotte and Mecklenburg County have changed sufficiently such that school siting no longer represents a practicable opportunity to eliminate the vestiges of segregation.

The *Swann* plaintiffs have identified additional areas in which CMS has fallen short of its obligations under the court orders. For the life of the desegregation orders, CMS has consistently placed the heaviest burden of mandatory busing on African-American students. Currently, 80% of those students who ride the bus as a result of a mandatory assignment are African-American. J.A. 11515. Judge McMillan repeatedly ordered CMS to distribute this burden more fairly. *See* 475 F. Supp. at 1339-40; 379 F. Supp. at 1103-04; 362 F. Supp. at 1232-33. Yet, CMS has utterly failed to do so. In addition, CMS has never developed an effective system for monitoring student transfers to ensure that the overall effect of such transfers is not to increase the racial imbalance in the system as a whole. Again, this represents a failure to comply with the explicit instructions of the district court. *See* 475 F. Supp. at 1337-38; 379 F. Supp. at 1103-04; 362 F. Supp. at 1229-30. We are troubled by these failings on the part of CMS. They provide additional support for a conclusion that, in the face of political pressure, CMS has not done all that it could do to eliminate the vestiges of segregation.

Finally, the Board has itself taken the remarkable step of *admitting* its noncompliance with prior orders in this case. A school board's frank acquiescence in a position inuring to its detriment (in this case, the potential of ongoing judicial intervention), if not treated as conclusive, should at least be considered with the utmost gravity. Under these circumstances, we have no difficulty in determining that the district court's conclusion that the Board's level of compliance was "full and satisfactory" should be vacated.

b.

If the vestiges of official discrimination have indeed been eliminated to the extent practicable with respect to student assignment, then there is little reason to prolong court supervision. In light of the district court's failure, however, to recognize the Board's continuing noncompliance with respect to student assignment — administered as recently as twenty years ago in a manner reinforcing the once-official notion that African-Americans are inferior — we have no confidence in the court's ultimate finding that these vestiges have now disappeared.

The district court neglected to determine whether, since Judge McMillan's decision in *Martin*, CMS has fulfilled its constitutional and court-imposed obligations with regard to site selection for new schools. Had the Board's efforts been deemed lacking, the court below should have proceeded to decide whether this failure contributed to the present condition of racial isolation in the school system. If the district court then found that CMS had failed to live up to its constitutional and judicially decreed obligations, and if that failure did contribute to the present racial imbalances, then the court was bound to further investigate whether proper site selection is a practicable remedy for the lingering effects of the Board's past discriminatory practices. Only if proper site selection were not a viable option could the district court have relinquished control over student assignment; there would be nothing further that CMS could practicably do to eliminate the vestiges of the prior de jure system.

If, however, proper sites were found to be available, then student assignment should have remained under the district court's control. In fashioning a remedy, the court might have directed, for example, that most or all new schools constructed over the next several years be located proximate to the inner city or in midpoint areas already integrated residentially. Conversely, the district court might have concluded that more flexibility is required because of real estate costs, crushing demand in the suburban fringes, or for some other sufficient reason. In this vein, the Board's Remedial Plan could have been considered as a limited term remedy for the racial isolation that would

otherwise continue to exist until the Board's newly redirected school siting policies can begin to take effect.[11]

Should corrective action one day be deemed justified in this case, some reasons will not be sufficient to deny African-American students a remedy. For example, political pressure and perceived resistance to change by certain groups in the community will not suffice. Additionally, logistical barriers merely making "difficult" the transport inward of outlying white students will likewise, if reasonably surmountable, not be enough. *Cf. Capacchione*, 57 F. Supp. 2d at 253 (district court's observation that "transport[ing] white students in from satellite zones . . . is difficult given the rush hour traffic patterns"). Although what is "practicable" need not extend to all that is "possible," rectifying the grievous constitutional wrongs of the past surely justifies reaching beyond the "difficult" or purely "problematic."

### 2.  *Physical Facilities*

After describing how CMS has allocated its physical facilities and resources among its students, Judge Potter concluded that "the *Swann* plaintiffs have failed to overcome the Court's previous findings on facilities by establishing the requisite discriminatory intent and causation." *Id.* at 267. Judge Potter's mention of "previous findings" refers to excerpts from various opinions and orders authored by Judge McMillan:

---

[11]The strategies described in the Remedial Plan would be of particular help in deciding whether practicable measures are available. The Plan proposes, among other things, to divide Mecklenburg County into three to five demographically similar "clusters," within which students may choose to attend any school, magnet or otherwise. Where the demand for a given school exceeds the available room, spots would be assigned by lottery based on factors such as proximity, sibling attendance, and racial, ethnic, and economic diversity. The Plan also outlines a formal mechanism to disseminate information regarding the enrollment process, and it provides that the Board will work with the business community and local government to secure subsidies for disadvantaged families wishing to relocate to areas in which low-cost housing is scarce. *See* J.A. 11053-59.

> *April 1969* - "No racial discrimination or inequality is found in the . . . . quality of the school buildings and equipment. . . . Schools described by witnesses as 'white' ranged well up and down on both sides of [the average per-pupil expenditure], and schools described by witnesses as 'black' showed a similar variation." 300 F. Supp. at 1366.

> *August 1969* - "The defendants contended and the court found in its April 23, 1969 order that facilities and teachers in the various black schools were not measurably inferior to those in the various white schools. It is too late now to expect the court to proceed upon an opposite assumption." 306 F. Supp. at 1298.

> *October 1971* - "[T]he formerly black schools are not shown nor suggested to be inferior in faculty, plant, equipment or program." 334 F. Supp. at 625.

Toward the close of the prior proceedings in 1975 (and consistent with the above), Judge McMillan awarded attorney's fees to the *Swann* plaintiffs as prevailing parties, "[e]xcept for the refusal of the court to find in the plaintiffs' favor . . . regarding adequacy of physical plants and equipment and teacher quality." *Swann*, 66 F.R.D. at 484.

Judge Potter acknowledged that no court "ha[d] [ ]ever granted unitary status to CMS, nor . . . partially withdrawn supervision as to facilities or any other *Green* factor." *Capacchione*, 57 F. Supp. 2d at 262. The court nevertheless relied on the above 1969 and 1971 findings to release the *Capacchione* plaintiffs from their burden of proving CMS unitary with respect to facilities, stating that to proceed otherwise would "defy logic." *Id.* at 263. Judge Potter thus accepted the premise that Judge McMillan's 1969 and 1971 findings "constitute collateral estoppel and law of the case" regarding facilities, "thereby shifting the burden to CMS and the *Swann* plaintiffs to show discriminatory intent." *Id.* at 262.

The district court's burden-shifting analysis was an error of law. Once the existence of an unlawful dual school system has been established and court supervision begun, it is presumed that racial dispari-

ties arising during the period of intervention "are causally related to prior segregation." *School Bd. of the City of Richmond v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987). Following the imposition of judicial control, a party seeking to end the status quo bears the burden of overcoming the presumption of causation. If this burden is met and the school system is declared to have achieved unitary status as to the particular factor at issue, the presumption ends. *Id.* Generally, in any subsequent proceeding involving new allegations of disparate treatment, the complaining party must show purposeful discrimination. *Riddick*, 784 F.2d at 537 (concluding that *Swann* and its progeny require proof of "discriminatory intent on the part of the school board of a unitary school system" in order to resume court supervision).[12]

To be sure, the absence heretofore of any finding to the contrary would have been an important consideration in determining whether the *Capacchione* plaintiffs had proved CMS to have achieved unitary status with respect to facilities. However, that Judge McMillan did not intend his initial observations regarding facilities to be construed as a finding of unitary status is obvious from his subsequent actions. In 1973, Judge McMillan assumed control over facilities and resources, found inequities, and ordered CMS to remedy those disparities. *See Swann*, 362 F. Supp. at 1235 (finding Double Oaks Elementary access road still undeveloped two years after court's identification of the problem — "No $80,000,000 budget is so powerless."); *id.* (finding Double Oaks library not restored to standards several years after fire); *id.* at 1238 (ordering athletic facilities at West Charlotte High School immediately upgraded to level comparable with other schools in the county). We must conclude that the Board has been subject to the court's jurisdiction as to its facilities since at least 1973. *See Dowell*, 498 U.S. at 246 (school boards entitled to a "rather precise statement" terminating a desegregation order).

The asserted lack of a prior adverse finding should not have been determinative of the issue, especially as the district court in 1969 was not focusing on a school system suddenly thrust into the judicial

---

[12]However, if a district court retains jurisdiction over one or more *Green* factors, it may, upon a proper showing, reassert control over a factor previously adjudged to have attained unitary status. *Freeman*, 503 U.S. at 508-09 (Souter, J., concurring).

arena, but was instead examining one that had been subject to court supervision for nearly four years. Between the commencement of the initial *Swann* lawsuit in 1965 and the district court's first mention of the facilities issue in April 1969, CMS closed sixteen black schools. The Board's *en masse* action gives rise to an almost undeniable inference that these schools were shut down because they were inferior, and the timing also suggests strongly that the closures were prompted by the judicial proceedings then underway.

Viewed in context, the most plausible conclusion is that the putative equality mentioned by the district court in 1969 and 1971 was actually an endorsement of the steps that had been taken by the Board to remedy the inequities in facilities. In any event, CMS could not be said to have achieved unitary status absent a finding by the lower court that the Board had "eliminated the vestiges of its prior discrimination," embodied in an "adjudicat[ion] . . . through the proper judicial procedures." *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1413 n.12 (11th Cir. 1985), *quoted in Dowell*, 498 U.S. at 245 (noting distinction between school systems operating in an unitary fashion and those that have achieved unitary status, and observing that the former "could be called unitary and nevertheless still contain vestiges of past discrimination").

Thirty-five years have passed since the Board first acted to equalize its facilities, yet serious questions remain as to whether it has finally realized that goal. Dr. Dwayne E. Gardner, an impressively qualified educational planner and consultant, compiled an exhaustive report for the Board in which he evaluated the suitability of its school facilities.[13] Dr. Gardner examined and personally visited more than half of the schools in CMS (including all of the high schools), analyzing a host of factors affecting educational quality. For the purposes of his study, Dr. Gardner divided the subject schools into three groups: (1) all imbalanced-black schools; (2) all racially balanced schools in imbalanced-black census tracts; and (3) each remaining high school, along with a set of elementary and middle schools randomly selected

---

[13]The district court found that the expert called on behalf of the *Capacchione* plaintiffs, Dr. David J. Armor, could offer no reliable testimony on the subject. *See Capacchione*, 57 F. Supp. 2d at 264.

from the remaining schools and approximately equal in number to those already included within the first two groups.

Each school in the study was assigned a composite score from 0-100, indicating its worthiness. Schools scoring 44 or lower were, in Dr. Gardner's opinion, so deficient as to merit replacement, while those with scores between 45-59 were classified as needing "major improvements." Any school that scored 60 or above was "considered to have the ability to serve the educational program adequately." J.A. 12174.

The results of Dr. Gardner's study are troubling. The average score for the forty Group 3 schools (racially balanced or imbalanced-white in predominantly white or balanced areas) was 61.7. Although the Group 3 data indicate a situation that is far from ideal, the ten Group 2 schools (racially balanced in predominantly black areas) fared much worse, with an average score of 56.3. The scores of the twenty-three Group 1 schools (imbalanced-black) were worse still, averaging just 53.3.[14] At trial, Dr. Gardner confirmed that the disparities apparent

---

[14]It has been famously said (by either Mark Twain or, earlier, Benjamin Disraeli, depending on one's source), "There are three kinds of lies — lies, damned lies and statistics." A common difficulty in dealing with statistics is illustrated by the district court's analysis of Dr. Gardner's study. The court first noted that, of the four schools scoring in the lowest category, two were in Group 1 and two were in Group 3. *Capacchione*, 57 F. Supp. 2d at 264-65. Next, the court observed that the two highest ratings accorded elementary schools were again split between Groups 1 and 3. *Id.* at 265. Based on this selective culling of the data, the lower court concluded that "the results of Dr. Gardner's analysis do not show disparities along racial lines." *Id.* at 264.

The forest that is CMS is not sufficiently mapped by the documentation of a few trees. We could accurately say, for example, that omission from Group 1 of the brand-new elementary school referred to by the district court as having one of the highest ratings would lower the Group 1 average by more than a full point. Or we could state without error that seven of the twenty-three Group 1 schools (more than 30 percent) scored below 50, while only five of the forty Group 3 schools (12.5 percent) scored similarly. Indeed, we note that *none* of the Group 1 high schools scored higher than 46, yet *all* those in Groups 2 and 3 scored at 50 or

from the above numbers were "substantial" with respect to the facilities generally available to white and African-American children attending CMS. J.A. 6196-99.

The anecdotal accounts of a number of witnesses effectively corroborated Dr. Gardner's conclusions. *See*, *e.g.*, J.A. 4992 (testimony of Board member Pamela R. Mange) (schools with "more severe" problems tended to be predominantly black); J.A. 4769 (testimony of Annelle Houk) ("[T]he schools that were in the worst repair and had the poorest supply of resources . . . were on the west side and they were predominantly populated by black students."). John A. Kramer, co-chair of an advisory task force created by the Board, made formal visits to several CMS schools in 1997. Among the locales on Mr. Kramer's itinerary were Elizabeth Lane Elementary, a predominantly white school located in a prosperous suburban area of the county, and Shamrock Gardens Elementary, a downtown school with an African-American student population exceeding sixty percent. Mr. Kramer's descriptions of his visits contrasted sharply:

> [T]o compare Elizabeth Lane Elementary as an example, which is a relatively new school located in Matthews, I walked into that school, I was overwhelmed because I had never set foot in a school that was like that before. It was clean, it was light and airy, it was a beautiful facility. . . . My overwhelming feeling was, wow, I wish my kids could go to this school. And another observation that was very clear was that when I looked at the student body, it was vir-

---

above. Of course, one would rightly view this latter declaration with some skepticism once it became known that there are but fourteen high schools in CMS, only two of which were included by Dr. Gardner in Group 1.

The pick-and-choose method gets us nowhere. The value of Dr. Gardner's research lies in the general conclusions that can be drawn from the entirety of the data. The most obvious conclusion is that, as a general matter, imbalanced-black schools in CMS are in worse shape than those attended by larger proportions of white students. Once we accept that premise, the lone remaining question of any significance is "Why?"

tually all white students, obviously, affluent, happy kids having a great time.

On the other hand, my experience, for example, at Shamrock Gardens was shocking by comparison. I had never visited either one of these schools before, but to visit that school which is in the inner city, the students are predominantly black students, it reminded me of a rundown 1950s motel. There was literally no access to the rooms except by outer walkways that were covered by rusted, dilapidated overhead fixtures. . . . They were using closets and things to teach children in. The carpets were stained and threadbare. . . . It just didn't feel clean, it didn't feel good. And I can honestly say that as a parent, my heartfelt reaction was relief that my children didn't have to go to school there.

J.A. 6098-99. Even those Board members who voted to pursue a determination of unitary status before the district court admitted that disparity in facilities was a problem within CMS. J.A. 1817, 1820 (testimony of James H. Puckett); J.A. 1918-19 (testimony of John W. Lassiter); J.A. 2095-96 (testimony of Lindalyn Kakadelis).

Although it seems reasonably clear that a racial disparity in facilities exists in CMS, its cause is somewhat less apparent. The *Capacchione* plaintiffs maintain that no discrepancies exist in CMS facilities, and even if they do, such discrepancies are totally benign in origin. Had the *Capacchione* plaintiffs proved their theory, we would be constrained to affirm the district court's conclusion that unitary status has been achieved with respect to the facilities factor. The district court, however, required the *Capacchione* plaintiffs to prove nothing; it instead erroneously placed the burden on CMS and the *Swann* plaintiffs to affirmatively show that the present inequities in facilities are a vestige of official discrimination, *i.e.*, causally related to the prior de jure system of segregation. *Capacchione*, 57 F. Supp. 2d at 267.

The district court erred as a matter of law in foreclosing the development of evidence relevant to a proper vestige analysis. We would therefore remand this portion of the case to permit the parties and the district court to elicit the additional facts necessary to fully consider the question of causation with respect to the current racial inequities

in facilities. Because CMS has not been previously adjudged to have attained unitary status, we would charge the *Capacchione* plaintiffs on remand with the burden of demonstrating that the vestiges of past de jure racial discrimination in the context of the school system's facilities have been eliminated "root and branch" to the extent practicable.[15]

---

[15]The district court made no findings as to whether practicable remedies exist with respect to facilities. In light of the court's refusal to consider the Board's proposed five-year Remedial Plan, it cannot be determined in the first instance whether practicable remedies to the current disparities exist. We note, however, that the Remedial Plan specifically identifies disparities associated with race in baseline needs for schools' instructional materials and media centers, and the lack of any standardized criteria to evaluate the adequacy of these resources. J.A. 11037-38. The Plan proposes to achieve uniformity in resources across schools by imbalanced allocations that reflect the schools' current resource gaps and imbalances. J.A. 11038-40. Likewise, the Remedial Plan identifies disparities associated with race in the instructional facilities, and proposes building replacements or renovating existing facilities for sixteen schools that are either racially identifiable as black or are located in a predominantly black census tract. J.A. 11041-42. Uniform building maintenance standards and procedures are proposed. J.A. 11043. Monitoring, evaluation, and development of appropriate criteria for evaluation are also proposed to maintain equity across the school system's resources and facilities. J.A. 11038-40, 11042-43.

### 3.    Transportation

"School bus transportation was at the epicenter of the original *Swann* litigation, specifically the degree to which involuntary busing could be used to implement a remedial desegregation decree. The Supreme Court in *Swann*, of course, approved busing as a "normal and accepted tool of educational policy," 402 U.S. at 29, at least to the extent that the rigors of time and distance would pose little risk to the affected students' health or to the educational process as a whole. *See id.* at 30-31. In the intervening twenty-nine years, CMS has taken the Court's license to heart; during the 1998-99 school year, five of every six students in the school system rode a school bus.

Upon review of the *Green* factor of transportation, Judge Potter concluded that "a court may grant unitary status when transportation is provided on a non-discriminatory basis." 57 F. Supp. 2d at 267. In other words, according to the district court, a school system achieves unitary status with respect to transportation once it provides access to transportation non-discriminatorily to black and white children. Because CMS provides all children, regardless of race, access to transportation, Judge Potter concluded that CMS had achieved unitary status with respect to this *Green* factor.

We must be mindful of the Supreme Court's command to consider

the interrelatedness of the various *Green* factors. *See Freeman*, 503 U.S. at 491 (court must consider "whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system"). In this context, we can only conclude that the *Green* factor of transportation is so inextricably intertwined with the *Green* factors of student assignment and facilities that vacatur on these latter issues would also mandate vacatur on the former.[16]

The *Swann* plaintiffs maintain and offer substantial record evidence that the burdens of busing for desegregation purposes are being borne disproportionately and unfairly by African-American children. Brief of Appellants at 31-32, 33-35; *see Swann*, 306 F. Supp. at 1298 (district court commenting in initial stages of remediation that it did not intend "to endorse or approve any future plan which puts the burden of desegregation primarily upon one race"). Eighty percent of students who currently ride the bus as a result of a mandatory assignment are African-American. Judge Potter rejected any consideration of this

---

[16]Pursuant to *Freeman*, the district court accepted the invitation of the Board and the *Swann* plaintiffs to consider whether vestiges of official discrimination remain concerning the ancillary factors of student achievement and student discipline. The court found in the negative, concluding that CMS had attained unitary status in both areas. We agree that the district court's judgment regarding student discipline should be affirmed.

With respect to the ancillary factor of student achievement, however, we would vacate Judge Potter's holding that unitary status had been achieved. Judge Potter found that disparities in student achievement existed but that the disparities (1) were not vestiges of de jure segregation and (2) could not be remedied by any practicable measure. *Capacchione*, 57 F. Supp. 2d at 280-81. An analysis of disparities in student achievement may only be appropriate once the school system has achieved unitary status in other respects. *See Swann*, 306 F. Supp at 1309 ("Until unlawful segregation is eliminated, it is idle to speculate whether some of this [achievement] gap can be charged to racial differences or to 'socio-economic-cultural' lag."). At the very least, student achievement in this case is inextricably intertwined with the other *Green* factors, particularly student assignment. Therefore, for reasons akin to those discussed in our analysis of the *Green* factor of transportation, we would likewise conclude that the student achievement factor requires further consideration.

evidence, holding that a school district has achieved unitary status with respect to transportation as soon as it is provided on a race-neutral basis. The evidence, however, demonstrates the close interrelationship of transportation with student assignment. In view of our conclusion that CMS is not yet unitary with regard to student assignment, we think it is premature to relinquish control over transportation at this stage.[17]

### 4. *Faculty*

Our analysis of this factor must take two concerns into account. We must determine both whether CMS has generally eliminated the vestiges of discrimination in faculty assignment, and whether the teachers assigned to predominantly black schools are of comparable quality to those teaching in schools with large numbers of white students.[18] *See Swann*, 311 F. Supp. at 268 (final desegregation order directing that the racial composition of faculty assigned to each school reflect that of the system at large, with the proviso that "the competence and experience of teachers in formerly or recently black schools will not be inferior to those in the formerly or recently white schools in the system").

---

[17]While the Remedial Plan does not specifically address transportation as a *Green* factor, it does propose siting new schools in a manner calculated to promote racial balance in CMS. J.A. 11042. If CMS chooses sites for new schools that are more accessible to the majority of the black population, we presume that fewer black students would have to be bused to the suburbs for purposes of desegretation. A new approach to school siting would address the vestiges of past discrimination, if such vestiges remain, in those areas in which CMS has not yet achieved unitary status.

[18]The district court considered a particular school to be racially imbalanced if its proportion of African-American students varied more than fifteen percent from the district-wide average. In 1998-99, African-Americans represented 42.7% of the elementary students in CMS, 41.7% of the middle school students, and 39.6% of the high school students. J.A. 11574. An elementary school would therefore be designated imbalanced-black if more than 57.7% of its students are African-American; conversely, if African-Americans constituted less than 27.7% of the student body, the school would be designated imbalanced-white.

The evidence at trial demonstrated that CMS assigned its faculty in substantial compliance with the desegregation order at least until 1992, when school principals were granted the leeway to actively recruit new teachers without the strictures of maintaining a specific racial proportion. As a result of this gravitation from centralized to site-based control of faculty assignments, a trend away from proportionality has emerged. In 1998-99, one-third of the 126 schools covered by the remedial decree had a proportion of black faculty deviating more than ten percent from the system-wide norm (about twenty-one percent). Prior to the 1992 change in policy, no more than one-sixth of the schools had ever been so situated.

We are satisfied that the current trend toward faculty imbalance is neither a vestige of the dual system nor the product of subsequent discrimination. There is no evidence that this trend results from legal or administrative compulsion within CMS or from perceptions about the desirability or undesirability of teaching positions in schools that serve students of predominantly one race. In short, we do not perceive a causal relationship between past de jure segregation and the present assignment of faculty members to schools within CMS.[19]

Nor do we think that this trend toward more racially imbalanced faculties has resulted in disparities in the quality of teaching, as measured by the instructors' years of experience and post-graduate work. Indeed, there is no significant difference in experience between faculties at imbalanced-black schools as compared to those that are imbalanced-white. Faculties at black schools are about one year less experienced than the district-wide average, while faculties at white

---

[19]Even if the pattern of faculty assignments were somehow shown to be a vestige of past official discrimination, the evidence before the district court casts substantial doubt upon the Board's ability to effect a practicable remedy. *See Capacchione*, 57 F. Supp. 2d at 258-59:

> CMS runs the risk of losing significant numbers of teachers if its faculty assignment policies become too restrictive. . . . Another practical problem faced by the district is the fact that it must constantly hire thousands of new teachers in the midst of a national teacher shortage . . . . [which] is especially pronounced with regard to black teachers, particularly in this region of the country.

schools are correspondingly more seasoned. This disparity may arouse some initial concerns, until one is informed that the typical CMS teacher has spent more than ten years in the classroom. The upshot is that black and white students alike are, with no meaningful distinction, enjoying the benefits of their teachers' substantial experience.

The difference in post-graduate education between black-school and white-school faculties is more pronounced. For every three teachers holding advanced degrees who ply their craft at imbalanced-white schools, there are only two similarly qualified teachers assigned to schools that are imbalanced-black. Compared to the district average, white schools have a somewhat larger proportion of these highly trained instructors, while the allotment granted to black schools is slightly less than the norm.

Although these facts give us reason for concern, we think it imprudent to disturb the district court's conclusion that the trial evidence affirmatively disclosed no link between past discrimination and the current asymmetry. Most revealing on this point is that, until now, the issue of teacher quality within CMS has not been contested. The 1970 desegregation order mandating equal competence and experience in faculty assignments was not meant to remedy disparities then existing, but was instead intended to caution against future imbalances. In the intervening thirty years, there is little indication that CMS has neglected to heed the warning inherent in that order. We therefore agree that the district court did not clearly err in concluding that the developing disparities in teacher assignments and any (perhaps superficial) deficiency in the quality of instruction currently afforded African-American children are unrelated to the de jure segregation once prevalent in the school system.[20]

---

[20]Although the Board's official position, as outlined in its Remedial Plan, is that remediable vestiges of de jure segregation do remain as to faculty assignments and quality, the clear weight of the evidence is to the contrary. The district court's failure to consider the Plan was therefore harmless in this narrow respect.

### 5.    *Staff*

In substantially the same manner as it spoke to the allocation of teachers, the final desegregation order provided that "the internal operation of each school, and the assignment and management of school employees, of course be conducted on a non-racial, non-discriminatory basis." *Swann*, 311 F. Supp. at 269. Inasmuch as the *Swann* plaintiffs raised no challenge to the school system's compliance with the desegregation order in this regard, the court below found CMS to have achieved unitary status with regard to its support staff. We agree that this aspect of the district court's judgment should be affirmed.

### 6.    *Extracurricular activities*

According to the evidence at trial, African-American students in CMS participate in athletics and hold class office at a rate proportionate to their numbers. These same students lag far behind, however, when it comes to participating in co-curricular clubs and honors programs. J.A. 11634. However, the scope of our inquiry concerning extracurricular activities is limited. We need only determine whether the school system permits its students equal access to extracurricular activities, without regard to race. *Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 90 F.3d 752, 768-69 (3d Cir. 1996) (citation omitted); *see also Swann*, 402 U.S. at 18-19 ("[T]he first remedial responsibility of school authorities is to eliminate invidious racial distinctions. With respect to such matters as transportation, supporting personnel, and extracurricular activities, no more than this may be necessary. . . . In these areas, normal administrative practice should produce schools of like quality, facilities, and staffs.").

The criterion of equal access is surely satisfied in this regard. Participation in honors programs and co-curricular clubs is strictly voluntary, and there is no evidence that the lack of participation by African-American students in certain activities reflects the efforts of CMS to exclude them. We discern no error in the district court's conclusions regarding this *Green* factor.

### C.

Pursuant to the foregoing, we agree that the district court should be affirmed in its determination of unitary status with respect to faculty,

staff, extracurricular activities, and student discipline. However, we believe that the court's judgment should be vacated and the case remanded for further consideration in the areas of student assignment, facilities, transportation, and student achievement.

## III.

We now turn to the question of whether the Board's adoption of the expanded magnet schools program with its race-conscious assignment policy violates the Constitution. We conclude that it does not.[21] *See also* Wilkinson Op. at 72-75.

At the outset, we note that it is undisputed that this expanded magnet schools program differs in critical respects from *all* race-based student assignment plans that have been held to be in conflict with the Equal Protection Clause. Unlike school districts found to have violated the Constitution, CMS adopted the challenged program while operating a dual, segregated school system, under a myriad of court orders commanding the Board to eliminate the unlawful segregation.

The court orders — the public record attests to their numerosity and demands — require CMS to use its expertise and best efforts to desegregate its schools promptly. The federal court repeatedly directed the school board to employ its "full 'know-how' and resources" to use "any means at [its] disposal" to do away with the unconstitutionally segregated school system. *Swann*, 311 F. Supp. at 269; *accord Swann*, 318 F. Supp. at 802 (characterizing this directive as the "most important single element" of its order); *see also Swann*, 402 U.S. at 15 ("[S]chool authorities are 'clearly charged with the affirmative duty to take *whatever steps might be necessary* to convert to a unitary system in which racial discrimination would be eliminated root and branch.'") (quoting *Green*, 391 U.S. at 437-38) (emphasis added); *Swann*, 379 F. Supp. at 1105 (giving CMS the authority to resolve "the sizeable continuing problems yet remaining . . . by spontaneous action by staff or board"); *Swann*, 306 F. Supp.

---

[21]We review the district court's factual findings for clear error and its legal conclusions de novo. *See Freeman*, 503 U.S. at 474; *United States v. Texas*, 158 F.3d 299, 306 n.8 (5th Cir. 1998); *Little Rock Sch. Dist. v. North Little Rock Sch. Dist.*, 109 F.3d 514, 516 (8th Cir. 1997).

at 1297 (leaving "[t]he choice of how to do the job of desegregation" to CMS, and noting it "has *wide discretion* in choosing methods") (emphasis added); *Swann*, 300 F. Supp. at 1360 (providing CMS with authority "to consider *all known ways of desegregation*") (emphasis added). *Accord Freeman*, 503 U.S. at 485 ("The duty and responsibility of a school district once segregated by law is to take *all steps necessary* to eliminate the vestiges of the unconstitutional *de jure* system.") (first emphasis added).

Nor is there any doubt that at the time CMS adopted the expanded magnet schools plan, it was not a unitary school system. This is because even if Judge Potter did not err in decreeing that CMS has *now* achieved unitary status (and we believe he did), prior to his decision, no court had ever determined that CMS had attained unitary status. As the *Capacchione* plaintiffs concede, Judge Potter's decision — not some earlier event — "terminated [the] injunction" issued by Judge McMillan and affirmed by the Supreme Court. Brief of Appellees at 3.

Judge Potter properly acknowledged both the governing court orders and the fact that the remedial measures CMS took pursuant to them, including expansion of its magnet schools program, could not be analyzed as if taken by a "de facto" unitary school district. *See Capacchione*, 57 F. Supp. 2d at 285 ("The Court finds no legal basis for a finding of *de facto* unitary status that would abrogate CMS's immunity retroactively. In other words, the termination of court supervision cannot 'relate back' to an earlier time."). Yet, notwithstanding CMS's undisputed status as a dual school district under multiple court orders to desegregate its schools, the judge held that the Board's adoption of the expanded magnet schools program violated the Equal Protection Clause. Furthermore, he found this constitutional violation rendered CMS liable to the *Capacchione* plaintiffs for damages and enormous attorney's fees.

The *Capacchione* plaintiffs seek to uphold that ruling on several grounds. First and principally, they contend that the Board's increased reliance on magnet schools constituted a "voluntary desegregation plan implemented to counteract demographic change," rather than a good faith effort to eliminate the vestiges of discrimination as required by the court orders governing this case. Second, they argue

that the expanded program's race-conscious assignment policy violated the existing desegregation orders. Finally, they maintain that, even if CMS expanded its magnet schools program pursuant to and in compliance with governing court orders, strict scrutiny nonetheless applies and requires that the program be held unconstitutional. The district court properly rejected the first and third arguments, and the dissent does not seek to resurrect them. Accordingly, although we address all of these contentions, we initially examine the second, the only one on which the district court, or the dissent, relies.

A.

In concluding that the expanded magnet schools program violated the Constitution, the district court committed two fatal errors. Initially, it ignored the extent of the protection afforded an entity governed by federal court orders. Then, the district court refused to recognize the broad directives and expansive terms of the controlling court orders, and so failed to appreciate that the Board expanded its magnet schools program in good faith to comply with these orders, and thus cannot be held to have violated the Constitution. The dissent replicates both errors.

1.

Judge Potter, like the dissent, does pay lip service to the "immunity" the Board enjoyed because it was subject to numerous judicial desegregation decrees, *see, e.g.*, *Capacchione*, 57 F. Supp. 2d at 285 ("CMS enjoys immunity from liability for any actions it took consistent with the Court's injunction."); Traxler Op. at 46. But the district court and the dissent apparently do not understand what the numerous court orders in this case required of CMS and the breadth of the protection those orders afforded to it. Thus, both Judge Potter and the dissent mention the subject only in passing, failing even to cite controlling Supreme Court cases on point. *See id.*

A person or entity subject to a judicial decree or injunction (as CMS indisputably was when operating its dual, segregated school system) must comply with that decree or injunction, notwithstanding its possible unlawfulness. Thus, the Supreme Court has clearly and unequivocally directed that "persons subject to an injunctive order

issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, *even if they have proper grounds to object to the order.*" *GTE Sylvania, Inc. v. Consumers Union of the United States*, 445 U.S. 375, 386 (1980) (emphasis added); *see also W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).

The only possible exceptions to this "important public policy," *W.R. Grace*, 461 U.S. at 766, arise if a court lacks jurisdiction over the subject matter of the order or the order has "'only a frivolous pretense to validity.'" *GTE*, 445 U.S. at 386 (quoting *Walker v. City of Birmingham*, 388 U.S. 307, 315 (1967)). Without question, the federal court had jurisdiction over the subject matter of the desegregation orders issued in this case and no one suggests that those orders constituted "only a frivolous pretense to validity."

Accordingly, CMS had to obey those orders. This is so notwithstanding that those orders may have required the Board to forego competing obligations, *see W.R. Grace*, 461 U.S. at 767-68, including obligations seemingly required by a federal statute, *see GTE*, 445 U.S. at 378 & n.2, 386-87, or the Constitution itself, *see Walker*, 388 U.S. at 317. Indeed, the Supreme Court has explained that to hold that an entity acts "improperly" in obeying a valid court order "would do violence to the common understanding of the term 'improperly,'" even if the order is later held unlawful or unconstitutional. *GTE*, 445 U.S. at 387. Moreover, a court order need not mandate specific or precise procedures to compel obedience. Thus, although the Court noted the "breadth and vagueness" of the injunction challenged in *Walker*, it nonetheless held that the injunction had to be obeyed until "modified or dissolved." *Walker*, 388 U.S. at 317.

"Violations of [a court] order are punishable as criminal contempt even though the order is set aside on appeal." *United States v. United Mine Workers*, 330 U.S. 258, 294 (1947). *Accord Spangler*, 427 U.S. at 438 ("Violation of an injunctive decree . . . can result in punishment for contempt in the form of either a fine or imprisonment."). Conversely, when a person or entity acts in good faith to comply with a court order, it should not be punished. Thus, in words that resound here, the Supreme Court has explained that "a school board and a school constituency which attempt to comply with a [court-ordered

desegregation] plan to the best of their ability should not be penalized." *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 421 (1977).

Indeed, the Supreme Court has twice expressly held that school boards under court orders to desegregate must comply with those desegregation decrees until absolved of that obligation by a subsequent court order, even if the existing desegregation decrees are improper or unnecessary. In *Spangler*, the Court concluded that the district court exceeded its remedial discretion when it ordered the Pasadena school district to reconfigure its student attendance zones annually so that there would be "no majority of any minority" in any school. 427 U.S. at 434-35. Despite the impropriety of this order, the Court held that the school board had to obey the order until it was properly modified or reversed by a court. *See id.* at 439-40 ("[T]hose who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed.").

Similarly, in *Dowell*, the Court refused to interpret an arguably ambiguous court order as having terminated the desegregation decree previously entered against the Oklahoma City school board. Instead, the Court remanded the case to the district court for a determination of "whether the Board made a sufficient showing of constitutional compliance . . . to allow the injunction to be dissolved." *Dowell*, 498 U.S. at 249. In doing so, the Court explained that judicial orders carry binding authority until they are modified or dissolved.

Moreover, the *Dowell* Court rejected precisely the kind of argument the *Capacchione* plaintiffs seek to make here. In *Dowell*, as here, those challenging the school board's actions argued (and the court of appeals found) that the school board "unilaterally and contrary to specific provisions" of the controlling court orders "acted in a manner not contemplated by the court in its earlier decrees." *Dowell by Dowell v. Bd. of Educ. of Okla.*, 795 F.2d 1516, 1521 (10th Cir. 1986). The Supreme Court acknowledged that this might well be so, but concluded that nonetheless it did "not think that the Board should be penalized for relying on the express language of that order." *Dowell*, 498 U.S. at 249 n.1. Similarly, even if CMS had "acted in a manner not contemplated" in the governing orders — and clearly it did not, *see infra*, at part III.A.2 — it should not "be penalized for

relying on the express language" of those orders, *Dowell*, 498 U.S. at 249 n.1, i.e., "to use [its] full 'know-how' and resources . . . to achieve the constitutional end [i.e., desegregation of the schools] by any means at [its] disposal." *Swann*, 318 F. Supp. at 802.

Of course, the *Capacchione* plaintiffs could have sought to modify or dissolve the *Swann* orders as inconsistent with their rights under the Constitution; what they could not do is obtain an injunction, or declaration, that a party compelled to adhere to those orders violated the Constitution in so doing. CMS was obliged to follow the governing desegregation orders and injunctions, and thus the Board "should not be penalized," *Brinkman*, 433 U.S. at 421, for its actions, which were taken to comply with those orders and which the district court found, and the dissent does not dispute, were taken in good faith. *See* Traxler Op. at 41.

With these principles in mind, we turn to the desegregation orders in this case and the Board's actions in response to those orders.

2.

Throughout the course of the desegregation efforts in this case, the federal courts — from the district level to the Supreme Court — have told the Board that it has the authority to take "whatever steps might be necessary to convert to a unitary system." *Swann*, 402 U.S. at 15; *see also Swann*, 300 F. Supp. at 1360 ("The Board is free to consider *all known ways of desegregation*.") (emphasis added). Thus, CMS has continually acted under judicial directives that "[t]he choice of how to do the job of desegregation is for the School Board — not for the court." *Swann*, 306 F. Supp. at 1297. *See also* Wilkinson Op. at 72-74.

Even beyond CMS's broad discretion to choose its own methods of eliminating its unconstitutionally segregated schools, Judge McMillan's orders repeatedly endorsed the Board's general power and duty to maintain control over the racial composition of the schools in order to eliminate the vestiges of the segregated system "root and branch." For instance, in 1970 Judge McMillan mandated:

> That the defendants maintain a continuing control over the race of children in each school . . . and *maintain the racial make-up of each school* (including any new and any re-opened schools) to prevent any school from becoming racially identifiable. . . . The duty imposed by the law and by this order is the desegregation of schools and the maintenance of that condition. . . . The *defendants are encouraged to use their full 'know-how' and resources to attain the results above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the results.*

311 F. Supp. at 268-69 (emphasis added and emphasis omitted); *see also* 362 F. Supp. at 1225 (same); 334 F. Supp. at 631 (same); 475 F. Supp. at 1342 (approving counsel's statement that "if this Board of Education chose to run an integrated school system on the basis of *preconceived ratios*, it has that constitutional right") (emphasis added); 318 F. Supp. at 801 (ordering "[t]hat 'freedom of choice' or 'freedom of transfer' may not be allowed by the Board if the cumulative effect of any given transfer or group of transfers is to increase substantially the degree of segregation in the school from which the transfer is requested or in the school to which the transfer is desired").

Moreover, Chief Justice Burger's opinion for the Supreme Court in *Swann* provides explicit sanction of the Board's use of racial "ratios" or proportions in assigning students to schools:

> *School authorities* are traditionally charged with broad power to formulate and implement education policy and *might well conclude*, for example, that in order to prepare students to live in a pluralistic society *each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole*. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.

402 U.S. at 16 (emphasis added).[22]

Not only was CMS empowered to use ratios in student assignments generally, it was also specifically authorized to use race-conscious assignment policies for "appropriately integrated optional schools." *Swann*, 379 F. Supp. at 1103. Judge McMillan approved the Board's policy, which provided:

> *Strict and central control must be exercised over all admissions (reassignments) to each optional school* in order to fulfill the necessary ends that these schools be open to all county residents and *be integrated by grade at or above approximately a 20% black ratio*. Reassignments to optional schools must not jeopardize the racial composition of any other school.

> Guidelines and central monitoring by the Pupil Assignment staff with the respective school principals are to be drawn up. Capacities and allocation of maximum numbers of students that may be drawn from each other school attendance area, by race, are to be designated. The *actual enrollment of the optional school may have to be guided by its racial composition* and by the number drawn from each other school area, not by considerations of space and program only.

*Id.* at 1108 (emphasis added).

In response to these directives, in the 1970s CMS established some

---

[22]The dissent's suggestion that this holding in *Swann* was somehow abrogated by *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 283 (1986) and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494 (1989) is baffling. Neither case overruled, explicitly or implicitly, the *Swann* Court's authorization for *this school board* to assign students according to a "prescribed ratio." *Swann*, 402 U.S. at 16. This is not an instance in which CMS is attempting to extend an analogous Supreme Court holding to fit its own needs. Rather, the Supreme Court authorized *CMS's* actions specifically, and that authorization has never been overruled. As such, CMS is entitled to follow it. *See infra*, at part III.C.

magnet schools, which it called "optional schools." These schools offered two special curricula — "open" and "traditional" — both of which constituted "very rigorous academic program[s]" not offered in "conventional schools." J.A. 2489, 15683. In 1992, the Board expanded its magnet schools program into a district-wide system with a wider range of curricular choices. In the expanded magnet schools program, the Board retained the curricula first available in the early magnet or "optional" schools — the "open" curriculum emphasizing "interdisciplinary approaches," and the "traditional" curriculum featuring a "highly structured program." J.A. 16722-23. Furthermore, six of the early magnet schools that offered such curricula prior to 1992 — Myers Park, Elizabeth, Hawthorne, Irwin Avenue, Piedmont, and West Charlotte — continue to do so today under the expanded magnet schools program. *Compare* J.A. 13448, 13529-40, 15683 (pre-1992 "open" and "traditional" magnets) *with* J.A. 16722-23 (1998-99 "open" and "traditional" magnets); *see also* J.A. 10061 (report indicating that pre-1992 magnet schools were incorporated into the 1992 expanded magnet schools program).[23]

---

[23]Judge Potter recognized that the optional schools "were similar to today's magnet schools," both having "countywide enrollment and a racial balancing target." *Capacchione*, 57 F. Supp. 2d. at 286. He nonetheless concluded that the schools established after 1992 under the expanded magnet schools program "differ from optional schools in that [the new] magnets offer specialized curricula and thereby confer a benefit above and beyond the regular academic program." *Id.* at 286-87 n. 49. The dissent allies itself with this view, Traxler Op. at 49, but nothing in the record offers any support for it. To the contrary, assuming arguendo that "specialized curricula" constitute a "benefit," the magnet schools instituted after 1992 provide precisely the same "benefit" as the pre-1992 "optional schools." *See* J.A. 10552 (proposed 1992 pupil assignment plan recommending *continuation* of six magnet schools already in place); J.A. 15504 (1993 letter noting that magnet schools were called "optional schools" prior to 1992); J.A. 10651 (Summary of Findings From Research on Magnet Schools explaining that "[o]ur optional schools function as magnet schools"); J.A. 13606, 15581 (Stolee Plan explaining that "[t]he traditional schools presently existing in Charlotte-Mecklenburg are good examples" of curriculum specialty schools, "sometimes called magnet schools"). After all, it was only because the optional schools did offer certain "specialized curricula" that parents (including Michael Grant, one of the *Capacchione* plaintiffs, J.A. 2489) were willing, well prior to the 1992 expanded magnet schools program,

The expanded magnet schools program is a typical and appropriate desegregation tool "conceived and developed in large, urban school districts seeking a voluntary alternative to busing as a means of decreasing racial segregation." J.A. 10654. Even the dissenters recognize that "a magnet schools program, properly implemented, can no doubt be an effective desegregation tool." Traxler Op. at 50. But they nonetheless suggest that the expanded magnet schools program, in and of itself, may violate the Constitution. *See id.* at 71-74. This suggestion is surprising, given that the federal courts have consistently approved magnet school plans as desegregation tools. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 272 (1977) (*Milliken II*); *Stell v. Savannah-Chatham County Bd. of Educ.*, 888 F.2d 82, 85-86 (11th Cir. 1989); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 839 F.2d 1296, 1309-12 (8th Cir. 1988); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1237-39 (2d Cir. 1987); *Liddell v. Missouri*, 731 F.2d 1294, 1310-11 (8th Cir. 1984). The dissent's suggestion that CMS somehow violated the Constitution by expanding its magnet schools program and "abandon[ing] pairings, satellites, and feeders," Traxler Op. at 50, seems particularly extraordinary. Magnet schools are generally regarded as being a less onerous and more successful desegregation tool than pairing, satellites, or feeders because magnet schools provide more opportunity for student choice. *See, e.g.*, *Stell*, 888 F.2d at 85; *Yonkers*, 837 F.2d at 1239.

Of course, as Judge McMillan warned, in approving the early magnet or optional schools, assignment of pupils to such schools must be undertaken in a manner that "provide[s] . . . access to appropriately integrated optional schools," and "prevent[s] significant jeopardy to the racial composition of other schools." *Swann*, 379 F. Supp. at 1103.[24]

---

to enroll their children in desegregated optional schools. *See* J.A. 13641, 15616. In fact, the original six "open" and "traditional" schools remain among CMS's more heavily subscribed magnets. *See* J.A. 10292-340. Myers Park Traditional, for example, had 245 students on its waiting list for the 1998-99 school year. *See* J.A. 2159.

[24]The dissent's contention that Judge McMillan "cautio[ned]" CMS against creating optional schools because the schools were marked by "failure" flies in the face of the court orders. Traxler Op. at 49. In fact, the only warnings that Judge McMillan gave regarding optional schools

For this reason, race is, and must be, considered in assigning students to the magnet schools instituted under CMS's expanded program, just as it was in assigning students to the original magnet or optional schools. *See* 379 F. Supp. at 1108. Specifically, under the expanded program, CMS allocates 40% of the seats in its magnet schools for black students and 60% for students of other races. This ratio reflects the student population of the school system, which is approximately 41.0% black, 52.2% white, 3.7% Asian, 2.5% Hispanic, and .5% American Indian. CMS generally assigns students to its magnet schools using two parallel lotteries, one for black students and one for white students. When there has been insufficient interest from black students to fill the seats allocated to them in a particular school, CMS has sometimes refused to allow students of other races to fill those slots. Thus, race may affect a student's chances of being assigned to a magnet school.

It is this portion of the expanded magnet schools program that Judge Potter regarded as unconstitutional, reasoning that Judge McMillan "firmly rejected the use of rigid racial quotas." *Capacchione*, 57 F. Supp. 2d at 286 (relying on *Swann*, 306 F. Supp. at 1312). In reaching this conclusion, Judge Potter misread the order on which he assertedly relied and ignored the multiple other orders and injunctions governing this case.

---

were against repeating the past "failure" to provide adequate transportation and against failing to provide "adequate safeguards against discriminatory results," so as to prevent optional schools from "resurrect[ing]" "freedom of choice" plans under a new name. *Swann*, 379 F. Supp. at 1103-04.

Moreover, the dissent's heavy emphasis on Dr. Stolee's recommendation to the Board that it seek court approval of the expanded magnet schools program is puzzling. That one advisor should suggest this does not change the facts, and the critical facts here are that the expanded magnet schools program was simply an expansion of the court-appointed optional schools. Even if this were not so, the Board's decision to ignore a recommendation from one educational adviser (not a lawyer) on a legal matter certainly does not evidence the Board's bad faith or render its action violative of any court order.

Actually, in the very paragraph on which Judge Potter relied, in which Judge McMillan held that "[f]ixed ratios of pupils in particular schools will not be set" *by the court*, Judge McMillan also held that "efforts *should be made* [by the school board] to reach a 71-29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others." *Swann*, 306 F. Supp. at 1312 (emphasis added). Judge Potter transmuted this statement — an *authorization* for the Board to make "efforts" to "reach a 71-29 ratio" — into a *prohibition* against the Board assigning students to schools on the basis of that fixed ratio. *See Capacchione*, 57 F. Supp. 2d at 286. We cannot accept this reading of Judge McMillan's order. Taken as a whole, this paragraph provides some of the clearest evidence that Judge McMillan not only authorized the Board to use fixed ratios in assigning students to schools but encouraged it to do so. Recognizing the impracticability of adopting a court-ordered, system-wide racial balance to which all schools must adhere, Judge McMillan did observe that "variations from that [71-29 ratio] may be unavoidable." *Swann*, 306 F. Supp. at 1312. But that statement imposes no limitations on the scope of permissible Board action. Rather, it suggests that "variations" were acceptable only because they were "unavoidable."

The Board could not have accomplished what the desegregation orders required without "using race" in the way that it "used race" in the context of the expanded magnet schools program. In the 1970 order, affirmed by the Supreme Court, Judge McMillan decreed "[t]hat pupils of all grades be assigned in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students." *Swann*, 311 F. Supp. at 268. We cannot fathom how the Board could set out to achieve "about the same proportion of black and white students" in each grade level in each of its over one hundred schools without employing fixed racial ratios as the central components of its student assignment plan. Neither, apparently, could Judge McMillan.

To achieve "about the same proportion," the Board necessarily had to set fixed upper and lower limits on the proportion of white and black students it would permit in each grade in each school. Only with these fixed racial proportions as its lodestars could the Board assign students to schools, and approve or deny individual requests to

transfer. The Board could never have justified a denial of a transfer request without having a fixed conception of exactly how few white or black students in a particular school would be too few.

Indeed, Judge McMillan expressly approved many aspects of the CMS desegregation plan that were explicitly based on strict racial ratios. For example, the Board's majority-to-minority transfer policy, which was specifically authorized by the governing desegregation orders, takes race into account in much the same way as the magnet schools assignment policy. Under the transfer policy, a student in the racial majority in his current school could freely transfer to a school in which he would be in the racial minority. A white student in a majority white school, for example, could freely transfer to a majority black school, but that same student could be denied admission to a majority white school, solely on the basis of a rigid 50% racial ceiling. Meanwhile, a black student at a majority black school could freely transfer into the same majority white school to which the white student might be denied admission. The Supreme Court approved this use of majority-to-minority transfer policies as "a useful part of every desegregation plan" and "an indispensable remedy." *Swann*, 402 U.S. at 26. In fact, Judge McMillan specifically upheld this majority-to-minority plan, despite former CMS Superintendent Dr. J. M. Robinson's complaints about the rigidity of the 50% limit. *See Martin*, 475 F. Supp. at 1343 ("I would like to have had more flexibility than the 50 percent in some instances, but I would be opposed to recommending any plan that went, any of the schools going over more than a few percentage points above 50 percent.").

It is certainly true that Judge McMillan's orders and the Supreme Court's opinion in *Swann* consistently signaled concern with the imposition of racial proportions or ratios *by federal courts*. That concern, however, is rooted in the problem of federal courts exceeding their remedial discretion, not in any objection to the use of racial proportions or ratios by school boards themselves in their desegregation plans. Thus, the Supreme Court noted that, "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole," but went on to conclude that "the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." *Swann*, 402 U.S. at 24-25.

That this concern with ratios is rooted in the limits of judicial power to order remedial action, not in the impropriety of using racial proportions to remedy the vestiges of segregation, is nowhere more apparent than in Chief Justice Burger's statement in *Swann*. There, the Chief Justice noted that while in certain circumstances it might be inappropriate for a federal court to require adherence to "a prescribed ratio of Negro to white students reflecting" the population of the "district as a whole," it would be "within the broad discretionary powers of school authorities" to do so. *Id.* at 16. *See also* Wilkinson Op. at 73.

Indeed, in *Swann*'s companion case, *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45-46 (1971), the Supreme Court held that any attempt to "inhibit or obstruct" the Board's use of racial ratios "must fall." The Court explained that, "when past and continuing constitutional violations are found [as they had been in the Charlotte-Mecklenburg school system], some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against use of such a device . . . contravenes the implicit command of *Green*." *Id.* at 46. The Court expressly recognized that a "*flat prohibition* against assignment of students for the purpose of creating racial balance *must inevitably conflict with the duty of school authorities* to disestablish dual school systems." *Id.* (emphasis added).

The Board's authority to employ racial ratios is explicit not only in the Supreme Court's opinions, but also in Judge McMillan's repeated statements to the effect that "[i]ndependent of any court order . . . if this Board of Education chose to run an integrated school system *on the basis of preconceived ratios*, it has that constitutional right." *Martin*, 475 F. Supp. at 1342 (internal quotation marks omitted). In fact, early in the litigation Judge McMillan held that:

> Counsel for the plaintiffs says that since the ratio of white to black students is about 70/30, the School Board should assign the children on a basis 70% white and 30% black, and bus them to all the schools. This court does not feel that it has the power to make such a specific order. Nevertheless, the Board does have the power *to establish a formula* and provide transportation.

*Swann*, 300 F. Supp. at 1371 (emphasis added).

Moreover, this Court upheld "the validity of the Board's decision to reassign students in order *to maintain racial ratios*," and stated that the "School Board is vested with broad discretionary powers over educational policy and is well within its powers when it decides that as a matter of policy schools should not have a majority [over 50%] of minority students." *Martin*, 626 F.2d at 1167. Having been repeatedly told by federal courts that it had the "constitutional right" to "maintain racial ratios" to remedy past segregation, CMS cannot now be held to have violated the Constitution for doing exactly what the courts have said it had the power to do.

In short, time and again, the federal courts at all levels have authorized the Board to employ racial ratios to remedy its unlawfully segregated school system. Although the dissent repeatedly contends to the contrary, Traxler Op. at 52, 54, 55, no court has ever prohibited CMS (rather than the federal court supervising it) from imposing "racial ratios." The dissent's contention that Judge McMillan's order — mandating a black student population "about or above 20%" in the optional schools, instead of the Board's proposed "at or above approximately 20%" language — constitutes a rejection of "rigid racial quotas," Traxler Op. at 53, is singularly unconvincing. It seems unlikely that by this slight word difference Judge McMillan even indicated a disapproval of the *Board's* use of "rigid" quotas, which would otherwise have been permitted under the Board's policy. It seems far more likely that Judge McMillan believed that his order permitting a racial ratio "about or above 20%" was equivalent to the Board's policy of permitting a racial ratio "at or above approximately 20%." In any event, neither linguistic formulation *prohibits the Board* from adopting an 80-20 ratio for the early optional schools, or the 60-40 ratio for magnet schools that it subsequently adopted in 1992, especially in light of the Board's broad discretion and explicit authorization to use strict racial ratios in other areas of its desegregation plan.

Similarly, the dissent's suggestion that the expanded magnet schools program differs from the "optional schools" program because the Board set "inflexible quotas" in the expanded plan, Traxler Op. at 44, is simply not borne out by the record. In truth, in 1992, CMS implemented a 60-40 white-black ratio with an eye to reaching a

racial balance that corresponded with the make-up of the entire student population of the school system, just as in 1974 it implemented the 80-20 white-black ratio to correspond with the entire student population at that time. The 60-40 ratio was not applied in any more of a rigid or "inflexible" manner than the earlier ratio; Board policy provided that "all magnet schools would maintain a 60-40 white-black ratio *plus or minus 15%*," J.A. 13705; *see also* J.A. 3187, 3193, and the Student Assignment Plan permitted "racial balance [to] be allowed to fluctuate." J.A. 15702. The Board's Executive Director of Planning and Student Placement testified that several race-neutral considerations, such as sibling attendance, would allow a school to "depart from the 60-40 goal." J.A. 3217; *see also* J.A. 3091-92, 3193-94. Contrary to the dissent's claims of rigidity, not a single magnet school actually manifested a 60-40 ratio. J.A. 3185. A number of magnet schools came close to the stated goal, but the percentage of black students in CMS's magnet schools ranged from 7% to 82%, *id.*, and students that failed to gain admission to one magnet school "often ha[d] a seat waiting for them at another magnet school of their choosing." J.A. 3076. In fact, the two "black seats" about which Christina Capacchione originally complained were ultimately filled by two white students, despite the supposedly "inflexible" ratio. In sum, the 60-40 ratio was not an unbendable "quota," either in policy or in practice, any more than the earlier ratio had been.

Both the Supreme Court and Judge McMillan provided CMS with "wide discretion" to fashion appropriate remedies in light of the particular needs of its pupils and the school system's experience with other desegregation tools. Additionally, Judge McMillan approved specific race-conscious assignment measures generally and specifically as to magnet schools.[25] Thus, when adopting a 60-40 assignment

---

[25]The dissent, *see* Traxler Op. at 50, makes much of Judge McMillan's 1970 instruction that "leave of the court be obtained before making any material departure from any specific requirement set out herein," *Swann*, 311 F. Supp. at 270. But the dissent fails to acknowledge that this statement followed Judge McMillan's declaration that the Board had "maximum discretion . . . to choose methods that will accomplish the required result." *Id.* The "material departure" provision was not an attempt to limit the Board's ability to choose its own methods to move aggressively forward with the desegregation of its schools, but rather was a message that

formula in the expanded magnet schools program, the Board not only acted within its "wide discretion," but also in accordance with specific procedures approved by the district court.

Judge Potter's conclusion (and the dissent's contention) to the contrary simply cannot be reconciled with the Supreme Court opinion in *Swann*, our opinions in this case, and Judge McMillan's decrees. The magnet schools' race-conscious assignment policy constitutes a necessary safeguard against the risk that unchecked transfers to magnet schools could increase the number of racially identifiable schools in violation of the Board's continuing obligation under the desegregation orders. *See* 379 F. Supp. at 1105 ("Racially identifiable schools may not be operated."). In that vein, the *Capacchione* plaintiffs' own expert on school desegregation, Dr. David Armor, agreed that racial quotas are permissible in a desegregation plan. J.A. 3627. Dr. Armor testified that "race is an integral part of pairing, of satelliting, of magnet schools, of running lotteries for magnet schools. The entire plan is predicated on race and race controls, because that's the only way you can meet the court order and to have an effective plan is to employ race requirements and racial quotas basically for all schools." J.A. 3434.

In sum, contrary to Judge Potter's conclusion, Judge McMillan specifically authorized the use of fixed ratios based on race in assigning students to magnet schools. *See* 379 F. Supp. at 1104. Furthermore, even without such specific authorization, the broad discretion granted the Board by the Supreme Court's opinion in *Swann* and by the other court orders and injunctions governing this case permitted CMS to fashion magnet schools with racially balanced enrollments. The decrees make plain that ratios based on race were among the "means" by which the Board was authorized "to achieve the constitutional end" of desegregation. *Swann* 311 F. Supp. at 268-69; *see also Swann*, 362 F. Supp. at 1225; *Swann*, 334 F. Supp. at 631. As such,

this previously recalcitrant school district should not use its "discretion" to take steps backward, i.e., a "material departure," from its obligation to achieve the court-ordered "goal" of "complete desegregation of the entire system to the maximum extent possible." *Swann*, 306 F. Supp. at 1298-99.

the Board did not violate the Equal Protection Clause in adopting such ratios in its expanded magnet schools program.

### B.

As their principal contention, the *Capacchione* plaintiffs argue that the expanded magnet schools program was a response to demographic change rather than a true attempt to remedy past discrimination. We cannot agree.[26]

First, Judge Potter "accept[ed] that the school system was acting to . . . remedy[ ] the effects of past racial discrimination" in expanding the number of magnet schools in 1992. *Capacchione*, 57 F. Supp. 2d at 289. Ample record evidence supports this finding. *See, e.g.*, J.A. 2716 (testimony of John Murphy, former CMS Superintendent, that 1992 plan to expand the magnet school program was among the "creative strategies we could come up with to stay in compliance with the court order"); J.A. 3869-74 (testimony of Jeff Schiller, former assistant superintendent for research, assessment, and planning for CMS, explaining that the 1992 student assignment plan, including the expanded magnet schools program, "had the same objectives as the one that it was going to replace, maintaining the court order," and that the objective of the expanded magnet program specifically was "to maintain the integration of schools through voluntary means"); J.A. 15503-05 (1993 letter from CMS to the U.S. Department of Education discussing Judge McMillan's 1974 order and identifying the creation of additional magnet schools as among the "more effective ways . . . [to] meet[ ] the guidelines established by the Court"); J.A. 13607, 15582 (Stolee Plan recommendation that "[the Charlotte-Mecklenburg school desegregation plan should be gradually changed from a mandatory plan with little voluntarism to a voluntary plan with few mandatory facets").

Furthermore, the dichotomy the *Capacchione* plaintiffs suggest between "counter[ing] demographic change," on the one hand, and remedying past discrimination, on the other, oversimplifies both the law of school desegregation, particularly the Supreme Court's deci-

---

[26]Tellingly, the dissent does not even mention this argument.

sions in *Green*, *Swann*, and *Freeman*, and the practical reality of achieving desegregation in a large urban school district. From the early stages of the *Swann* litigation, all concerned have understood that demographic patterns would complicate the process of school desegregation. Indeed, remedies such as school busing and satellite attendance zones would never have been necessary in the first place if the demography of the community were not an obstacle to desegregation. In a sense, *Swann*'s basic teaching is that the Constitution sometimes requires schools to "counter demograph[y]" in order to achieve desegregation. The *Swann* Court noted that the process of "local authorities . . . meet[ing] their constitutional obligations" had "been rendered more difficult by changes . . . in the structure and patterns of communities, the growth of student population, [and] movement of families." 402 U.S. at 14. The Court expressed concern that "segregated residential patterns . . . [would] lock the school system into the mold of separation of the races." *Id.* at 21. Thus, CMS simply followed the Supreme Court's guidance in *Swann* in regarding change as a problem inhibiting its progress toward unitary status.[27]

---

[27]The *Capacchione* plaintiffs contend that, given the obvious concern of school officials with demographic changes, "CMS could not have been motivated by any desire to comply with its court-ordered duty to eradicate vestiges of segregation." Brief of Appellees at 85. But this stands the analysis on its head. A court determines from the *effect* of their *acts*, not from their *motives*, whether school authorities comply with a desegregation decree. *See Wright v. Council of Emporia*, 407 U.S. 451, 462 (1972) ("It is difficult or impossible for any court to determine the sole or dominant motivation behind choices of a group of legislators, and the same may be said of the choices of a school board. . . . Thus we have focused upon the effect — not the purpose or motivation — of a school board's action in determining whether it is a permissible method of dismantling a dual system.") (internal quotations marks omitted). Moreover, even if motivation were relevant, the argument would fail. A fair reading of the record demonstrates that although school officials were obviously aware of the demographic shifts, they viewed these shifts as an *obstacle* to achieving compliance with the *Swann* orders and to eliminating the vestiges of discrimination in the school system, not as the condition that itself necessitated a remedy. *See, e.g.*, J.A. 13597-98, 15572-73 (Stolee Plan identifying "a growing and moving population" as one of several factors creating instability in student assignment under the pre-1992 system of pairing and satelliting); J.A. 15504 (1993 letter from CMS to the U.S. Department of Education listing "demographic and residential pat-

Moreover, *Freeman* simply did not hold, as the *Capacchione* plaintiffs necessarily imply, that demographic changes in a metropolitan area independently eliminate the vestiges of past discrimination. Nor does *Freeman* bar courts from targeting racial isolation resulting in significant part from "private choice," if that isolation is also a vestige of past discrimination. The effect of such a holding in *Freeman* would have been to overrule *Green*, which the Supreme Court did not purport to do. In *Green*, even though the school board allowed every student "freedom of choice" as to which school to attend, the formerly black school remained all black and the formerly white school remained predominantly white — wholly as a result, in some sense, of this "private choice." The *Green* Court held that, although the private choices of students and their families were responsible for the continuing racial isolation of the schools' student populations, that fact did not preclude a finding that the racial isolation was also a vestige of past discrimination. Indeed, the Court held not only that it was permissible for the school board to take further action to desegregate, but that the board was *required* to take further action in order to fulfill its "affirmative duty" to desegregate. *Green*, 391 U.S. at 437-38.

Although *Freeman* recognized that, at a certain point in the process of desegregation, a court may determine that present racial isolation cannot be considered a by-product of the past regime of segregation, the case does not require — or even empower — a school board under a judicial desegregation order to make that determination on its own. Rather, so long as CMS was under court order to desegregate, it was required to treat racial isolation in its schools as a vestige of segregation, and to take appropriate action to eliminate that vestige. *See Swann*, 402 U.S. at 26.

---

terns" as one of several increasing strains on the pairing system); J.A. 2712 (testimony of former CMS Superintendent John Murphy that "[w]e really weren't going to be bringing about desegregation and racially balanced schools unless we began to address the issue of housing at the same time."). The Board may have chosen sites for new schools in response to, or even in furtherance of, these demographic trends, *see supra*, but in any event the Board also clearly evidenced awareness that the population changes, particularly the greater distance between white and black population centers, would put a greater strain on the process of desegregation.

## C.

Finally, the *Capacchione* plaintiffs maintain that, even if CMS administered the expanded magnet schools program pursuant to and in conformity with the governing desegregation decrees, CMS violated the Constitution in doing so. Judge Potter rejected this argument, as do we (and the dissent, in never mentioning it, apparently also rejects it). The *Capacchione* plaintiffs rely on inapposite case law in attempting to establish that Board actions taken pursuant to court-ordered desegregation decrees can be held unconstitutional.

Specifically, they rely on recent decisions finding *voluntary*, race-conscious magnet school programs (not developed under a governing desegregation order) unconstitutional. *See Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123, 125 (4th Cir. 1999); *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698 (4th Cir. 1999); *see also Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998). In fact, the courts emphasized in those cases that the school system had *not* been under a court order to desegregate, *see Eisenberg*, 197 F.3d at 124, and had adopted a magnet program "*not* to remedy past discrimination, but rather to promote racial, ethnic, and socioeconomic diversity." *Tuttle*, 195 F.3d at 700 (emphasis added); *see also Wessman*, 160 F.3d at 792 (noting that prior to instituting its magnet program the school system "had achieved unitariness in the area of student assignments" and that "the district court thereupon relinquished control over" that area). Indeed, in *Eisenberg* we endorsed the *permissibility* of race-based classifications "in situations," like that at hand, "where past constitutional violations require race-based remedial action." 197 F.3d at 130 (citing *Swann*, 402 U.S. at 1); *see also Wessmann*, 160 F.3d at 795.

The distinction between a unitary school system and a school system under court order to desegregate is, from a legal standpoint, fundamental. Furthermore, as discussed *supra*, it is the judicial finding of unitary status, not any particular action by the school board or condition in the school system, upon which the distinction turns. Of course, for a formerly segregated school system, the attainment of unitary status reflects years or decades of gradual change, not an overnight shift in policy or outlook. Although CMS will not look much different the day it becomes unitary than it will have looked the previous day, attainment of unitary status triggers significant legal conse-

quences. In a non-unitary school system, all one-race or predominantly one-race schools are presumed to be vestiges of segregation, and the burden is on the challenging party to show that those schools are nondiscriminatory. *See Swann*, 402 U.S. at 26 ("The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part."). Once a court has declared a school system unitary, on the other hand, the presumption is that the vestiges of segregation have been eliminated, and a plaintiff seeking to demonstrate a constitutional violation on the basis of the existence of one-race or predominantly one-race schools must "prove discriminatory intent on the part of the school board." *Riddick*, 784 F.2d at 537.

As Judge Potter recognized, *see Capacchione*, 57 F. Supp. 2d at 285, CMS implemented and administered its expanded magnet schools program *prior* to ever achieving unitary status and while still *under court order* to remedy the vestiges of segregation. Therefore, recent decisions, like *Eisenberg* and *Tuttle*, addressing the constitutionality of magnet school assignment policies in unitary school systems *not* under court order, are simply inapposite.

Moreover, even if *Tuttle* and *Eisenberg* generally applied to governmental acts performed pursuant to remedial desegregation orders (which they do not), the Board's expanded magnet schools program would withstand constitutional scrutiny. This is so because if a precedent of the Supreme Court "has direct application in a case," inferior courts must follow that precedent "even if later cases appear to call it into question, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

There could hardly be a clearer case for application of this principle. Here, the Supreme Court's *Swann* decision itself constitutes directly controlling precedent. In *Swann*, the Court concluded that CMS could be constitutionally required to make efforts "to reach a 71-29 ratio" in the schools under its authority, and to assign students "in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students." *See* 402 U.S. at 23-25 (approving Judge McMillan's order).

Indeed, the Supreme Court again noted in *Freeman* that its decision in *Swann* specifically approved racial balancing by CMS to achieve the remedial end of eliminating the vestiges of segregation. 503 U.S. at 493 (In *Swann*, "[w]e confirmed that racial balance in school assignments was a necessary part of the remedy in the circumstances there presented."). Under the principle articulated in *Agostini*, only the Supreme Court itself can modify the decrees in this case to prohibit what *Swann* so clearly permitted.

### D.

The Supreme Court's decision in *Swann* is the law of the case; it must be followed. But more than just the law of this case, for almost thirty years *Swann* also has functioned as a blueprint for school desegregation in school districts throughout this Nation. As long as *Swann* is controlling law, and as long as the Board acts pursuant to the *Swann* desegregation orders — as it did in implementing the expanded magnet schools program — it cannot be held to have violated the Constitution.

### IV.

Judge Potter also enjoined CMS from "assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race." *Capacchione*, 57 F. Supp. 2d at 294. In considering the propriety of an injunction, we review factual findings only for clear error, but the "district court's application of legal principles . . . presents a legal question reviewed *de novo*." *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 601 (4th Cir. 1992).

Given the Court's holding today that CMS did not violate the constitutional rights of the *Capacchione* plaintiffs by consideration of race in its expanded magnet schools program, and because we would also hold that CMS has not yet achieved unitary status, there is, in our view, no legal basis for the district court's injunction. Moreover, even if the district court properly determined that CMS had attained unitary status, the injunction still must be vacated. This is so because the district court could issue an injunction only to the extent that it con-

cluded that CMS was likely to persist in current practices that would violate the Constitution if undertaken outside of the remedial context. *See United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952). Judge Potter made no such finding.

Indeed, the only CMS action that Judge Potter held to violate the Constitution was the expanded magnet schools program (a holding that this Court has now reversed); the judge did not consider the constitutionality of any other method of student assignment or resource allocation. Yet the injunction by its terms prohibits any consideration of race by CMS in student assignment or allocation of educational benefits that "den[ies] students an equal footing." *Capacchione*, 57 F. Supp. 2d at 294. The injunction thus goes much further than simply prohibiting CMS from reinstituting the expanded magnet schools program and its race-conscious assignment policy.

This court has repeatedly held similar injunctions too broad, explaining that "[a]lthough injunctive relief should be designed to grant the relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation." *Hayes*, 10 F.3d at 217; *see also Tuttle*, 195 F.3d at 708. Similarly, the Supreme Court has directed "[f]ederal court decrees must directly address and relate to the constitutional violation itself." *Milliken*, 433 U.S. at 282. Because the injunction issued in this case did not do this, it must be vacated.

## V.

In addition to injunctive relief, the district court awarded nominal damages of one dollar to the *Capacchione* plaintiffs "to vindicate the constitutional rights of children denied an equal footing in applying to magnet schools." *Capacchione*, 57 F. Supp. 2d at 290. Because a majority of the Court holds that the expanded magnet schools program did not violate the Constitution, it follows that the nominal damages award must also be vacated.

## VI.

The district court awarded the *Capacchione* plaintiffs $1,499,016.47, plus interest, in attorney's fees, pursuant to 42 U.S.C.

§ 1988 (1994). *See Capacchione v. Charlotte-Mecklenburg Schs.*, 80 F. Supp. 2d 557 (W.D.N.C. 1999) (amended by orders of December 16, 1999, J.A. 1313-15, and March 6, 2000, J.A. 1356-62). Under § 1988, a court is only permitted to award fees when a "party, other than the United States" prevails in an "action to enforce" the Constitution or specific federal civil rights statutes. 42 U.S.C. § 1988. Because the *Capacchione* plaintiffs have not prevailed on any constitutional or other claim providing a basis for statutory attorney's fees, the $1.49 million fee award must be vacated in its entirety.

We note initially that this Court's reversal of the district court's finding that CMS's magnet schools program violates the Constitution obviously means that all attorney's fees awarded in connection with the *Capacchione* plaintiffs' previous success on this issue must be vacated. The district court apparently based much of its attorney's fees award on this ground. *See Capacchione*, 80 F. Supp. 2d. at 559 (awarding attorney's fees in part because the "Court found for Plaintiff Capacchione on the *core of his claim* that CMS violated Cristina Capacchione's constitutional rights under the Equal Protection Clause") (emphasis added). Our Court today not only holds that CMS did not violate the *Capacchione* plaintiffs' constitutional rights in adopting the expanded magnet schools program, but also reverses and vacates the district court's attendant orders for injunctive and monetary relief. As the *Capacchione* plaintiffs themselves recognize, it is "self-evident" that they cannot recover attorney's fees "if this Court reverses on the order appealed from." Brief of Appellees at 113 n.51. Given the reversal of the magnet schools ruling, the award of attorney's fees attendant to it must be vacated.

The dissent maintains, however, that because this Court has also upheld Judge Potter's unitary status ruling, the *Capacchione* plaintiffs are entitled to an award of *some* attorney's fees. *See* Traxler Op. at 66.[28] Our Court properly rejects this notion because the unitary status

---

[28]Contrary to the dissent's contentions, CMS did not concede that if the Grant intervenors obtained *only* a declaration of unitary status, without an injunction or determination that CMS violated the Constitution, they would be entitled to attorney's fees. CMS actually stated:

Unlike Capacchione, the Grant intervenors were granted declaratory and injunctive relief related to the issues of unitary status

determination alone simply provides no basis for an award of attorney's fees. *See also* Wilkinson Op. at 72 & n.1.

Just a few weeks ago, the Supreme Court removed all doubt in this area. In *Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health and Human Res.*, ___ U.S. ___, ___, 121 S. Ct. 1835, 1839 (2001), the Court reiterated that "[i]n the United States, parties are ordinarily required to bear their own attorney's fees — the prevailing party is not entitled to collect from the loser." In accord with the traditional "American Rule," courts may not award attorney's fees to the prevailing party absent explicit statutory authority. *See id.* (citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)). Indeed, in *Buckhannon*, the Supreme Court noted that statutory authority to award attorney's fees is critical, for "Congress ha[s] not 'extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted.'" *Buckhannon*, 121 S. Ct at 1843 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260 (1975)).

In this case, there is simply no statutory basis for an award of fees to the *Capacchione* plaintiffs on the sole issue on which they have prevailed, namely the unitary status determination. Although a majority of this Court has regrettably, and we believe mistakenly, determined that CMS has attained unitary status, no member of the Court suggests that in doing so, or in not doing so sooner, CMS violated 42 U.S.C. §§ 1981, 1983, 2000d, the Fourteenth Amendment of the Constitution, or any other law or constitutional provision that would give rise to an award of attorney's fees under § 1988 or any other statute.[29]

---

*and CMS' magnet school admission policies*. Therefore, the entitlement of the Grant intervenors to recover attorneys' fees is tied directly to the merits of those claims.

Brief of Appellants at 40 (emphasized language omitted in dissent, *see* Traxler Op. at 66). Of course, no plaintiff prevailed on the claim that the "magnet school admission policies" violated the Constitution, or any other claim that provided a statutory basis for attorney's fees. Moreover, even if CMS had conceded to the contrary, there would be no basis for a fee award.

[29]We note that if CMS itself had succeeded in simply obtaining a declaration that its school system was now unitary, no one would contend that the Board would be entitled to an award of fees. Given this, how can the *Capacchione* plaintiffs, operating as a "private attorneys general" on behalf of the Board, Traxler Op. at 68, be entitled to fees?

While some of the *Capacchione* plaintiffs had alleged that CMS's failure to obtain a declaration that it had attained unitary status violated their constitutional rights, Judge Potter *never so held*. Tellingly, on appeal, the *Capacchione* plaintiffs do not assert this position, let alone offer any support for it. Nor does any member of this Court embrace this unprecedented theory. Thus, there is no basis for an award of attorney's fees here.

We note that, even if § 1988 somehow applied to a mere finding of unitary status, absent some additional finding of a constitutional or civil rights violation, the *Capacchione* plaintiffs would still not be entitled to attorney's fees because they do not qualify as "prevailing part[ies]." In order to be a "prevailing party," a party seeking fees must have obtained "an enforceable judgment . . . consent decree or settlement." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). Additionally, there must be some defendant in the case who has been "prevailed against," *id.* at 109, with a resulting "material alteration of the legal relationship" between that defendant and the party seeking fees, *id.* at 111.

This prevailing party requirement is crucial: in *Buckhannon*, the Supreme Court rejected the so-called "catalyst theory" of attorney's fees on the ground that it might permit an award "where there is no judicially sanctioned change in the legal relationship of the parties." *Buckhannon*, 121 S. Ct. at 1840. By simply obtaining a declaration that the Board has achieved unitary status, the *Capacchione* plaintiffs have not obtained "an enforceable judgment, consent decree, or settlement;" they have not "prevailed against" CMS; nor have they effected a "material alteration of the legal relationship" between the parties.

Indeed, the declaration of unitary status merely restores the parties to the status quo prior to the issuance of the desegregation decree. Such a declaration does not constitute "an enforceable judgment" for the *Capacchione* plaintiffs. The dissent is mistaken in its assertion that a unitary status declaration is "enforceable against CMS in the unlikely event it later attempts to continue prior assignment policies." Traxler Op. at 68. Any challenge to future race-based assignment policies would be on the ground that they violate the Constitution, not that they violate a declaration of unitary status. Thus, a future challenge would seek to "enforce" the Constitution, not the unitary status

determination. This point highlights the heart of the dissent's misunderstanding. Section 1988 exists to provide attorney's fees for those plaintiffs who demonstrate that they suffered deprivations of rights under federal civil rights laws or the Constitution. Today, a majority of this Court has held that the *Capacchione* plaintiffs have suffered no such deprivation; thus, they are not entitled to statutory attorney's fees.

Although the declaration of unitary status represents a rejection of the legal position that CMS has taken in this litigation, such a defeat is not tantamount to being "prevailed against" under § 1988. *See Buckhannon*, 121 S. Ct. at 1841 ("We cannot agree that the term 'prevailing party' authorizes federal courts to award attorney's fees to a plaintiff who . . . has reached the 'sought-after destination' without obtaining any judicial relief."). Rather, the primary significance of a declaration of unitary status is that CMS has been successful; it has eradicated the vestiges of past discrimination to the extent practicable and, as the *Capacchione* plaintiffs put it, obtained a "return of control to local authorities." Brief of Appellees at 34. The Board, upon a declaration of unitariness, now actually has wider latitude to assign students than it did while it was under court order to remedy past discrimination (although certain race-conscious policies might no longer be permissible). Accordingly, this declaration of Board success, and attendant broadening of the Board's discretion, does not constitute an alteration of the parties' legal relationship "in a way that *directly benefits* the plaintiff." *Farrar*, 506 U.S. at 112 (emphasis added). Without more, the declaration that CMS has achieved unitary status does not place any direct benefit on the *Capacchione* plaintiffs, who "obtain[ ] nothing from the defendants." *Hewitt v. Helms*, 482 U.S. 755, 761-62 (1987).[30]

---

[30]The dissent's contention that the *Capacchione* plaintiffs helped "in making unitariness a reality" underscores the dissent's confusion as to the difference between seeking injunctive relief to eliminate illegal segregation connected with a dual school system with a declaration that this has been done. The former is an action to "enforce" civil rights laws and the Constitution — and therefore contemplated by § 1988 — and the latter is a statement that earlier enforcement efforts have succeeded for reasons having nothing to do with the *Capacchione* plaintiffs' lawsuit.

Moreover, "only those changes in a defendant's conduct *which are mandated* by a judgment . . . in the case at bar may be considered by the court in determining the plaintiff's success at trial" for purposes of attorney's fees under § 1988. *Clark v. Sims*, 28 F.3d 400, 425 (4th Cir. 1994) (emphasis added). In affirming the district court's unitary status determination, this Court does not mandate that CMS engage in any "conduct" whatsoever, but simply holds that "CMS has complied in good faith with the mandate of *Brown*," and that the "dual system has been dismantled." Traxler Op. at 43. By vacating the award of nominal damages and injunctive relief, this Court has removed any "mandate" on the actions of the district court. Having been determined to be unitary, CMS is now free to take whatever action it wishes consistent with the Constitution.

Thus, the *Capacchione* plaintiffs' suit seeking a declaration of unitary status was not an "action to enforce" the civil rights laws under § 1988. Rather, these plaintiffs sought a declaration that CMS has complied with judgments obtained by the *Swann* plaintiffs in *previous actions* to enforce civil rights. Although the *Capacchione* plaintiffs brought separate § 1983 claims asserting that the expanded magnet schools program violated the Equal Protection Clause, they have not "prevail[ed]" on those claims.

In sum, not only is there no statutory authority to award attorney's fees here, but even if such authority were present, the *Capacchione* plaintiffs are not prevailing parties under § 1988. For these reasons, there is no basis for an award of any attorney's fees in this case.

## VII.

Finally, CMS appeals the district court's order awarding sanctions — including legal fees and costs — to the *Capacchione* plaintiffs arising from a discovery dispute. In the months before trial, CMS did not respond to interrogatories by the *Capacchione* plaintiffs seeking disclosure of fact witnesses. Instead, the Board waited until the week before trial to reveal the names of most of its fact witnesses, providing the *Capacchione* plaintiffs with a list of 174 names which it ultimately narrowed to twenty-six potential witnesses. The Board maintains that its actions complied with the district court's pretrial order, which required the parties to provide a list of fact witnesses to

each other "[n]o later than the morning of the first day of trial." J.A. 150.

The district court, however, granted the *Capacchione* plaintiffs' motion for sanctions. The court held that it had established the rules for disclosure of fact witnesses in an order of September 1998, which superseded the pretrial order. The September 1998 order denied the *Capacchione* plaintiffs' motion to compel disclosure of witnesses prior to the date established in the pretrial order for disclosure of expert witnesses, but the court stated that "CMS must supplement its responses, as it promised, when such information becomes known." J.A. 195. In awarding sanctions, the district court also indicated its concern that CMS had been "lacking candor in disclosing relevant and important information" during the pretrial stage, that the disclosure of a list of 174 potential witnesses in the week before trial was "extremely prejudicial to opposing counsel," and that many of the witnesses on the list may have been "irrelevant or unnecessarily cumulative." J.A. 305. As a result, the district court ordered a one-week recess after the *Capacchione* plaintiffs' presentation at trial to allow them to depose, at the school system's expense, any of the twenty-six witnesses on the Board's revised list. Witnesses whom the Board did not make available for deposition or interview during the mid-trial recess were barred from testifying.

"Rule 37(d) of the Federal Rules of Civil Procedure gives the district court wide discretion to impose sanctions for a party's failure to comply with its discovery orders." *Mutual Fed. Sav. & Loan Ass'n v. Richards & Ass'ns., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989). CMS could plausibly have understood the deadline for disclosure of fact witnesses contained in the pretrial order to have continued in effect after the subsequent September 1998 order given that the subsequent order's central effect was to *reaffirm* the deadline contained in the pretrial order for disclosure of expert witnesses. Nonetheless, we cannot say that the district court abused its broad discretion in finding that its September 1998 order did in fact supersede the pretrial order, and that the Board's pretrial conduct had been unnecessarily dilatory and prejudicial to the *Capacchione* plaintiffs. Therefore the order of sanctions against CMS must be affirmed.

## VIII.

We must and do sympathize with those who are impatient with continued federal court involvement in the operation of local schools. One might consider thirty-five years a long time for a school district to operate under judicial desegregation decrees. However, when the Supreme Court decided *Swann* in 1971 no one could reasonably have thought that the substantial task described there would be quickly or easily accomplished. CMS, which maintained a separate, decidedly unequal dual educational system for decades — and which mightily resisted desegregation of any sort for years after it became the law of the land — has come a long way. Although CMS has now achieved unitary status in certain respects, the record in this case simply does not support a determination that the process of desegregation is at an end.

For more than a hundred years, in fits and starts, our nation has attempted to undo the effects of its shameful heritage of slavery. For nearly fifty years, federal courts have struggled with the task of dismantling legally enforced racial segregation in many of our schools. This task has given rise to one of the preeminent issues of constitutional law in our time. We do not yet know how history will regard the courts' role in adjudicating and presiding over the desegregation of schools. It may be seen as a brief and unfortunate jurisprudential anomaly, justified only by the immediacy of the evil it was intended to uproot, *cf. Freeman*, 503 U.S. at 505-07 (Scalia, J., concurring); or it may be recognized as the necessarily sustained effort to eradicate deep-seated vestiges of racial discrimination and to vindicate the promise of the Fourteenth Amendment, *cf. Dowell*, 498 U.S. at 266-68 (Marshall, J., dissenting); or it may be viewed in some other way that we cannot now anticipate.

But we are certain that the end of this great task must be accomplished in an orderly manner, consistent with and true to its origin. We are certain, too, that if the courts, at some point, come to view the effort to eliminate the vestiges of segregation as having been overly "race-conscious," they must do so with a clear assessment of the historical record.

Race neutrality, of course, represents one of our constitutional ideals. Properly understood, it is an ideal not at all in tension with our

obligation as a society to undo the effects of slavery and of the racial caste system that was perpetuated, for more than a century, in slavery's wake. But we must be ever mindful, as we strive for race neutrality, that a reductive and willfully ahistorical conception of race neutrality was, in an earlier era, used as a blunt instrument against the aspirations of African-Americans merely seeking to claim entitlement to full citizenship.

In striking down early civil rights legislation, the Supreme Court embraced this misconceived race neutrality, reasoning, only twenty years after the issuance of the Emancipation Proclamation, that the legislation at issue would illegitimately make black citizens "the special favorite of the laws." *Civil Rights Cases*, 109 U.S. 3, 25 (1883). Indeed, the system of segregation with which we are concerned was justified at its inception by a particular conception of race neutrality — that a regime of racial separation could be constitutionally justified so long as it applied neutrally and equally to persons of all races. *See Plessy v. Ferguson*, 163 U.S. 537, 551 (1896) ("We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority.").

The first Justice Harlan, dissenting in *Plessy*, declared our Constitution to be "color-blind," *id.*, 163 U.S. at 559, and in doing so provided one of the most famous and compelling articulations of the constitutional guarantee of equality. But in urging us to be "blind" to race, Justice Harlan did not, as is sometimes suggested, suggest that we be ignorant of it. In *Plessy*, he was the only member of the Court willing to acknowledge the most obvious truth about segregation: "Everyone knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied or assigned to white persons." *Id.* at 557. Thirteen years earlier, dissenting in the *Civil Rights Cases*, Justice Harlan rejected the notion that civil rights legislation made blacks a "special favorite of the laws," *id.*, 109 U.S. at 61, and he criticized the majority's reasoning as "narrow and artificial." *Id.* at 26.

We recognize now, as Justice Harlan recognized then, that no simple syllogism can enfold all of history's burdens and complexities.

Eliminating race-consciousness from government decision making must be regarded as among our worthiest constitutional aspirations. But that aspiration surely cannot be so rigid that it refuses to distinguish the "race consciousness" that created a segregated school system and the race-conscious efforts necessary to eliminate that system. While most judges are not historians, we must be willing to acknowledge and confront our history. If we fail to do so, we risk falling into a mode that equates the cure with the disease: civil rights with favoritism, desegregation with segregation. As American citizens, we know better.

We are honored to state that Judge Michael and Judge Gregory join in this opinion.